George M. Lee (SBN 172982)
gml@seilerepstein.com
**SEILER EPSTEIN LLP**
275 Battery Street, Suite 1600
San Francisco, California 94111
Phone: (415) 979-0500
Fax: (415) 979-0511

Raymond M. DiGuiseppe (SBN 228457)
law.rmd@gmail.com
**THE DIGUISEPPE LAW FIRM, P.C.**
4320 Southport-Supply Road, Suite 300
Southport, North Carolina 28461
Phone: 910-713-8804
Fax: 910-672-7705

Adam Kraut, Esq. (admitted *pro hac vice*)
akraut@fpclaw.org
**FIREARMS POLICY COALITION**
1215 K Street, 17th Floor
Sacramento, CA 95814
(916) 476-2342

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

# FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JANICE ALTMAN, an individual, et al.<br><br>                    Plaintiffs,<br><br>        vs.<br><br>COUNTY OF SANTA CLARA,<br>CALIFORNIA, et al.<br><br>                    Defendants. | Case No. 4:20-cv-02180-JST<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' APPLICATION FOR TEMPORARY RESTRAINING ORDER, AND/OR, IN THE ALTERNATIVE, ISSUANCE OF A PRELIMINARY INJUNCTION**<br><br>Date:        TBA<br>Time:        TBA<br>Location:    TBA<br>Judge:       Hon. Jon S. Tigar<br><br>First Amended Complaint Filed Apr. 10, 2020 |

## <u>TABLE OF CONTENTS</u>

I.   INTRODUCTION ................................................................................................................. 1

II.  STATEMENT OF FACTS .................................................................................................. 3

III. ARGUMENT ..................................................................................................................... 11

   A. STANDARD ................................................................................................................. 11

   B. PLAINTIFFS WILL SUCCEED ON THE MERITS OF THEIR CLAIMS. .................................. 11

      1. Defendants' Orders and Enforcement Actions Infringe and Deny Fundamental,
         Individual Second Amendment Rights. ................................................................. 12

         (a) Defendants' Orders and Enforcement Actions Are a Prohibition
             on Second Amendment Rights and Categorically Unconstitutional.. ............. 13

         (b) The Orders Cannot Survive Any Level of Scrutiny. ...................................... 15

      2. Defendants' Orders, and Enforcement Thereof, Violate Due Process. ................... 20

   C. THE DESTRUCTION OF CONSTITUTIONAL RIGHTS
      CONSTITUTES IRREPARABLE INJURY. ........................................................................... 23

IV. CONCLUSION ................................................................................................................... 25

## TABLE OF AUTHORITIES

### CASES

*Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127 (9th Cir. 2011) .................................... 11

*Am. Trucking Ass'ns, Inc. v. City of Los Angeles*, 559 F.3d 1046 (9th Cir. 2009) ........................ 11

*Andrews v. State*, 50 Tenn. 165 (1871) ............................................................................... 12

*Arizona Dream Act Coalition v. Brewer*, 757 F.3d 1053 (9th Cir. 2014) .................................... 24

*Ass'n of New Jersey Rifle & Pistol Clubs, Inc. v. Attorney Gen. New Jersey*,
   910 F.3d 106 (3d Cir. 2018) ............................................................................................ 18

*Associated Press v. Otter*, 682 F.3d 821 (9th Cir. 2012) .......................................................... 14

*Bateman v. Purdue*, 881 F.Supp.2d 709 (E.D. N.C. 2012) .................................................. 16, 17

*Bauer v. Becerra*, 858 F.3d 1216 (9th Cir. 2017) .................................................................... 16

*Board of Trustees of State Univ. of New York v. Fox*, 492 U.S. 469 (1989) ................................ 17

*Bonidy v. U.S. Postal Serv.*, 790 F.3d 1121 (10th Cir. 2015) ...................................................... 18

*Carey v. Population Servs., Int'l*, 431 U.S. 678 (1977) ............................................................... 13

*Citizens United v. Fed. Election Comm'n*, 558 U.S. 310 (2010) ................................................ 16

*District of Columbia v. Heller*, 554 U.S. 570 (2008) ...........................................................*passim*

*Duncan v. Becerra*, 265 F.Supp.3d 1106 (S.D. Cal. 2017),
   aff'd, 742 F.App'x 218 (9th Cir. 2018) .......................................................................... 16, 24

*Edenfield v. Fane*, 507 U.S. 761 (1993) ............................................................................. 17, 19

*Elrod v. Burns*, 427 U.S. 347 (1976) ................................................................................. 14, 23

*Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011) .......................................................*passim*

*Gonzales v. Carhart*, 550 U.S. 124 (2007) ............................................................................. 22

*Grace v. District of Columbia*, 187 F.Supp.3d 124 (D.D.C. 2016) ............................................ 24

*Grayned v. City of Rockford*, 408 U.S. 104- (1972) .................................................................. 23

– iii –

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' APPLICATION FOR TEMP RESTRAINING ORDER,
OR ISSUANCE OF A PRELIMINARY INJUNCTION | CASE NO. 4:20-cv-02180-JST

*Greater New Orleans Broad. Ass'n, Inc. v. United States*, 527 U.S. 173 (1999) ...................17, 19

*Heller v. District of Columbia*, 801 F.3d 264 (D.C. Cir. 2015) ("*Heller III*") ..............................18

*Illinois Ass'n of Firearms Retailers v. City of Chicago*, 961 F.Supp.2d 928 (N.D. Ill. 2014).......12

*Italian Colors Rest. v. Becerra*, 878 F.3d 1165 (9th Cir. 2018) .....................................................17

*Jackson v. City & Cty. of San Francisco*, 746 F.3d 953 (9th Cir. 2014).......................................12

*Kolender v. Lawson*, 461 U.S. 352 (1983) .....................................................................................22

*Leiva-Perez v. Holder*, 640 F.3d 962 (9th Cir. 2011).....................................................................11

*Luis v. United States*, 136 S.Ct. 1083, 194 L.Ed.2d 256 (2016).....................................................13

*Mance v. Sessions*, 896 F.3d 699 (5th Cir. 2018) ...........................................................................13

*McCullen v. Coakley*, 134 S.Ct. 2518 (2014) ................................................................................18

*McCulloch v. State*, 17 U.S. 316, 415 (1819) ..................................................................................1

*McDonald v. City of Chicago*, 561 U.S. 742 (2010) ......................................................................12

*Melendres v. Arpaio*, 695 F.3d 990 (9th Cir. 2012) .......................................................................23

*Monterey Mech. Co. v. Wilson*, 125 F.3d 702 (9th Cir. 1997) ......................................................24

*Moore v. Madigan*, 702 F.3d 933 (7th Cir. 2012) ..........................................................................18

*Ms. L. v. U.S. Immigration and Customs Enforcement*, 310 F.Supp.3d 1133 (S.D. Cal. 2018)....24

*Norsworthy v. Beard*, 87 F.Supp.3d 1164 (N.D.Cal. 2015) ...........................................................23

*Richmond Newspapers v. Virginia*, 448 U.S. 555 (1980)...............................................................12

*Rodriguez v. Robbins*, 715 F.3d 1127 (9th Cir. 2013)....................................................................24

*Tattered Cover v. City of Thornton*, 44 P.3d 1044 (Colo. 2002) ...................................................12

*Turner Broad. Sys., Inc.*, 520 U.S. 180 (1997) ..............................................................................17

*United States v. Alvarez*, 617 F.3d 1198 (9th Cir. 2010) ...............................................................16

*United States v. Chovan*, 735 F.3d 1127 (9th Cir. 2013)..........................................................15, 16

*United States v. Reese*, 627 F.3d 792 (10th Cir. 2010) ................................................................ 18

*United States v. Williams*, 553 U.S. 285 (2008) ........................................................................ 23

*Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489 (1982) ................ 23

*Ward v. Rock Against Racism*, 491 U.S. 781 (1989) .................................................................... 18

*Winter v. Nat. Res. Def. Council*, 555 U.S. 7 (2008) .................................................................. 11

*Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952) .................................................... 1

S̲TATUTES

Cal. Pen. Code § 27540 ............................................................................................................ 14

Cal. Pen. Code § 27545 ............................................................................................................ 14

Cal. Pen. Code § 28175 ............................................................................................................ 14

Cal. Pen. Code § 28200 ............................................................................................................ 14

Cal. Pen. Code § 30312 ............................................................................................................ 14

O̲THER A̲UTHORITIES

Charles Alan Wright et al., *Federal Practice and Procedure* § 2948.1 (2d ed. 1995) .................. 23

## I.    INTRODUCTION

The "constitution [was] intended to endure for ages to come, and consequently, to be adapted to the various *crises* of human affairs." *McCulloch v. State*, 17 U.S. 316, 415 (1819). Indeed, "the forefathers … knew what emergencies were, knew the pressures they engender for authoritative action, knew, too, how they afford a ready pretext for usurpation." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 650 (1952) (Jackson, J., concurring). And, "they made no express provision for exercise of extraordinary authority because of a crisis." *Id.* (Jackson, J., concurring). Put differently, the Constitution's protections remain robust through peace and turmoil. A declaration of emergency does not justify the denial or destruction of a constitutionally enumerated fundamental right – not even for a limited period of time.

In California, individuals must generally acquire all modern firearms and ammunition from and/or through duly licensed retailers by means of in-person transactions. (Pen. Code §§ 27545; 28050, et seq.; 30342, et seq.; 30370, et seq.). And, with few exceptions, only individuals holding a valid Firearm Safety Certificate ("FSC") can acquire and take possession of firearms. (Pen. Code § 26840.) Moreover, because of the State's waiting period laws and background check systems, individual purchasers and transferees must visit a retailer at least once for ammunition, and at least twice for firearms. Therefore, under these laws, the only way for a Californian to take possession of firearms and ammunition for their self-defense and lawful purposes is through in-person transactions. By their Orders and actions shuttering and criminalizing both operating retailers and shooting ranges, and going to and from retailers and ranges, shuttered firearm and ammunition retailers, Defendants have made it impossible for Plaintiffs, Plaintiffs' members and customers, and similarly situated individuals to purchase firearms and ammunition during this time of extended insecurity by prohibiting the operation of retailers, and the right of individuals to go to and from them, for an indefinite period of time, and until Defendants say so. Defendants have used the COVID-19 pandemic to deprive Californians of their fundamental rights – through mere executive decree, no less – in Orders and enforcement actions affecting millions of people in thousands of square miles—an entire region.

While Defendants have a legitimate interest in reducing the population's exposure to

1   COVID-19, the extreme manner in which Defendants are doing so – a total ban – is unlawfully

2   overbroad, irrationally tailored to meet that goal, and categorically unconstitutional. The

3   "enshrinement of constitutional rights necessarily takes certain policy choices off the table."

4   *Heller,* 554 U.S. at 636. These include policy choices and orders effecting an absolute

5   prohibition on the exercise of Second Amendment rights. *Id.* Licensed firearm and ammunition

6   retailers and shooting ranges are essential businesses, provide law-abiding individuals with

7   critical access to constitutionally protected rights, and must remain open like other *essential*

8   businesses.

9          Times of uncertainty and disturbance are *precisely when the right to self-defense is most*

10  *important*. When the Second Amendment was ratified, "Americans understood the 'right of self-

11  preservation' as permitting a citizen to 'repel force by force' when 'the intervention of society in

12  his behalf, may be too late to prevent an injury.'" *District of Columbia v. Heller*, 554 U.S. 570,

13  595 (2008) (quoting 1 Blackstone's Commentaries 145–46, n.42 (1803)) (brackets omitted). A

14  global pandemic epitomizes a setting in which waiting for "the intervention of society" on one's

15  behalf may be too late.

16         Through their Orders and enforcement actions, Defendants have implemented a number

17  of shockingly broad restrictions that affect both individuals and critically essential small

18  businesses. But not *all* individuals and businesses are affected alike. Some are favored by

19  Defendants and remain open to the public, while others, like Retailer Plaintiffs herein and others

20  similarly situated to them, are threatened with incarceration, fines, and the loss of their

21  livelihoods. But Defendants also threaten, on pain of criminal penalty, those individuals, like

22  Plaintiffs', Plaintiffs' members and customers, and others like them, should they dare exercise

23  their rights (and legal obligation) to go to and use a retailer for the lawful acquisition of

24  constitutionally protected items and services for self-defense. Criminalizing going to, coming

25  from, and operating essential businesses that provide access to the constitutionally protected right

26  to keep and bear arms for self-defense — especially in a manner that is inconsistent with other

27  so-called "essential businesses"— cannot withstand constitutional scrutiny or even rational

28  objectivity. The injunctive relief that Plaintiffs have been forced to seek through this action is

1  necessary – and immediately so – to uphold this bedrock principle of the United States

2  Constitution.

3  ## II.    STATEMENT OF FACTS

4  ### *State Orders Background*

5       In response to the COVID-19 coronavirus pandemic, on March 17, 2020, Governor

6  Newsom told reporters that his declaring martial law was an option if he feels it necessary.[1]

7  Governor Newsom then signed Executive Order N-33-20 on March 19, 2020. ("Executive

8  Order"). See Decl. of George M. Lee ("Lee Decl.") **Ex. 1**. Governor Newsom's Executive Order

9  included an order from Dr. Sonia Y. Angell, the State Public Health Officer. On March 22, 2020,

10  Dr. Angell issued a list of "Essential Critical Infrastructure Workers." Taken together, the State's

11  Orders directed "all individuals living in the State of California to stay home or at their place of

12  residence." The only exceptions are for whatever is "needed to maintain continuity of operations

13  of the federal critical infrastructure sectors." The State Orders granted Dr. Angell the authority to

14  "designate additional sectors as critical in order to protect the health and well-being of all

15  Californians," but do not identify any additional sectors nor indicate which sectors may qualify

16  as critical. These Orders took effect "immediately" and remain in effect indefinitely. Then, on

17  April 3, 2020, counsel for Gov. Newsom and Public Health Officer Angell represented to the

18  court in another federal action that, "As the Governor has publicly confirmed, the Executive

19  Order does not mandate the closure of firearms and ammunition retailers. To the extent any local

20  official acting on his or her own authority requires the closure of those retailers, such actions do

21  not concern the Executive Order."[2]

22

23  _____

24  [1] "We have the ability to do martial law . . . if we feel the necessity."
25  https://www.independent.co.uk/news/world/americas/coronavirus-california-martial-law-shelter-in-place-lockdown-army-a9410256.html.

26  [2] State Defs.' Opp. Pls.' Ex Parte App. Temp. Restraining Ord., *Brandy v. Villanueva*, C.D.Cal
27  No. 2:20-cv-02874-AB-AK, online at
28  https://www.courtlistener.com/recap/gov.uscourts.cacd.777785/gov.uscourts.cacd.777785.24.0_1.pdf. The *Brandy* matter involved similar orders at issue; see infra at p. 11.

*Santa Clara County Orders and Enforcement*

On March 16, 2020, the Public Health Department of the County of Santa Clara issued an order directing all residents of the County to shelter in place until April 7, 2020.[3] On March 31, 2020, the Public Health Department of Santa Clara issued an additional order superseding the March 16, 2020 Order and directing all residents of the County to continue to shelter in place until May 3, 2020.[4] (Lee Decl., **Ex. 3**.) Under the March 31 Order, firearm and ammunition retailers and ranges are not "Essential Businesses."

Plaintiff Janice Altman, a resident of Santa Clara County, would like to purchase, take possession of, and train with firearms and ammunition for self-defense. Ms. Altman is concerned that as a result of the COVID-19 crisis, Santa Clara County has released prison inmates onto the streets of Santa Clara County who otherwise would have remained incarcerated. (Altman Decl. ¶ 5; Lee Decl. **Ex. 4**.) Ms. Altman is not prohibited from possessing firearms under state or federal law, and possesses a valid FSC. She could take possession of a purchased firearm and ammunition upon completion of a background check. She resides minutes away from Reed's Indoor Range, a well-known firearm and ammunition retailer, indoor shooting range, and training facility shuttered by the Santa Clara District Attorney, according to the retailer's Website. (Lee Decl., **Ex. 5**.) She resides minutes away from other licensed retailers shuttered by the Orders and enforcement actions. Ms. Altman cannot purchase firearms or ammunition except through a licensed firearms dealer and/or licensed ammunition vendor under California law. Due to Defendants' Orders and enforcement actions, Ms. Altman is prevented from going to a licensed retailer, purchasing firearms and ammunition, passing a background check, and taking possession of the firearms and ammunition, thus infringing upon her right to lawfully purchase and take possession firearms and ammunition for self-defense.

---

[3] https://www.sccgov.org/sites/phd/DiseaseInformation/novel-coronavirus/Documents/03-16-20-Health-Officer-Order-to-Shelter-in-Place.pdf.

[4] https://www.sccgov.org/sites/phd/DiseaseInformation/novel-coronavirus/Pages/order-health-officer-033120.aspx.

On March 30, 2020, Defendant Mountain View Police Chief Max Bosel sent an email to Plaintiff Greg David, in which Chief Bosel advised Mr. David that his Santa Clara County business, Plaintiff Cuckoo Collectibles LLC d.b.a. Eddy's Shooting Sports, was required to close. Pursuant to Defendant Santa Clara County's Order, Plaintiffs and other firearm retailers that Defendants deem to be non-essential are not permitted to operate and sell any firearms, ammunition, or accessories. (David Decl., ¶ 8-9, 10-15.) As reported by San Jose Mercury News, Defendant Sam Liccardo, the Mayor of Defendant San Jose, said, "We are having panic buying right now for food. The one thing we cannot have is panic buying of guns."[5] (Lee Decl., **Ex. 6**.)

Enforcement against firearm and ammunition retailers, and individuals who would use them, spans across Santa Clara County. For example, on the website for Reed's Indoor Range,[6] a shooting range, retailer, and training facility in Santa Clara County, the Notice provides:

> Closed by order of the Santa Clara County District Attorney. If you have questions about the Order, contact the DA 408-792-2300. If you are in your 30-day period on a firearm, we cannot deliver it without further guidance from the county. We will open again as quickly as possible, but for now we are not allowed to process firearm pickups or registrations. Updates will be posted on social media and our website. Please stay safe and healthy.

(Lee Decl., **Ex. 5**., p. 0047.)

### *Alameda County Orders and Enforcement*

On March 16, 2020, the Public Health Department of the County of Alameda issued an order directing all residents of the County to shelter in place.[7] This Order was substantively identical with the Santa Clara County Order issued March 16, 2020 (described above), but applicable to Alameda County. (Lee Decl., **Ex. 7**.) Likewise, under the Alameda County Order, firearm and ammunition retailers and shooting ranges are not listed as "Essential Businesses." *Id.*

---

[5] https://www.mercurynews.com/2020/03/18/coronavirus-san-jose-orders-gun-store-to-close-in-one-of-first-tests-of-essential-under-shelter-order/.

[6] http://www.reedsindoorrange.com.

[7] https://www.acgov.org/documents/Final-Order-to-Shelter-In-Place.pdf.

Under Section 11 of the Order, Defendant Sheriff Ahern and all chiefs of police of the County are tasked with enforcement of the provisions set forth in the Order.

On March 31, 2020, the Public Health Department of Alameda County issued an additional Order superseding the March 16, 2020 order and directing all residents of the County to continue to shelter in place until May 3, 2020.[8] (Lee Decl., **Ex. 8**.) Under Section 13(f) of the March 31 order, firearm and ammunition retailers and ranges are not "Essential Businesses." *Id*.

Plaintiff Albert Swann, a resident of Alameda County, wishes to purchase firearms and ammunition for self-defense and defense of his home. Mr. Swann is not prohibited from possessing firearms or ammunition under state or federal law. He would purchase firearms and ammunition in Alameda County, but he is unable to do so as a direct result of the Alameda Order. (Swann Decl., ¶¶ 4–8.)

Multiple news outlets have published reports that Alameda County Defendants are actively shuttering access to arms, the ammunition required to use those arms, and the shooting ranges and education facilities that individuals need to learn how to safely and competently use firearms by forcing firearm and ammunition product manufacturers, retailers, importers, distributors, and shooting ranges within Alameda County to close their doors and stop performing sales, transfers, shipments, and deliveries of firearms and ammunition. (Lee Decl., **Ex. 9 and Ex. 10**.) [9] [10]

---

[8] http://www.acphd.org/media/563688/health-officer-order-20-04-shelter-in-place-20200331.pdf

[9] https://www.eastbaytimes.com/2020/03/26/coronavirus-l-a-sheriff-goes-back-to-closing-gun-stores-will-others-follow.

[10] https://www.businessinsider.com/california-coronavirus-gun-stores-essential-business-gavin-newsom-2020-3.

*San Mateo County Orders and Enforcement*

On March 16, 2020, the Public Health Department of the County of San Mateo issued an Order directing all residents of the County to shelter in place.[11] (Lee Decl., **Ex. 11**.) Again, this Order is substantively identical to other county orders described above, applicable to San Mateo County. Under Section 10(f) of the Order, firearm and ammunition retailers and shooting ranges are not "Essential Businesses." Under Section 11, the Defendant Sheriff Bolanos and all chiefs of police of the County are tasked with the enforcement of the provisions set forth in the Order. *Id*.

On March 31, 2020, the Public Health Department of San Mateo issued an additional Order superseding the March 16, 2020 Order and directing all residents of the County to continue to shelter in place until May 3, 2020.[12] Again, this Order did not list firearm and ammunition retailers and shooting ranges as "Essential Businesses." (Lee Decl., **Ex. 11**.) Defendant Sheriff Bolanos and all chiefs of police of the County are tasked with enforcement of the provisions set forth in the March 31, 2020 Order. *Id*.

On March 23, 2020, Pacifica Police informed Plaintiffs Dmitriy Danilevsky and City Arms LLC that they were required to halt all new sales of firearms and ammunition because firearm and ammunition retailers, like theirs, were non-essential businesses in San Mateo County and therefore required to close. Mr. Danilevsky was informed at that time that the store was provisionally permitted to remain open for the purpose of delivering firearms that had already been purchased, but for no other purpose. (Danilevsky Decl., ¶ 10.) Plaintiffs Danilevsky and City Arms LLC were advised further that the provisional operation allowance was temporary and would expire on April 6, 2020, at which point they were required to close the store entirely and cease all operations. *(Id*., at ¶ 11.)

---

[11] https://www.smcgov.org/sites/smcgov.org/files/HO%20Order%20Shelter%20in%20Place%2020200316.pdf.

[12] https://www.smcgov.org/sites/smcgov.org/files/Final%203-31%20Order.pdf.

### *Contra Costa County Orders and Enforcement*

On March 16, 2020, the Public Health Department of the County of Contra Costa issued an Order directing all residents of the County to shelter in place identical in substance to the orders described above, but applicable to Contra Costa County.[13] (Lee Decl., **Ex. 12**.) Similarly, under this Order, firearm and ammunition retailers and shooting ranges are not "Essential Businesses." *Id*. Under Section 11 of the Order, Defendant Sheriff Livingston and all chiefs of police of the County are tasked with enforcement of the provisions set forth in the Order.

Again, on March 31, 2020, the Public Health Department of the County of Contra Costa issued an additional order superseding the March 16, 2020 Order and directing all residents of the County to continue to shelter in place until May 3, 2020.[14] (Lee Decl., **Ex. 13**.) Under this Order, all non-essential businesses are ordered to cease all activities at facilities located within the County and under section 13(f), firearm and ammunition retailers and ranges are not "Essential Businesses." Defendant Sheriff Livingston and all chiefs of police of the County are tasked with the enforcement of the provisions set forth in the March 31st Order. *Id*.

Plaintiff Ryan Goodrich, a resident of Contra Costa County, wishes to purchase firearms and ammunition for self-defense, defense of his home, and for work. (Goodrich Decl., ¶¶ 4-9.) Mr. Goodrich is not prohibited from possessing firearms or ammunition under state or federal law. He is employed as an armored truck driver. (*Id.*, at ¶¶ 3, 5.) Under the Contra Costa Order, Mr. Goodrich is considered an essential worker based on his profession, and in order to fulfill his duties, he requires access to firearms and ammunition. Mr. Goodrich would purchase the ammunition he needs for self-defense, the defense of his home, and to execute his work duties. (*Id.*, at ¶ 5.)

---

[13] https://cchealth.org/coronavirus/pdf/HO-COVID19-SIP-0316-2020.pdf.

[14] https://www.contracosta.ca.gov/DocumentCenter/View/64727/2020-0331-Health-Officer-Order-COVID19.

On March 25, 2020, the Pleasant Hill Police Department informed plaintiffs Roman Kaplan, Yan Traytel, and City Arms East LLC that their store in Contra Costa County could no longer make any new sales or transfers of firearms or ammunition. (Kaplan Decl., ¶10-12; Traytel Decl., ¶¶ 10-13.) On March 31, 2020, in an email to Plaintiff Kaplan, Ronald Priebe of the Pleasant Hill Police Department confirmed that the City was continuing to enforce a shutdown against Plaintiffs Kaplan and Traytel's City Arms East. (*Id.*)

On April 1, 2020, in an email to Plaintiff Kaplan, Ronald Priebe of the Pleasant Hill Police Department stated:

> I determined a new order was issued by the county health officer, and went into effect at midnight last night. I've attached a copy and highlighted some of what I believe to be relevant points. Unfortunately, it looks like they did not adopt the fed's advisory definitions for essential businesses. There is no mention of gun stores in the county order. They do make some reference to businesses that *support* essential businesses (such as a law enforcement organization needing to buy guns/ammo from you), but that likely wouldn't apply to individuals (law enforcement or otherwise). There are other restrictions related to conducting business, such as social distancing, sending non-essential employees to work from home, etc. Although I've highlighted some of the pertinent paragraphs related to your situation, other portions of the order may be new and need to be adopted, if you'll continue operating in a limited fashion (as we discussed previously, for gun releases only). I wish had better news to share and could help more. As always, I appreciate your support and cooperation given the situation we're currently facing.

(Kaplan Decl., **Ex. 1**.) Mr. Priebe attached the March 31, 2020 Contra Costa shelter in place order with "pertinent paragraphs related to [Plaintiff Kaplan's] situation." (*Id.*, **Ex. 2**.)

■   ■   ■

In California, a violation of a statute is a misdemeanor unless specified to be punishable otherwise. California Penal Code Prelim. Prov. 19.4 ("When an act or omission is declared by a statute to be a public offense and no penalty for the offense is prescribed in any statute, the act or omission is punishable as a misdemeanor."). County Defendants' Orders, enforced by Defendant sheriffs and police chiefs, among others, commonly state: "Pursuant to Government Code sections 26602 and 41601 and Health and Safety Code section 101029, the Health Officer requests that the Sheriff and all chiefs of police in the County ensure compliance with and enforce this Order. The violation of any provision of this Order constitutes an imminent threat

1   and menace to public health, constitutes a public nuisance, and is punishable by fine,

2   imprisonment, or both." Thus, under Defendants' Orders and enforcement policies, it is a crime

3   for individuals to leave their homes and go to firearms and ammunition retailers and shooting

4   ranges. Additionally, it is a crime for retailers and ranges, including Plaintiffs herein, to operate.

5        In total, "health officers in seven Bay Area jurisdictions are extending a previous stay-at-

6   home order at least through May 3, 2020 in order to preserve critical hospital capacity across the

7   region." (Lee Decl., **Ex. 14**.) Currently, six Northern California counties have completely banned

8   the operation of firearm and ammunition retailers (Alameda, Contra Costa, Marin, Santa Clara,

9   San Francisco, and San Mateo Counties). Collectively, and not including the counties of Marin

10  and San Francisco, Defendant counties alone have banned and shut down firearms and

11  ammunition retailers for over 3,600 square miles, closing off and damaging the fundamental

12  rights of over 5 million people in California who reside in these counties. (Lee Decl., **Ex. 15**.)

13       Notably, the Department of Homeland Security, Cyber-Infrastructure Division ("CISA"),

14  issued updated (Version 2.0) "Guidance on the Essential Critical Infrastructure Workforce"

15  during the COVID-19 pandemic. (Lee Decl., **Ex. 15**.)[15] While the CISA's guidance is advisory in

16  nature, its findings and conclusions were "developed, in collaboration with other federal

17  agencies, State and local governments, and the private sector" for the specific purpose of

18  "help[ing] State, local, tribal and territorial officials as they work to protect their communities,

19  while ensuring continuity of functions critical to public health and safety, as well as economic

20  and national security." To that end, CISA determined that "[w]orkers supporting the operation of

21  firearm or ammunition product manufacturers, retailers, importers, distributors, and shooting

22  ranges" fall squarely within the "critical infrastructure workforce."

23       In addition to the individual and retailer Plaintiffs, Plaintiffs Second Amendment

24  Foundation, Inc. ("SAF"), California Gun Rights Foundation ("CGF"), California Association of

25  Federal Firearms Licensees, Inc. ("CAL-FFL"), National Rifle Association of America ("NRA"),

26  ─────────────────

27  [15] Guidance on the Essential Critical Infrastructure Workforce,
    https://www.cisa.gov/publication/guidance-essential-critical-infrastructure-workforce

28

1  and Firearms Policy Coalition, Inc. ("FPC") are themselves damaged by the Orders and

2  enforcement actions. Beyond their own direct damages, these institutional plaintiffs have

3  California members and supporters who are affected by Defendants' Orders and enforcement

4  actions. (See Declarations of Brandon Combs, Alan Gottlieb, Gene Hoffman, Mike Baryla, and

5  Josh Savani.) All Plaintiffs accordingly seek this necessary relief.

6  *Brandy v. Villanueva*

7  In *Brandy v. Villanueva et al.*, C.D. Case No. 2:20-cv-02874-AB-AK, the district court

8  considered and on April 6, 2020, denied the plaintiffs' application for a temporary restraining

9  order against similar orders [ECF No. 29].

10

11  ### III.   ARGUMENT

12  **A.   STANDARD FOR ISSUING A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION.**

13  This court is well familiar with the four-factor test on an application for a temporary

14  restraining order and motion for a preliminary injunction. A plaintiff "must establish that he is

15  likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of

16  preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the

17  public interest." *Am. Trucking Ass'ns, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1052 (9th Cir.

18  2009) (quoting *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008)). To grant preliminary

19  injunctive relief, a court must find that "a certain threshold showing [has been] made on each

20  factor." *Leiva-Perez v. Holder*, 640 F.3d 962, 966 (9th Cir. 2011).  Assuming that this threshold

21  has been met, "'serious questions going to the merits' and a balance of hardships that tips sharply

22  towards the plaintiff can support issuance of a preliminary injunction, so long as the plaintiff also

23  shows that there is a likelihood of irreparable injury and that the injunction is in the public

24  interest." *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011).

25  **B.   PLAINTIFFS WILL SUCCEED ON THE MERITS OF THEIR CLAIMS.**

26  Plaintiffs will succeed on the merits of their claims, as the Defendants' sweeping Orders

27  and enforcement actions at issue prohibit millions of Californians in an entire region from

28

exercising fundamental rights guaranteed by the Second Amendment, and violate principles of Due Process under the Fifth and Fourteenth Amendments.

> **1. Defendants' Orders and Enforcement Actions Deny Access To, Exercise Of, and Infringe Fundamental, Individual Second Amendment Rights.**

The Second Amendment to the United States Constitution provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. The Second Amendment "guarantee[s] the individual right to possess and carry weapons in case of confrontation." *Heller*, 554 U.S. at 592. And because "the Framers and ratifiers of the Fourteenth Amendment counted the right to keep and bear arms among those fundamental rights necessary to our system of ordered liberty," it applies to the States through the Fourteenth Amendment. *McDonald v. City of Chicago*, 561 U.S. 742, 778, 791 (2010) (plurality opinion).

The Supreme Court has held that the Second Amendment guarantees the right to "possess" weapons. *Heller*, 554 U.S. at 592. And "the Court has acknowledged that certain unarticulated rights are implicit in enumerated guarantees. . . . [F]undamental rights, even though not expressly guaranteed, have been recognized by the Court as indispensable to the enjoyment of rights explicitly defined." *Richmond Newspapers v. Virginia*, 448 U.S. 555, 579–80 (1980). Accordingly, "the right to possess firearms for protection implies a corresponding right to obtain the bullets necessary to use them." *Jackson v. City & Cty. of San Francisco*, 746 F.3d 953, 967 (9th Cir. 2014) (citing *Ezell v. City of Chicago*, 651 F.3d 684, 704 (7th Cir. 2011)). And "[t]he right to keep arms, necessarily involves the right to purchase them." *Andrews v. State*, 50 Tenn. 165, 178 (1871). *See Illinois Ass'n of Firearms Retailers v. City of Chicago*, 961 F.Supp.2d 928, 930 (N.D. Ill. 2014) ("the right to keep and bear arms for self-defense under the Second Amendment … must also include the right to *acquire* a firearm") (emphasis in original); *cf. Tattered Cover v. City of Thornton*, 44 P.3d 1044, 1052 (Colo. 2002) ("When a person buys a book at a bookstore, he engages in activity protected by the First Amendment because he is exercising his right to read and receive ideas and information."). Thus, the right to possess weapons necessarily also includes the right to acquire and transfer them. "Without protection for

these closely related rights, the Second Amendment would be toothless." *Luis v. United States*, 136 S.Ct. 1083, 1098 (2016) (Thomas, J., concurring).

For all these same reasons, firearm retailers are protected by the Second Amendment. If "[a] total prohibition against sale of contraceptives … would intrude upon individual decisions in matters of procreation and contraception as harshly as a direct ban on their use," *Carey v. Population Servs., Int'l*, 431 U.S. 678, 687–88 (1977), the same rationale applies to firearms. Thus, "[c]ommercial regulations on the sale of firearms do not fall outside the scope of the Second Amendment." *United States v. Marzzarella*, 614 F.3d 85, 92 n.8 (3d Cir. 2010). "If there were somehow a categorical exception for these restrictions [on gun sales], it would follow that there would be no constitutional defect in prohibiting the commercial sale of firearms. Such a result would be untenable under *Heller*." *Id. See also Mance v. Sessions*, 896 F.3d 699 (5th Cir. 2018) (implicitly recognizing a right to sell firearms by analyzing a burden on that right).

> **(a)   Defendants' Orders and Enforcement Actions Are a Prohibition on Second Amendment Rights and Categorically Unconstitutional.**

The Supreme Court held in *Heller* that the appropriate test to be applied is a categorical one, first looking to the text of the Constitution itself, and then looking to history and tradition to inform the scope and meaning of that text. Indeed, *Heller* held a handgun ban – which is the effect of Defendants' expansive Orders and actions, among other restrictions – categorically unconstitutional: "Whatever the reason, handguns are the most popular weapon chosen by Americans for self-defense in the home, and a complete prohibition of their use is invalid." 554 U.S. at 629. "Both *Heller* and *McDonald* suggest that broadly prohibitory laws restricting the core Second Amendment right—like the handgun bans at issue in those cases, which prohibited handgun possession even in the home—are categorically unconstitutional." *Ezell*, 651 F.3d at 703 (emphasis added).

At issue here is a complete and unilateral suspension on the right of ordinary citizens to acquire firearms and ammunition, a right protected by the Second Amendment. Due to the ever-expanding nature of the laws regulating firearm transfers, in-person visits to gun stores and retailers are the *only* legal means for ordinary, law-abiding citizens to acquire and purchase

1   firearms—and now, ammunition—within the State of California. See, e.g., Cal. Pen. Code §

2   27545 (requiring all firearm transfers be processed through a licensed dealer); Pen. Code § 30312

3   (requiring all ammunition transactions to be made through a licensed ammunition vendor, in a

4   face-to-face transfer). In addition, firearm and ammunition retailers are required to initiate

5   background checks at the point of transfer to fulfill the State's mandates, administer the vast

6   majority of FSC tests to ensure that a recipient is aware of firearm safety rules, and administer

7   the safe handling demonstration. Pen. Code §§ 28175 ("The dealer or salesperson making a sale

8   shall ensure that all required information has been obtained from the purchaser. The dealer and

9   all salespersons shall be informed that incomplete information will delay sales."); 28200 et seq.

10  (establishing procedure for collecting information and fees associated with required background

11  checks). These are additional services that gun store dealers now *must* provide in furtherance of

12  the State's statutes and regulations.

13        The State has mandated these burdensome in-person requirements, requiring, for

14  example, at least two visits to licensed retailers for each firearm transaction, and at least one for

15  ammunition transactions. Defendants simply cannot be permitted to take actions that effectively

16  ban access to, on pain of criminal liability, and shut down all firearm and ammunition transfers in

17  their jurisdictions. Such transactions cannot be done remotely as many other, non-firearm online

18  retailers are able to do. *See* Pen. Code § 27540 (requirements for dealer delivery of firearms).

19  The effect of Defendants' Orders and enforcement actions is a destruction of a fundamental,

20  individual right. It is well established that the deprivation of constitutionally protected individual

21  liberty, even temporarily, constitutes irreparable injury. *Associated Press v. Otter*, 682 F.3d 821,

22  826 (9th Cir. 2012) ("the loss of First Amendment freedoms, for even minimal periods of time,

23  unquestionably constitutes irreparable injury.") (quoting *Elrod v. Burns*, 427 U.S. 347, 373

24  (1976)).

25        The effect of Defendants' Orders, and Defendants' enforcement of them, is a ban on

26  individuals' going to and from, and on the operation of, all firearm and ammunition retailers and

27  shooting ranges in the massive jurisdictions within which their various Orders apply. As the

28  Orders are now being interpreted and enforced, millions of Californians are being prevented from

1    acquiring or practicing with firearms or ammunition, and during a time of national *crisis*.

2          Defendants' is a policy outcome that is completely taken off the table under *Heller*. The

3    "central" holding in *Heller* was "that the Second Amendment protects a personal right to keep

4    and bear arms for lawful purposes, most notably for self-defense within the home." *McDonald*,

5    561 U.S. at 780. "The very enumeration of the right takes out of the hands of government—even

6    the Third Branch of Government—the power to decide on a case-by-case basis whether the right

7    is really worth insisting upon." *Heller*, 554 U.S. at 634.

8          Plaintiffs must here preserve and maintain their position that any interest-balancing test,

9    including tiered scrutiny, is inappropriate under *Heller*, particularly for categorical bans like and

10   including those at issue here. *Heller*, 554 U.S. at 634, 635 ("We know of no other enumerated

11   constitutional right whose core protection has been subjected to a freestanding 'interest-

12   balancing' approach"; "The Second Amendment . . . is the very product of an interest balancing

13   by the people"); *Ezell*, 651 F.3d at 703 ("Both *Heller* and *McDonald* suggest that broadly

14   prohibitory laws restricting the core Second Amendment right—like the handgun bans at issue in

15   those cases, which prohibited handgun possession even in the home—are categorically

16   unconstitutional.").

17         Anyone who does not already own a firearm in Defendant Counties is now entirely

18   prohibited from exercising their Second Amendment rights in thousands of square miles

19   throughout Defendants' jurisdictions, at a time when those rights are most important. As such,

20   Defendants' actions amount to a categorical ban and should be categorically invalidated.

21                    **(b)      The Orders Cannot Survive Any Level of Scrutiny.**

22         The Defendants' orders and actions also fail the Ninth Circuit's two-part test applying

23   tiered scrutiny. Assuming *arguendo* that an interest-balancing test is appropriate, the challenged

24   provisions fail any level of scrutiny. Generally, the Ninth Circuit applies a two-part test for

25   Second Amendment challenges. *United States v. Chovan*, 735 F.3d 1127 (9th Cir. 2013). "The

26   two-step Second Amendment inquiry we adopt (1) asks whether the challenged law burdens

27   conduct protected by the Second Amendment and (2) if so, directs courts to apply an appropriate

28   level of scrutiny." *Id.* at 1136–37. But consistent with Supreme Court precedent, "[a] law that

imposes such a severe restriction on the fundamental right of self defense of the home that it amounts to a destruction of the Second Amendment right is unconstitutional under any level of scrutiny." *Silvester v. Harris*, 843 F.3d 816, 821 (9th Cir. 2016). *Accord Bauer v. Becerra*, 858 F.3d 1216, 1222 (9th Cir. 2017) ("A law that . . . amounts to a destruction of the Second Amendment right is unconstitutional under any level of scrutiny"). "That is what was involved in *Heller*." *Silvester*, 843 F.3d at 821 (citing *Heller*, 554 U.S. at 628–29).

As discussed above, Defendants' acts strike at the very core of the Second Amendment, thereby satisfying the first step of the two-part test. At the second step of the inquiry, a court is to measure "how severe the statute burdens the Second Amendment right. 'Because *Heller* did not specify a particular level of scrutiny for all Second Amendment challenges, courts determine the appropriate level by considering '(1) how close the challenged law comes to the core of the Second Amendment right, and (2) the severity of the law's burden on that right.''" *Duncan v. Becerra*, 265 F.Supp.3d 1106, 1119 (S.D. Cal. 2017) (granting preliminary injunction), aff'd, 742 F.App'x 218 (9th Cir. 2018) (quoting *Bauer*, 858 F.3d at 1222). "Guided by this understanding, [the] test for the appropriate level of scrutiny amounts to 'a sliding scale.' […] 'A law that imposes such a severe restriction on the fundamental right of self defense of the home that it amounts to a destruction of the Second Amendment right is unconstitutional under any level of scrutiny.' […] Further down the scale, a 'law that implicates the core of the Second Amendment right and severely burdens that right warrants strict scrutiny. Otherwise, intermediate scrutiny is appropriate.'" *Bauer*, 858 F.3d at 1222 (citing *Silvester*, 843 F.3d at 821, and *Chovan*, 735 F.3d at 1138; *see also*, *Bateman v. Purdue*, 881 F.Supp.2d 709, 715 (E.D. N.C. 2012) (applying strict scrutiny to North Carolina's emergency declaration statutes that effectively prevented access to firearms).

If heightened scrutiny applies, Defendants' policies should be evaluated under strict scrutiny, meaning Defendants must show that their policies are narrowly tailored to achieve a compelling state interest, and that no less restrictive alternative exists to achieve the same ends. *United States v. Alvarez*, 617 F.3d 1198, 1216 (9th Cir. 2010) (citing *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 340 (2010)). With the wide breadth of the Order and its effect of

completing destroying the right to keep and bear arms during this pandemic, by no stretch of imagination would it survive strict scrutiny – which highlights the reality that it is the very sort of categorical ban that can never be tolerated under *Heller*. This calculus does not change in an emergency, declared or otherwise. In *Bateman v. Purdue*, the district court evaluated North Carolina's statutes which authorized government officials to impose various restrictions on the possession, transportation, sale, and purchase of "dangerous weapons" during declared states of emergency. 881 F.Supp.2d at 710–11. The district court evaluated the statutes under the two-part test, and found first that "[i]t cannot be seriously questioned that the emergency declaration laws at issue here burden conduct protected by the Second Amendment." *Id*. at 713–14. "Additionally, although the statutes do not directly regulate the possession of firearms within the home, they effectively prohibit law abiding citizens from purchasing and transporting to their homes firearms and ammunition needed for self-defense. As such, these laws burden conduct protected by the Second Amendment." Accordingly, under strict scrutiny, the emergency declaration statutes were voided and declared to be unconstitutional since the statutes were not narrowly tailored, e.g., with reasonable time, place and manner restrictions. *Id*. at 716.

Accordingly, if heightened scrutiny is appropriate here, strict scrutiny should likewise apply. But even under intermediate scrutiny, the Order, and the Defendants' enforcement of it, are unconstitutional. Under intermediate scrutiny review, the government bears the burden of demonstrating a reasonable fit between the challenged regulation or law and a substantial governmental objective that the law ostensibly advances. *Board of Trustees of State Univ. of New York v. Fox*, 492 U.S. 469, 480–81 (1989). To carry this burden, the government must not only present evidence, but "substantial evidence" drawn from "reasonable inferences" that actually support its proffered justification. *Turner Broad. Sys., Inc.*, 520 U.S. 180, 195 (1997). And in the related First Amendment context, the government is typically put to the evidentiary test to show that the harms it recites are not only real, but "that [the speech] restriction will in fact alleviate them to a material degree." *Italian Colors Rest. v. Becerra*, 878 F.3d 1165, 1177 (9th Cir. 2018) (citing *Greater New Orleans Broad. Ass'n, Inc. v. United States*, 527 U.S. 173, 188 (1999) (quoting *Edenfield v. Fane*, 507 U.S. 761, 770-71 (1993)). This same evidentiary burden should

apply with equal force to Second Amendment cases, where equally fundamental rights are similarly at stake. See, *Ezell*, 651 F.3d at 706–07 ("Both *Heller* and *McDonald* suggest that First Amendment analogues are more appropriate, and on the strength of that suggestion, we and other circuits have already begun to adapt First Amendment doctrine to the Second Amendment context") (citing *Heller*, 554 U.S. at 582, 595, 635; *McDonald*, 130 S.Ct. at 3045; *see also Marzzarella,* 614 F.3d at 89 n.4 ("[W]e look to other constitutional areas for guidance in evaluating Second Amendment challenges. We think the First Amendment is the natural choice.").

Under intermediate scrutiny, a court must ensure that "the means chosen are not substantially broader than necessary to achieve the government's interest." *Ward v. Rock Against Racism*, 491 U.S. 781, 800 (1989). Thus, in the First Amendment context, "the government must demonstrate that alternative measures that burden substantially less speech would fail to achieve the government's interests, not simply that the chosen route is easier." *McCullen v. Coakley*, 134 S.Ct. 2518, 2540 (2014). For example, restrictions on commercial speech must "tailored in a reasonable manner to serve a substantial state interest." *Edenfield v. Fane*, 507 U.S. 761, 770 (1993).  The Supreme Court has made abundantly clear that such "reasonable tailoring" requires a considerably closer fit than mere rational basis scrutiny, and requires evidence that the restriction directly and materially advances a *bona fide* state interest. In the Second Amendment context, even Justice Breyer's balancing test proposed in his *Heller* dissent (and expressly rejected by the majority) considered "reasonable, but less restrictive, alternatives." 554 U.S. at 710 (Breyer, J., dissenting). Many circuit courts recognize the obligation in the Second Amendment context. *Heller v. District of Columbia*, 801 F.3d 264, 277–78 (D.C. Cir. 2015) ("*Heller III*"); *Ass'n of New Jersey Rifle & Pistol Clubs, Inc. v. Attorney Gen. New Jersey*, 910 F.3d 106, 124 n.28 (3d Cir. 2018); *Ezell*, 651 F.3d at 709; *Moore v. Madigan*, 702 F.3d 933, 940 (7th Cir. 2012); *United States v. Reese*, 627 F.3d 792, 803 (10th Cir. 2010); *Bonidy v. U.S. Postal Serv.*, 790 F.3d 1121, 1128 (10th Cir. 2015).

"[The Court] must determine whether the regulation *directly* advances the governmental interest asserted, *and whether it is not more extensive than is necessary to serve that interest*."

1   *Greater New Orleans Broad. Ass'n, Inc.*, 527 U.S. at 183 (internal citations omitted) (emphasis

2   added). The government bears the burden of justifying its restriction on constitutional rights, and

3   that "burden is not satisfied by mere speculation or conjecture; rather, a governmental body

4   seeking to sustain a restriction on commercial speech must demonstrate that the harms it recites

5   are real and that its restrictions will in fact alleviate them to a material degree." *Edenfield*, 507

6   U.S. at 770-71. "The Government is not required to employ the least restrictive means

7   conceivable . . . but one whose scope is in proportion to the interest served." *Greater New*

8   *Orleans Broad. Ass'n, Inc.*, 527 U.S. at 188.

9        More, a governmental interest that is as inconsistently pursued as Defendants' here is not

10   and cannot be a substantial one for constitutional purposes. To be sure, the question is not

11   whether an interest is important at the highest level of generality; rather, the fundamental concern

12   is whether a government is genuinely applying rules about its interest in a consistent manner

13   such that it demonstrates the importance of the interest. Like the regulatory regime that failed

14   constitutional muster in *Greater New Orleans Broad. Ass'n, Inc.*, Defendants' Orders and

15   enforcement actions here are "so pierced by exemptions and inconsistencies that [they] cannot

16   hope to exonerate [them]." *Id*. at 190.

17        More, the substantiality of the interest in Defendants' Orders and enforcement actions,

18   relative to the incontrovertible importance of and right to the constitutionally enumerated,

19   fundamental right to keep and bear arms – particularly for self-defense in times of crisis – is

20   informed by the federal government's declaration that the firearm industry, its workers, and its

21   products, are all critical infrastructure. So too must those who would go to and use them to

22   acquire constitutionally protected items and services be protected in doing so.

23        Here, there can be no "reasonable fit" nor a "proportional fit" between blanket Orders and

24   enforcement actions that prohibit all legal firearm and ammunition transfers and training at

25   shooting ranges, and the Defendants' presumptive desire to abate the spread of a viral pandemic.

26   Nor can it be said that the mandatory closing of all firearms retailers in their entirety "is not more

27   extensive than is necessary" to limit community spread. Like all other businesses, retailers, and

28   service providers that are exempt from Defendants' Orders and enforcement actions, firearm and

1   ammunition retailers and ranges, and the people, like Plaintiffs, who would go to them, could

2   abide by maximum occupancy limitations, social distancing requirements, and sanitation

3   regimens just as with the many other essential businesses allowed to continue operating. And

4   likewise, to the extent that certain activities (such as the pickup/transfer of firearms, ammunition,

5   and the safe handling demonstration) are statutorily mandated to be conducted using in-person

6   transactions, these activities can be conducted while adhering to the same best practices and

7   necessary precautions required of other businesses that are permitted to continue operating

8   during this time.

9       Adherence to the Defendants' Orders is simply a take-it-or-leave it proposition, with no

10   room for less restrictive alternatives that would otherwise allow transactions to proceed. As

11   Defendant San Jose Mayor Liccardo recently said, unsurprisingly and as a window into

12   Defendants' motivations, "We are having panic buying right now for food. The one thing we

13   cannot have is panic buying of guns." (Lee Decl., **Ex. 6**, p. 0051**.**) Defendants' motivations are

14   manifested within this statement, evidence of a simple unwillingness even to consider less

15   restrictive alternatives that would allow firearm transfers to proceed while preserving a purported

16   interest in public health. This zero-tolerance approach, whether motivated by ideological

17   concerns or otherwise, runs afoul of the government's burden that the restrictions at issue be

18   "proportional in scope," "not more extensive than necessary," or reasonably tailored to achieve

19   the government's interest. However laudable an interest may be, well-settled United States

20   Supreme Court jurisprudence has clearly spoken on what constitutes intermediate scrutiny.

21   Defendants' Orders and enforcement actions do not pass constitutional muster under categorical,

22   heightened, or even intermediate constitutional scrutiny.

23       **2.    Defendants' Orders and Enforcement Actions Violate Due Process.**

24       Plaintiffs will further prevail on their second claim, set forth in their First Amended

25   Complaint, that the Orders, and Defendants' enforcement practices specifically targeting firearm

26   and ammunition retailers, effect a deprivation of due process under the Fifth and Fourteenth

27   Amendments. The Fifth Amendment to the United States Constitution provides, in pertinent part:

28   "No person shall be. . .deprived of life, liberty or property, without due process of law. . . ."

1   Likewise, the Fourteenth Amendment provides "nor shall any state deprive any person of life,

2   liberty, or property, without due process of law[.]"

3          In this case, arbitrariness exists within all of the Defendants' Orders and enforcement

4   actions, as the Orders classify as "essential" a variety of businesses which have no clear

5   connection to *essential* goods and services (let alone expressly constitutionally protected goods

6   and services), particularly in a time of crisis. For example, "convenience stores, and other

7   establishments engaged in the retail sale of unprepared food, canned food, dry goods, non-

8   alcoholic beverages, fresh fruits and vegetables, pet supply, fresh meats, fish, and poultry, as well

9   as hygienic products and household consumer products necessary for personal hygiene or the

10  habitability, sanitation, or operation of residences" are deemed to expressly fall within this

11  protected category of "Essential" businesses. So too are "auto-supply" stores, businesses "that

12  provide food, shelter, and social services, and other necessities of life for economically

13  disadvantaged or otherwise needy individuals," landscapers, gardeners, "[b]icycle repair and

14  supply shops," and hardware stores. But not firearm and ammunition retailers? Particularly

15  during or in anticipation of a further time of crisis?

16         The answer may be found, again, in the words of Defendant Mayor Liccardo: "We are

17  having panic buying right now for food. The one thing we cannot have is panic buying of guns."

18  (Lee Decl., **Ex. 6**.) So there we have it: even if firearms and ammunition are essential,

19  Defendants simply *cannot* allow people to have them now, no matter how essential they may be.

20         Defendants' Orders, and their enforcement of them, lead to the conclusion that

21  Defendants' Orders, policies, practices, customs, and enforcement actions are arbitrary and

22  capricious, overbroad, unconstitutionally vague, and violate Plaintiffs' Due Process rights.

23  Putting aside Defendants' expressed dislike of firearms and those who sell and buy them, the

24  Retailer Plaintiffs fall within any reasonable definition of "Essential Businesses," because they

25  are establishments engaged in the retail sale of household consumer products necessary for

26  maintaining the safety of individuals, like individual Plaintiffs and others similarly situated who

27  are prevented from attending Retailer Plaintiffs' establishments to purchase or transfer firearms,

28  ammunition, accessories, and components necessary—and constitutionally protected—for the

1   defense of their homes, selves, and others.

2   Moreover, Retailer Plaintiffs are essential service providers who provide statutorily

3   mandated services, such as the processing of background checks, administration of waiting

4   period laws, administration of FSC tests, and "safe handling" demonstrations, all of which must

5   be conducted *in person* pursuant to State laws and regulations.

6   And Retailer Plaintiffs' businesses provide goods to residences and essential businesses.

7   They are, in every meaningful sense, "essential," as CISA has recognized. But here, Defendants'

8   arbitrary and capricious classification scheme is made even more constitutionally suspect

9   because it bypassed the constitutionally authorized method for enacting laws. Legislatures are

10  supposed to enact laws; executive agencies are supposed to enforce them. Even had a legislative

11  body made these irrational and constitutionally repugnant rules, after due deliberation and

12  debate, they would be invalid. And while the constitutional harms are not made more (or less)

13  illegal because of the violation of separation of powers, that harm arises from both the substance

14  of unconstitutional polices, and also from the process that gave rise to them. Defendants here,

15  acting unilaterally, deserve no deference or legislative benefit of the doubt.

16  Moreover, Defendants' Orders and enforcement actions are unconstitutionally vague,

17  because they do not define critical terms, encompass protected activity, omit definitions of key

18  terms, operate as complete bans, do not require specific intent to commit an unlawful act, and

19  permit and encourage arbitrary and erratic arrests and convictions with too much discretion

20  committed to law enforcement. "As generally stated, the void-for-vagueness doctrine requires

21  that a penal statute define the criminal offense with sufficient definiteness that ordinary people

22  can understand what conduct is prohibited and in a manner that does not encourage arbitrary and

23  discriminatory enforcement." *Gonzales v. Carhart*, 550 U.S. 124, 148–49 (2007) (quoting

24  *Kolender v. Lawson*, 461 U.S. 352, 357 (1983)). The breadth and built-in vagueness here run

25  afoul of the due process clause because the subject Orders fail to give adequate guidance to those

26  who would be law-abiding, to advise them of the nature of the offense with which they may be

27  charged, or to guide courts in trying those who are accused of violating such orders.

28  "'Vague laws offend several important values. First, because we assume that man is free

1   to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary

2   intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly.

3   Vague laws may trap the innocent by not providing fair warning. Second, if arbitrary and

4   discriminatory enforcement is to be prevented, laws must provide explicit standards for those

5   who apply them. A vague law impermissibly delegates basic policy matters to policemen, judges,

6   and juries for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary

7   and discriminatory applications.'" *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*,

8   455 U.S. 489, 498 (1982) (quoting *Grayned v. City of Rockford*, 408 U.S. 104, 108-109 (1972));

9   accord *United States v. Williams*, 553 U.S. 285, 304 (2008) ("[a] conviction fails to comport with

10  due process if the statute under which it is obtained fails to provide a person of ordinary

11  intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages

12  seriously discriminatory enforcement.").

13          And thus, Plaintiffs will prevail in challenging not only the underlying orders and

14  enforcement policies for their blatant violations of enumerated constitutional rights, but also in

15  the manner in which the policies were enacted. It is a bedrock principle of our constitutional

16  order that legislatures may not enact vague and ambiguous laws that give unfettered discretion to

17  executive agencies to 'figure out' the details later, while also 'passing the buck' to those

18  executive agencies to make and enforce the policies that impact the people's lives, liberty, and

19  property. Defendants' enforcement of vague and arbitrary County Orders violates fundamental

20  precepts of due process, cannot stand, and must be enjoined.

21  **C.    THE DESTRUCTION OF CONSTITUTIONAL RIGHTS CONSTITUTES IRREPARABLE INJURY.**

22          "It is well established that the deprivation of constitutional rights 'unquestionably

23  constitutes irreparable injury." *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (quoting

24  *Elrod v. Burns*, 427 U.S. 347, 373 (1976)); 11A Charles Alan Wright et al., Federal Practice and

25  Procedure § 2948.1 (2d ed. 1995) ("When an alleged deprivation of a constitutional right is

26  involved, most courts hold that no further showing of irreparable injury is necessary");

27  *Norsworthy v. Beard*, 87 F.Supp.3d 1164, 1193 (N.D.Cal. 2015) ("Irreparable harm is presumed

28  if plaintiffs are likely to succeed on the merits because a deprivation of constitutional rights

1   always constitutes irreparable harm."); *Monterey Mech. Co. v. Wilson*, 125 F.3d 702, 715 (9th

2   Cir. 1997) (an alleged constitutional infringement will often alone constitute irreparable harm);

3   *Duncan*, 265 F.Supp.3d at 1135 ("The same is true for Second Amendment rights. Their loss

4   constitutes irreparable injury.… The right to keep and bear arms protects tangible and intangible

5   interests which cannot be compensated by damages.… 'The right to bear arms enables one to

6   possess not only the means to defend oneself but also the self-confidence—and psychic

7   comfort—that comes with knowing one could protect oneself if necessary.'") (citing *Grace v.*

8   *District of Columbia*, 187 F.Supp.3d 124, 150 (D.D.C. 2016)). See also, *Ezell*, 651 F.3d at 699–

9   700 (a deprivation of the right to arms is "irreparable," with "no adequate remedy at law").

10          Plaintiffs have established a strong likelihood of success based on clear violations of their

11   right to keep and bear arms under the Second and Fourteenth Amendments to the United States

12   Constitution, and their right under the Fifth and Fourteenth Amendments. "As with irreparable

13   injury, when a plaintiff establishes 'a likelihood that Defendants' policy violates the U.S.

14   Constitution, Plaintiffs have also established that both the public interest and the balance of the

15   equities favor a preliminary injunction.'" *Ms. L. v. U.S. Immigration and Customs Enforcement*,

16   310 F.Supp.3d 1133, 1147 (S.D. Cal. 2018) (quoting *Arizona Dream Act Coalition v. Brewer*,

17   757 F.3d 1053, 1069 (9th Cir. 2014); *see also Rodriguez v. Robbins*, 715 F.3d 1127, 1146 (9th

18   Cir. 2013) ("Generally, public interest concerns are implicated when a constitutional right has

19   been violated, because all citizens have a stake in upholding the Constitution.") Because

20   Plaintiffs have made such a showing, both the public interest and the balance of the equities

21   weigh in favor of and compel the relief they seek of a temporary restraining order and

22   preliminary injunction.

23          Finally, Plaintiffs respectfully disagree with the Court's decision in *Brandy v. Villanueva*,

24   C.D. Case No. 2:20-cv-02874-AB-AK, denying a temporary restraining order against similar

25   orders [ECF No. 29]. In that matter, the Court failed to apply categorical or struct scrutiny, and

26   improperly applied intermediate scrutiny, and was incorrect for the reasons set forth herein.

27

28

## IV.   CONCLUSION

There is no dispute that the coronavirus pandemic is serious in nature. Plaintiffs certainly do not intend to say or imply otherwise. But despite the abrupt way that the coronavirus has imposed itself upon our society, fundamental human rights cannot be closed off. This is especially true of the right to keep and bear arms for self-defense. And it is the true test of our national character as a People that we adhere to constitutional principles, without fear, and directly in the face of such dangers. We must pass this test, and every other test that challenges our resolve to honor our founding principles. For these reasons, and as set forth above, Plaintiffs respectfully request that this Court grant their Application for a Temporary Restraining Order or, in the Alternative, Motion for Preliminary Injunction and protect the fundamental, individual rights at stake in this important case.

Dated: April 10, 2020                    SEILER EPSTEIN LLP

                                         /s/ *George M. Lee*
                                         George M. Lee
                                         Attorney for Plaintiffs