1  JAMES R. WILLIAMS, County Counsel (S.B. #271253)
   MELISSA R. KINIYALOCTS, Lead Deputy County Counsel (S.B. #215814)
2  JASON M. BUSSEY, Deputy County Counsel (S.B. #227185)
   HANNAH KIESCHNICK, Legal Fellow (S.B. # 319011)
3  OFFICE OF THE COUNTY COUNSEL
   70 West Hedding Street, East Wing, Ninth Floor
4  San José, California 95110-1770
   Telephone: (408) 299-5900
5  Facsimile: (408) 292-7240

6  Attorneys for Defendants
   COUNTY OF SANTA CLARA, LAURIE SMITH,
7  JEFFREY ROSEN, and SARA CODY

8  ADDITIONAL COUNSEL FOR DEFENDANTS
   ON SIGNATURE PAGE

9

10                    UNITED STATES DISTRICT COURT
                  FOR THE NORTHERN DISTRICT OF CALIFORNIA
11                          (Oakland Division)

12

13  JANICE ALTMAN, et al.,                No. 20CV02180JST

14              Plaintiffs,               **DEFENDANTS' JOINT OPPOSITION TO
                                          PLAINTIFFS' APPLICATION FOR A
15  v.                                    PRELIMINARY INJUNCTION**

16  COUNTY OF SANTA CLARA, et al.         Date:      May 20, 2020
                                          Time:      2:00 p.m.
17              Defendants.               Judge:     Honorable Jon S. Tigar

18

19

20

21

22

23

24

25

26

27

28

# **TABLE OF CONTENTS**

I.      INTRODUCTION ................................................................................................... 1

II.     FACTUAL BACKGROUND ................................................................................. 3

III.    ARGUMENT .......................................................................................................... 7

        A.      A PRELIMINARY INJUNCION IS AN EXTRAORDINARY REMEDY .......... 7

        B.      PLAINTIFFS' SECOND AMENDEDMENT CLAIM WILL NOT
                SUCCEED ................................................................................................... 7

                1.      The Orders Satisfy Deferential Standards for Emergency Directives ........ 7

                2.      The Orders Do Not Trigger Heightened Second Amendment Scrutiny ..... 9

                3.      If the Health Orders Elicit Second Amendment Review, They Satisfy
                        It .................................................................................................................14

                        a.      At Most, The Health Orders Elicit Intermediate Scrutiny .............15

                        b.      The Orders Satisfy Intermediate Scrutiny ....................................19

        C.      PLAINTIFFS' DUE PROCESS CLAIM WILL NOT SUCCEED .....................21

        D.      THE PUBLIC INTEREST DOES NOT FAVOR INJUNCTIVE RELIEF ..........22

IV.     CONCLUSION .......................................................................................................25

**Cases**

*Arcara v. Cloud Books, Inc.*
478 U.S. 697 (1986) ................................................................................... 10, 11

*Bateman v. Perdue*
881 F. Supp. 2d. 709 (E.D.N.C. 2012) ......................................................... 8, 9

*Bauer v. Becerra*
858 F.3d 1216 (9th Cir. 2017) ................................................... 15, 16, 18, 20

*Binderup v. Attorney Gen. United States of Am.*
836 F.3d 336 (3d Cir. 2016) ............................................................................ 16

*United States v. Chovan*
735 F.3d (9th Cir. 2013) ................................................................................. 18

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*
508 U.S. 520 (1993) ........................................................................... 12, 13, 14

*County of Sacramento v. Lewis*
523 U.S. 833 (1998) ........................................................................................ 21

*Cty. Court of Ulster Cty., N.Y. v. Allen*
442 U.S. 140 (1979) ........................................................................................ 18

*District of Columbia v. Heller*
554 U.S. 570 (2008) .................................................................................... 9, 15

*Employment Division, Department of Human Resources of Oregon v. Smith*
494 U.S. 872 (1990) ................................................................................... 11, 12

*Fyock v. Sunnyvale*
779 F.3d 991 (9th Cir. 2015) .............................................................. 15, 18, 19

*GeorgiaCarry.Org, Inc. v. U.S. Army Corps of Engineers*
788 F.3d 1318 (11th Cir. 2015) ..................................................................... 16

*Hampsmire v. City of Santa Cruz*
899 F. Supp. 2d 922 (N.D. Cal. 2012) ........................................................... 14

*In re Abbott*
954 F.3d 772 (5th Cir. 2020) ..................................................................... 8, 23

ii

*Jackson v. City & Cty. of San Francisco*
  746 F.3d 953 (9th Cir. 2014)................................................................9, 15, 18, 20

*Jacobson v. Commonwealth of Massachusetts*
  197 U.S. 11 (1905) ........................................................................... 7, 8, 22

*Johnson v. United States*
  135 S. Ct. 2551 (2015)........................................................................ 22

*Kachalsky v. Cty. of Westchester*
  701 F.3d 81 (2d Cir. 2012)................................................................ 16, 18

*Kawaoka v. City of Arroyo Grande*
  17 F.3d 1227 (9th Cir. 1994)............................................................... 22

*Kohler v. Inter-Tel Techs.*
  244 F.3d 1167 (9th Cir. 2001)............................................................. 22

*Mahoney v. Holder*
  62 F. Supp. 3d 1215 (W.D. Wash. 2014) ............................................... 21

*Mai v. United States*
  952 F.3d 1106 (9th Cir. 2020)......................................................... 18, 20

*McDonald v. City of Chicago, Ill.*
  561 U.S. 742 (2010) .......................................................................... 9

*Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*
  700 F.3d 185 (5th Cir. 2012)............................................................. 17

*Olsen v. Mukasey*
  541 F.3d 827 (8th Cir. 2008)............................................................. 13

*Parents for Privacy v. Barr*
  949 F.3d 1210 (9th Cir. 2020)........................................................... 12

*Pena v. Lindley*
  898 F.3d 969 (9th Cir. 2018)............................................................. 14

*Samson v. City of Bainbridge Island*
  683 F.3d 1051 (9th Cir. 2012)........................................................... 21

*Sethy v. Alameda County Water Dist.*
  545 F.2d 1157 (9th Cir.1976)............................................................. 9

*Silvester v. Harris*
  843 F.3d 816 (9th Cir. 2016)......................................................16, 17, 19, 20

Defendants' Joint Opposition to Plaintiffs' Application for a
Preliminary Injunction

20CV02180JST

*Smith v. Avino*
   91 F.3d 105 (11th Cir. 1996)..................................................................8

*Stormans, Inc. v. Selecky*
   586 F.3d 1109 (9th Cir. 2009).........................................................23, 24

*Stormans, Inc. v. Wiesman*
   794 F.3d 1064 (9th Cir. 2015)..............................................................13

*Talk of the Town v. Dep't of Fin. & Bus. Servs. ex rel. City of Las Vegas*
   343 F.3d 1063 (9th Cir. 2003)....................................................9, 10, 11

*Teixeira v. Cty. of Alameda*
   873 F.3d 670 (9th Cir. 2017)...........................................................14, 15

*United States v. Chalk*
   441 F.2d 1277 (4th Cir. 1971)..................................................................8

*United States v. Salerno*
   481 U.S. 739 (1987) ...............................................................................18

*United States v. Torres*
   911 F.3d 1253 (9th Cir. 2019)....................................................17, 18, 20

*Watkins v. U.S. Army*
   875 F.2d 699 (9th Cir. 1989)....................................................................9

*Wilson v. Lynch*
   835 F.3d 1083 (9th Cir. 2016)..........................................................17, 19

*Winter v. Nat. Res. Def. Council, Inc.*
   555 U.S. 7 (2008)...........................................................................7, 23, 24

*Wright v. Incline Vill. Gen. Improvement Dist.*
   665 F.3d 1128 (9th Cir. 2011)................................................................18

*Young v. Hawaii*
   896 F.3d 1044 (9th Cir. 2018)................................................................16

**California Penal Code**

Section 27875.................................................................................................17

Section 27881.................................................................................................17

Section 27885.................................................................................................17

## California Health and Safety Code

Section 101040.................................................................................................. 22

Section 101085.................................................................................................. 22

Section 120175.................................................................................................. 22

## U.S. Constitution

Second Amendment ........................................................................................... 9

## Rules

Federal Rules of Civil Procedure 65 ................................................................ 7

## I. INTRODUCTION

The plaintiffs in this case—individual gun and gun-shop owners, retail businesses that sell guns, ammunition, and access to shooting ranges, and gun advocacy organizations—argue that emergency shelter-in-place orders ("Health Orders" or "Orders") issued by Bay Area jurisdictions, including the four county Defendants in this case, violate their Second Amendment rights. The abridgment, purportedly, stems from the fact that while the Orders allow "Essential Businesses" to operate during the COVID-19 pandemic, they do not deem gun stores or shooting ranges essential. Plaintiffs request an injunction requiring Defendants, during a health crisis, to exempt arms-related commerce from expert medical judgment.

The Court should deny the request. To obtain injunctive relief, Plaintiffs must, first and foremost, demonstrate they will likely succeed. They cannot do that for at least three reasons. One is that the Health Orders—emergency directives issued to fight a once-in-a-lifetime viral pandemic—deserve deference. The Court can enjoin the enforcement of such orders only if "arbitrary" and "unreasonable." They are neither.

Second, Plaintiffs' broadside ignores a basic constitutional precept: Neutral, generally applicable laws do not trigger heightened scrutiny merely because they happen to incidentally burden protected conduct. Here, the Health Orders could not be broader: They reach all businesses and all individuals in Defendants' jurisdictions. Plaintiffs do not seriously argue—let alone establish—that the Orders' neutrality masks an invidious intent to attack gun commerce. Nor can Plaintiffs credibly claim that they bear the Orders' brunt disproportionately. The Health Orders temporarily burden every resident's individual liberties—from free speech to free exercise—for the greater good of all. These, in short, are *Health* Orders, not firearms regulations. As such, they elicit only rational basis review, which they readily satisfy.

Third, even if the Health Orders could somehow be construed as firearms regulations, intermediate scrutiny would apply because the burdens they incidentally impose on Second Amendment rights are modest. The Orders do not restrict who can bear arms, when, or where; what types of arms one can keep; or how one uses, carries, or stores those arms. They merely limit one's ability—temporarily—to engage in arms-related commerce: to buy *new* weapons, *more* ammunition,

1

1  and shoot targets at commercial facilities.  The burdens are particularly weak here, as each

2  individual Plaintiff fails, conspicuously, to claim he or she did not already own firearms before the

3  Health Orders issued, and each organizational Plaintiff likewise presents no evidence of any member

4  unable to defend hearth and home.

5      Thus, here, as in virtually every post-*Heller* case, if any tiered analysis applied, it would be

6  intermediate, not strict.  To survive, the Health Orders need only "substantially relate" to an

7  "important government interest."  Fighting the worst pandemic since 1918 qualifies as important.

8  And the Orders appropriately relate to that objective if public health experts could reasonably

9  conclude, first, that transacting business in person can spread disease; second, that closing all but the

10  most essential businesses is the best way to save lives; and, third, that during a health crisis the most

11  essential businesses are those that directly or indirectly satisfy basic human needs such as food,

12  medicine, and shelter.  Two courts in the Ninth Circuit recently answered each of these questions

13  affirmatively.  This Court should too.

14      The Health Orders also do not offend due process.  Plaintiffs, insisting they do, first argue the

15  Orders are under-and over-inclusive.  But that argument merely restates their Second Amendment

16  claim, and Plaintiffs cannot obtain indirectly, through substantive due process, that which the

17  specific, enumerated right does not guarantee them directly.  Plaintiffs next insist the Health Orders

18  violate separation of powers principles.  However, their brief does not cite a single case, or provide

19  any meaningful argument, to flesh out that claim.  Plaintiffs' final due process theory—that

20  vagueness voids the Orders—is equally bare-bones.  They do not explain what about the Orders,

21  which contain many examples and definitions, is so confusing as to make arbitrary and standard-less

22  enforcement inevitable.  Nor could they.

23      Because both claims lack merit, the Court need not consider the remaining requirements for a

24  preliminary injunction.  But at least one—the public interest—separately undermines Plaintiffs'

25  request.  The public has a stake in this case, and its interests are clear: to save lives and prevent

26  suffering.  That interest vastly outweighs the temporary, limited impact the Health Orders

27  incidentally impose on Plaintiffs' rights.  Their attempt to interfere with emergency efforts to protect

28  public health during a pandemic should be rejected.

2

Coronaviruses—a family of viruses named for the spikes that protrude from their membranes, which resemble a crown, or "corona"—affect birds and mammals, including humans. Declaration of Sara H. Cody, M.D. ("Cody Decl.") ¶ 7. A "novel" coronavirus is one not previously identified in humans. *Id.* COVID-19 refers to the disease caused by a coronavirus that health authorities first recorded in China late last year. *Id.* ¶ 6. It is highly contagious. People spread the virus by coughing, sneezing, and through close personal contact. *Id.* ¶¶ 8-9. Infection can also occur when individuals touch contaminated surfaces and transfer the virus to their eyes, mouth, or nose. *Id.* ¶ 9. People can be both asymptomatic and contagious. *Id.* In mild cases, symptoms include fever, fatigue, cough, and shortness of breath. *Id.* ¶ 7. Severe cases cause pneumonia, multiple organ failure, and death. *Id.* There is currently no vaccine for the novel coronavirus and no specific treatment or cure for COVID-19. *Id.* ¶ 7. Since January, COVID-19 has spread exponentially, quickly becoming a pandemic. *Id.*

Santa Clara County was an initial hot spot for the disease.[1] *Id.* ¶ 10. As of March 5, 2020, its Public Health Department had confirmed 31 cases. *Id.* ¶ 11. Ten days later, it confirmed 92 more, with additional cases and deaths occurring in neighboring Bay Area jurisdictions. *Id.* ¶¶ 11, 18. That same day, under authority granted by the California Health and Safety Code, the Health Officers of seven Bay Area jurisdictions, including Santa Clara, San Mateo, Alameda, and Contra Costa counties—all Defendants here—issued "substantively identical" orders (Plaintiffs' Memorandum of Points and Authorities ("Mot.") at pp. 5, 7, 8) directing their residents to shelter in place. Cody Decl. ¶ 12, Ex. A ("Initial Health Orders").[2] The Initial Health Orders attempted "to slow the spread of COVID-19 to the maximum extent possible." Ex. A ¶ 1. They permitted residents to leave home only for specified reasons, including to operate or patronize "Essential Businesses." Ex. A ¶ 2. The Orders identified 21 such businesses, most of which provide goods and

---

[1] Jurisdiction-specific data for San Mateo, Alameda and Contra Costa Counties are set forth in the concurrently filed Declarations of Drs. Scott Morrow, Erica Pan, and Chris Farnitano.

[2] Unless otherwise indicated, all cited exhibits are to the Cody Declaration.

services related to healthcare, food, medicine, hygiene, housing, mobility, and infrastructure. Ex. A ¶ 10.f. The Initial Health Orders took effect March 17, 2020 and were set to expire, unless earlier extended, on April 7, 2020. Ex. A ¶ 12.

During the interim, however, conditions deteriorated. By late March, the same seven Bay Area jurisdictions logged 2,092 cases and 51 deaths (Ex. B ¶ 9), even as the Initial Orders appeared to have slowed transmission rates (*id.* ¶ 8). Thus, on March 31, 2020, their respective Public Health Officers jointly issued new, stricter orders ("First Superseding Health Orders"; together with the "Initial Health Orders," the "Orders" or "Health Orders"). Cody Decl. ¶ 19. The First Superseding Health Orders named two objectives: to further slow COVID-19's spread and to "mitigate the [disease's] impact" on "critical healthcare services…" Ex. B ¶ 2. To achieve those aims, they extended the shelter period until May 3, 2020 (Ex. B ¶16), clarified and narrowed which businesses qualify as "essential" (*id.* ¶ 13.f) and made Essential Businesses follow specific "Social Distancing Protocols" (*id.* ¶ 13.h); *see also* Cody Decl. ¶¶ 19-22.

The First Superseding Health Orders apply to "[a]ll individuals currently living" in the issuing counties (Ex. B ¶ 3) and to "business[es]," defined broadly to include "any for-profit, non-profit, or educational entity . . . regardless of the nature of the service, the function it performs, or its corporate or entity structure" (*id.* ¶ 13.e); *see also* Ex. A ¶ 10.e. They do not exempt houses of worship. They make only a limited exception for funerals—at which just 10 or fewer individuals can attend (Ex. B ¶ 13.a.vi)—and for educational institutions, which may remain open solely to facilitate "distance learning" (*id.* 13.f.xv). Neither round of orders exempts gun retailers or shooting ranges. Neither, in fact, says anything at all about firearms. The First Superseding Health Orders mention "shooting and archery ranges" only as one among many examples of recreational facilities that must temporarily close. Ex. B ¶ 13.a.iii.C (also identifying "golf courses, tennis and pickle ball courts, rock parks, climbing walls, pools, spas, gyms, disc golf, and basketball courts"). The Initial Health Orders do not mention them at all.

The plaintiffs in this case are eight individuals, three gun and ammunition retailers, and five advocacy organizations. *See* First Amended Complaint ("FAC") ¶¶ 11-26. They maintain the Health Orders should have deemed firearms retailers and shooting ranges essential and that those

businesses could, if allowed to operate, follow social distancing protocols.  Mot. at 19:27-20:8.
Plaintiffs also suggest that, if those businesses followed "best practices," there would be no reason to keep them closed.  *Id.*  But each additional exemption from the Health Orders increases the risks of community transmission.  Cody Decl. ¶ 22; Declaration of George W. Rutherford, M.D. ("Rutherford Decl.") ¶ 11.  And, by practicing social distancing, businesses cannot eliminate the additional transmission risks their operation creates.  Rutherford Decl. ¶ 12; Cody Decl. ¶ 17.  The Defendant Public Health Experts therefore deliberately defined "Essential Businesses" narrowly to reach only businesses that directly and indirectly meet residents' basic needs.  Cody Dec. ¶¶ 21-22; Rutherford Decl. ¶ 11.  Firearms retailers do not qualify.

Plaintiffs sue not just the four counties identified above (and their respective Sheriffs, Public Health Officers and, in the case of Santa Clara, its District Attorney) but also four cities within their boundaries (San Jose, Mountain View, Pacifica, and Pleasant Hill), the Police Chiefs of those cities, and San Jose's Mayor.  *See* FAC ¶¶ 27-48.  Plaintiffs allege that law enforcement agencies in each city have enforced, or threatened to enforce, the Health Orders against firearms retailers.  *Id.* ¶¶ 89, 111, 122-23.  However, Plaintiffs do not allege—let alone attempt to prove—that law enforcement agencies have selectively enforced the Health Orders exclusively or primarily against businesses with a Second Amendment nexus.  Nor could they, as officers have made all manner of non-compliant businesses close.[3]  In fact, one of the articles cited by the FAC reports that, the same day the San Jose Police Department closed a gun shop, it took the same action against "three smoke shops, a pet grooming business and a flower shop."[4]

Plaintiffs allege the Health Orders are "ideologically driven" (FAC ¶ 87); provide "political cover to impose bans and restrictions on rights [Defendants] do not like" (*id.* ¶ 1); and reflect "animus" towards firearms retailers and related businesses (*id.* ¶¶ 86, 134).  They cite only two

---

[3] *See* Declarations of Neal Valenzuela, Dan Steidle, Colby Staysa, Robert Imobersteg, Jenna McAlpin, Bryan Hill, and Armando Espitia.

[4] *See* https://www.mercurynews.com/2020/03/18/coronavirus-san-jose-orders-gun-store-to-close-in-one-of-first-tests-of-essential-under-shelter-order/ (cited at FAC ¶ 86, n.8)

sources for these claims. The first is a hearsay statement in a newspaper article, attributed to San Jose's Mayor, that "we cannot have . . . *panic* buying of guns." *See* FAC ¶ 86 (emphasis added). Plaintiffs neither explain how a desire to avoid panic buying reflects animus nor attempt to tie the Mayor to the drafting of County-issued Orders. Second, Plaintiffs cite a notice that a shooting range posted on its website, which states simply that it had been "[c]losed" by an unidentified "order of the Santa Clara County District Attorney." *Id.* ¶ 87. Plaintiffs make no attempt to explain how that notice reflects any Second Amendment animus either.

Although Plaintiffs allege that they are "concerned about" their "safety" and emphasize that these are "uncertain times" (*id.* ¶ 10) and times of "crisis" (*id.* ¶¶ 7-8, 131, 134, 136), they identify no specific threats or evidence of increased crime. No individual Plaintiff alleges he or she did not already own guns and ammunition before the Initial Health Orders issued, and the organizational Plaintiffs also fail to identify members without arms.

Since Plaintiffs filed this lawsuit, the Defendant Public Health Officers have continued to protect the community from COVID-19, which continues to spread exponentially. Worldwide, authorities have now confirmed nearly 3.1 million cases and 218,000 deaths, though actual numbers are likely higher due to limited testing and incomplete reporting. Cody Decl. ¶¶ 6, 10. The U.S. has gone from just one confirmed case on January 21, 2020 to well over one million today; from zero deaths to nearly 60,000 (*id.*)—more than total U.S. combat fatalities in the Vietnam War. It is officially the worst pandemic since 1918.

And yet the Bay Area, at the hands of the same Defendant Public Health Officers, has gone from an early COVID-19 hot spot to a region with proportionally few cases and fatalities compared to other parts of the U.S. Rutherford Decl. ¶¶ 13-19. The number of deaths in New York, for example, where COVID-19 appears to have emerged later, exceed those in the Bay Area by well over a factor of ten. *Id.* ¶ 18. A leading expert unaffiliated with Defendants attributes the Bay Area's success to both the early timing and strict terms of the Orders. *Id.* ¶¶ 13-19. Locally, COVID-19's transmission rate has begun to flatten. *Id.* ¶ 19; Cody Decl. ¶¶ 23-32. Whereas the number of cases doubled every five days as of March 16, 2020, the virus now takes about 60 days to achieve that same feat. Cody Decl. ¶ 23. The Health Orders' restrictions will not last forever. Now,

however, is not the time to abandon them.[5]

### III. ARGUMENT

#### A.  A PRELIMINARY INJUNCION IS AN EXTRAORDINARY REMEDY

A "preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008).  One may issue only if the moving party "clearly show[s]" that, absent injunctive relief, he will suffer "immediate and irreparable injury, loss, or damage." *Id.*; *see also* Fed. R. Civ. P. 65.  To satisfy that burden, the movant must establish that it will likely (i) succeed on the merits and (ii) suffer irreparable harm without preliminary injunctive relief, (iii) that the equities tip in its favor, and (iv) that an injunction would further the public interest.  *Winter*, 555 U.S. at 20.  Plaintiffs cannot meet their burden here, as the claims they press— for deprivations of Second Amendment (FAC ¶¶ 127-46) and due process (*id.* ¶¶ 147-55) rights— lack merit, and the injunction they seek, which would prevent enforcement of emergency health directives, contravenes the public interest.

#### B.  PLAINTIFFS' SECOND AMENDEDMENT CLAIM WILL NOT SUCCEED

##### 1.  The Orders Satisfy Deferential Standards for Emergency Directives

"[T]he liberty secured by the Constitution . . . does not import an absolute right in each person to be, at all times and in all circumstances, wholly freed from restraint." *Jacobson v. Commonwealth of Massachusetts*, 197 U.S. 11, 26 (1905).  Individual rights, rather, must at times give way to the "principle of self-defense," which confers on the "community . . . the right to protect itself against" forces that "threaten[] the safety of its members." *Id.*  "[A]n epidemic of disease" qualifies as a threat implicating core, self-defensive police powers.  Courts may invalidate emergency measures taken to repel such threats only if they bear "no real or substantial relation to th[eir] objects" or "beyond all question" effect "a plain, palpable invasion of rights . . . ." *Id.* at 31. *Jacobson*, which involved compulsory vaccination during a smallpox epidemic, alternatively framed

---

[5] On April 29, 2020, the County Defendants issued new versions of the health orders that extend the shelter period until May 31, 2020 and relax certain restrictions.  The FAC does not challenge those orders, and Plaintiffs' brief does not address them.  If Plaintiffs do place them at issue, Defendants will, at the Court's direction, file a supplemental brief defending them.

7

the question as whether the government acted in an "arbitrary, unreasonable manner." *Id.* at 28.

Other courts, considering emergency curfews that curtail constitutional rights, have articulated a

slightly different but equally deferential test: That "the scope of review is limited to . . .

determin[ing] whether" state "actions were taken in good faith and whether there is some factual

basis" for them. *Smith v. Avino*, 91 F.3d 105, 109 (11th Cir. 1996) (upholding post-hurricane curfew

against constitutional challenge and noting that "[i]n an emergency situation, fundamental

rights . . . may be temporarily limited or suspended"); *United States v. Chalk*, 441 F.2d 1277, 1281

(4th Cir. 1971) (same, as to riot-induced curfew).

Here, whether the Court applies *Jacobson* or other emergency-powers cases, the result

would be the same. Under *Jacobson*, the Health Orders "substantial[ly] relat[e] to" their

objectives—minimizing COVID-19 transmission rates and conserving healthcare resources—by

limiting the number and types of organizations that can expose their employees, customers, and

business partners to infection. The Orders are also not "beyond question" arbitrary or unreasonable,

as they were drawn neutrally, apply temporarily, and reasonably make limited exceptions only for

businesses that support the basic needs of residents. *See In re Abbott*, 954 F.3d 772, 783 (5th Cir.

2020) (holding that district court erred by declining to apply *Jacobson* to COVID-19 health

directive; upholding order against due process challenge due to its facial neutrality, limited temporal

scope, and reasonable exceptions). Likewise, under curfew authorities, the Health Orders survive

judicial review because Plaintiffs do not (and cannot) argue Defendants did not issue them "in good

faith" or that there is no "factual basis" for the lines that they draw. Plaintiffs urge this Court to

redraw those lines, but doing so would "usurp the function[]" of "another branch of government" to

effect emergency health measures. *Id.* at 801.

Plaintiffs do not address *Jacobson* or other emergency-powers authorities. They instead cite

*Bateman v. Perdue*, 881 F. Supp. 2d. 709 (E.D.N.C. 2012) for the claim that the "calculus does not

change in an emergency, declared or otherwise." Mot. at 17:3-15. But, besides being an out-of-

circuit district court case, *Bateman* did not consider whether a different standard should apply during

emergencies; it merely imported, without discussion, standards from cases that involved non-

emergency enactments. Because a "decision is not precedent on issues that were neither raised by

8

counsel nor discussed in the opinion of the court," *Bateman* provides Plaintiffs no support. *Watkins v. U.S. Army*, 875 F.2d 699, 721 (9th Cir. 1989) (quoting *Sethy v. Alameda County Water Dist.,* 545 F.2d 1157, 1159–60 (9th Cir.1976) (en banc)). The statutes *Bateman* considered also differ from the Health Orders in two respects. First, they were not facially neutral because they specifically targeted "dangerous weapon[s]." *Bateman,* 881 F. Supp. 2d. at 711. Second, the North Carolina Legislature determined that, whenever a state of emergency existed (a frequent occurrence there, *id.* at 711), some of those regulations applied automatically, broadly barring firearm possession and transportation, while localities were automatically authorized to impose other, even broader restrictions on possession, transportation, and use. *Bateman*, 881 F. Supp. 2d at 710-11. Here, in contrast, health officials acted in response to a particular threat, whose magnitude is nearly unprecedented. Their judgments about what *this* emergency requires deserve greater deference than the blanket determinations *Bateman* considered.

## 2.    The Orders Do Not Trigger Heightened Second Amendment Scrutiny

Even without regard to emergency-specific standards, the Orders easily pass constitutional muster. The Second Amendment provides: "A well regulated militia being necessary to the security of a free state, the right of the people to keep and bear arms shall not be infringed." U.S. Const. amend. II. It confers "an individual right to keep and bear arms," *District of Columbia v. Heller*, 554 U.S. 570, 595 (2008), which the Fourteenth Amendment's Due Process Clause protects against state and local infringement, *McDonald v. City of Chicago, Ill.*, 561 U.S. 742, 750 (2010). But just as the First Amendment does not require "judicial scrutiny" of every law that "happens to burden expressive conduct," the Second Amendment does not demand trenchant inspection of every regulation that incidentally implicates arms. *Talk of the Town v. Dep't of Fin. & Bus. Servs. ex rel. City of Las Vegas*, 343 F.3d 1063, 1073 (9th Cir. 2003). And while courts have yet to consider neutral and generally applicable regulations like the Orders in Second Amendment environs, well-developed First Amendment precedent guides the way. *See Heller*, 554 U.S. at 595 (referencing First Amendment precedents); *Jackson v. City & Cty. of San Francisco*, 746 F.3d 953, 960-61 (9th Cir. 2014) (stating that "First Amendment principles" guide Second Amendment analyses). First Amendment jurisprudence asks whether broad enactments target constitutionally protected activities

9

such as speech or religion.  If not, they elicit no heightened scrutiny, regardless of whether they happen incidentally to burden that conduct.

Two lines of cases illustrate the principle.  The first, involving free expression, springs from *Arcara v. Cloud Books, Inc.*, 478 U.S. 697 (1986).  There, a sheriff's department uncovered "illicit sexual activities" occurring at Cloud Books, an adult bookstore.  *Id.* at 698-99.  Local officials closed the store for one year based on health code provisions that defined "places of prostitution . . . as public health nuisances."  *Id.*  Cloud Books argued the penalty "impermissibly burden[ed] its First Amendment protected bookselling activities."  *Id.* at 705.  The Supreme Court disagreed for two reasons.  First, the conduct that drew the penalty—illicit sexual conduct—involved "no element of protected expression."  *Id.*  Second, the health law did not "single out bookstores or others engaged in First Amendment protected activities for . . . its burden."  *Id.* (distinguishing tax imposed on "large quantities of newsprint and ink," whose burdens fell "almost exclusively . . . upon the shoulders of newspapers").  The case was therefore no different than one where officials closed a store for "Fire Code violations or health hazards . . . ."  *Id.*  Enforcing "a public health regulation of general application" did "not implicate[]" the First Amendment at all, even though the regulated business also "happen[ed] to sell books."  *Id.* at 707.

The Ninth Circuit applied *Arcara* in *Talk of the Town*.  That case involved a "business licensed to present erotic dancing"—Talk of the Town (TOT)—which had violated a municipal code barring alcohol consumption in establishments without a liquor license.  *Talk of the Town*, 343 F.3d at 1065.  When the City of Las Vegas attempted to close the club for three weeks, TOT argued that penalty would infringe its First Amendment rights.  The Ninth Circuit rejected the argument that because nude dancing involved "constitutionally protected expression," *id.* at n.11, TOT's closure triggered First Amendment scrutiny, *id.* at 1068.  By requiring a liquor license, the City did not "regulate conduct containing an element of protected expression."  *Id.* at 1069-70.  The law also did not disproportionately burden individuals engaging in expressive conduct; it "applied to all business, whether…bookstores or bars."  *Id.*  As the burdens on TOT were an "incidental result" of a "generally applicable liquor license requirement," the First Amendment did not apply, notwithstanding the "mere happenstance" that protected activity occurred at TOT.  *Id.* at 1072.  That

10

1  TOT's "First Amendment rights [would] be completely suppressed for the duration of the
2  suspension" did not change that conclusion.  *Id.* at 1073.

3      The Health Orders Plaintiffs challenge are indistinguishable, in relevant respects, from those
4  upheld in *Arcara* and *Talk of the Town*.  The behavior they regulate—potentially disease-spreading,
5  interpersonal contact—is no more arms-related than the regulated conduct in those cases was
6  expressive.  There is, to be sure, a difference: Whereas the businesses in those cases engaged in two
7  separate activities—one non-expressive (harboring prostitution, allowing liquor consumption
8  without a license), and another expressive (book selling, nude dancing), Plaintiffs here want to
9  violate social distancing directives *while* buying, selling, and shooting guns.  But, either way, the
10 association of protected and unprotected activity is "mere happenstance" and thus constitutionally
11 irrelevant.  Plaintiffs cannot claim constitutional protection from broad, neutral health directives just
12 because arms-related commerce would violate them.

13     The Health Orders also do not "single out" gun shops to "almost exclusively" bear their
14 burdens.  Plaintiffs do not address the point directly (their arguments simply assume, incorrectly,
15 that the Orders constitute non-neutral regulations of firearms), but they do argue that, due to the
16 face-to-face nature of firearms transactions, the Orders burden gun stores, and thus gun rights,
17 disproportionately.  *See* Mot. at 14:15-18.  Their argument overlooks the fact that many types of
18 businesses—barbershops, bars, sports venues, and gyms, to name just a few—also cannot transact
19 business "remotely" and therefore have been "shut down" completely.  *Id.*  So have institutions
20 central to other individual constitutional rights, including libraries, houses of worship, and jury trials.
21 Orders that burden everyone single out no one.

22     The second line of cases, involving free exercise, stems from *Employment Division,
23 Department of Human Resources of Oregon v. Smith*, 494 U.S. 872 (1990).  There, citing a rule
24 against paying individuals who lost their jobs due to "work-related misconduct," Oregon denied
25 unemployment benefits to the respondents, who had been fired for ingesting peyote during religious
26 ceremonies.  *Id.* at 874.  They challenged the statute under the Free Exercise Clause, arguing the
27 state could not "require[] any individual to observe a generally applicable law that requires (or
28 forbids) the performance of an act that his religious belief forbids (or requires)."  *Id.* at 878.  The

11

Supreme Court emphasized that the law forbidding peyote use was "not specifically directed at [any] religious practice" and "constitutional as applied to those who use the drug" for non-sacramental reasons. *Id.* Noting that the "right to ignore generally applicable law . . . is a constitutional anomaly," the Court declined to apply heighted scrutiny.

By contrast, in *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520 (1993), the Supreme Court considered ordinances barring animal sacrifice that were neither neutral nor generally applicable. The laws said nothing about religion. However, their legislative history (they were enacted in "direct response to the opening of a church," *id.* at 540), operation ("almost the only conduct subject to" them was that church's rituals, *id.* at 535) and overbreadth (they "proscribe[d] more religious conduct"—including sanitary slaughters—"than…necessary to achieve their stated ends," *id.* at 538) established that lawmakers had crafted language that, despite its facial neutrality, was designed to "suppress[] …religion (*id.* at 540). The ordinances also did not apply generally because they were "underinclusive to a substantial extent" (*id.* at 547): They purported to protect public health and prevent animal cruelty but placed no restrictions on secular activities like hunting that implicated the same concerns (*id.* at 542-43).

The Ninth Circuit applied *Smith* and *Lukumi* this year. In *Parents for Privacy v. Barr*, 949 F.3d 1210 (9th Cir. 2020), an Oregon public school allowed transgender students to use bathrooms and other facilities that matched their gender identity. *Id.* at 1217. The student-plaintiffs argued that policy violated their free-exercise rights because, by forcing them to share facilities with individuals of the opposite biological sex, it prevented them from "practicing the modesty that their faith requires of them." *Id.* at 1234. Disagreeing, the Ninth Circuit found the policy neutral: It made "no reference to any religious practice" and, unlike *Lukumi,* bore no evidence having effected a "religious gerrymander." *Id.* at 1235. The policy also applied generally, as it "affect[ed] all students and staff" and did not, as in *Lukumi,* "place demands on exclusively religious persons or conduct." *Id.* at 1236. Being "neutral and generally applicable," the challenged rule elicited only rational basis review, which it readily satisfied. *Id.* at 1236-38.

Here, the Health Orders' congruence with *Smith* and *Parents for Privacy* could not be clearer. As in those cases, the Orders say nothing expressly about guns or gun sales. Also as in

those cases—and in contrast to *Lukumi*—Plaintiffs, despite being the burden-bearing movants, provide not one iota of evidence that its facial neutrality masks any arms-related animosity. Although Plaintiffs *allege* the Orders were "ideologically driven" and reflect "animus" against guns, they identify no *evidence*, and present no *argument*, supporting either claim—no facts suggesting Defendants issued the Orders in "direct response" to any firearms-related concern; no reason to believe the orders operate non-neutrally, either because "almost the only conduct" they reach relates to guns or because authorities have selectively enforced them in that manner; and no evidence the Orders "proscribe more [Second Amendment] conduct than . . . necessary to achieve their stated ends." *Lukumi*, 508 U.S. at 538. Quite the contrary. Plaintiffs admit that, for reasons wholly unrelated to the Orders, all commercial firearms and ammunition transactions must occur in-person. Mot. at 13:25-14:12. All, therefore, raise transmission risks. Plaintiffs' offer to "adhere[] to . . . best practices" (Mot. at 20:4-8) does not eliminate that risk.

The Orders also apply generally. Plaintiffs suggest they do not because they exempt numerous types of businesses. But "[g]eneral applicability does not mean absolute universality." *Olsen v. Mukasey*, 541 F.3d 827, 832 (8th Cir. 2008). Thus, in *Stormans, Inc. v. Wiesman*, 794 F.3d 1064, 1081 (9th Cir. 2015), the Ninth Circuit rejected an argument that, because a Washington law that otherwise required pharmacies to fill all prescriptions (including contraceptive pills) carved out secular but not religiously motivated exceptions, it lacked general applicability. The court explained that the exceptions—for fraud, inability to pay, lack of supplies, and emergencies—were necessary for pharmacies "to operate in the normal course of business." *Id.* at 1080. Thus, far from contradicting the "proffered interest[s]" underlying the enactment, *Lukumi*, 508 U.S. at 543, those exceptions "further[ed] the rules' stated goal of ensuring timely and safe patient access to medications," *Stormans*, 794 F.3d at 1080.

Here, likewise, the Health Orders' exceptions further their "proffered interests" to protect the community from disease and conserve healthcare resources: residents cannot shelter in place without food, medicine, and (to state the obvious) shelter. Plaintiffs emphasize that the exceptions extend—"arbitrari[ly], they say—to "convenience stores," "auto-supply stores," "landscapers," "gardeners," "bicycle repair and supply" stores, and "hardware stores." Mot. at 21:3-15. But

13

convenience stores qualify only if they sell food (Cody Decl., Ex. B at 13.f.ii) and are often the only option for low income individuals who live far from full service grocers; auto-supply and bicycle stores repair vehicles necessary for medical staff and other essential employees to travel to work; landscapers and gardeners can work only to "maintain . . . habitability" and "safety"—by abating weeds, for example, in fire-prone regions (*id.* at 13.f.xiii); and many habitability-impairing problems, from broken appliances to overflowing toilets, can be fixed only with supplies hardware stores stock. These exceptions hardly place the Health Orders' aims at odds with their means, let alone establish that their restrictions are being imposed "only against conduct with a [Second Amendment] motivation." *Lukumi,* 508 U.S. at 543; *see also Hampshire v. City of Santa Cruz,* 899 F. Supp. 2d 922, 936 (N.D. Cal. 2012) (rejecting argument that noise ordinance was not generally applicable because it exempted dins caused by "garbage collection, street sweeping and other public health activities"—but not itinerant preaching—as those exemptions did not "undermine the City's interest in curbing excessive noise").

Thus, under both free expression and free exercise lines of cases, the Health Orders—neutral and generally applicable regulations—avoid heightened scrutiny. And while the principle has not been applied in Second Amendment contexts, two Ninth Circuit judges have articulated it there. *See Teixeira v. Cty. of Alameda*, 873 F.3d 670, 698 (9th Cir. 2017) (en banc) (Bea, J. dissenting) (noting in Second Amendment case that "[i]f there were a zoning measure of general application to bar retail stores of any kind within 500 feet of residences to lower traffic or noise, we wouldn't be here."); *Pena v. Lindley*, 898 F.3d 969, 1008 (9th Cir. 2018) (Bybee, J., concurring in part, dissenting in part) ("[R]ules of general applicability do not violate the Second Amendment just because they place conditions on commercial sales. . . . Fire codes, sales taxes, and commercial licenses are ordinary conditions on commercial sales generally.") They were right to do so. Regulations that apply generally and do not target protected rights, either by design or disproportionate impact, raise no constitutional concerns. That principle ends the analysis, for Plaintiffs do not—and cannot—argue the Orders have no rational basis.

### 3. If the Health Orders Elicit Second Amendment Review, They Satisfy It

Even if the Court scrutinized the Health Orders as though they regulated firearms, the result

14

would be the same. The Ninth Circuit applies a two-part test to firearms regulations. It first asks whether a law "burdens conduct protected by the Second Amendment." *Jackson*, 746 F.3d at 960. If so, it identifies and applies the "appropriate level of scrutiny." *Id.*

Here, the claims made by seven Plaintiffs—three retail establishments and four individuals— that their right to "sell and transfer" arms has been curtailed (FAC ¶¶ 14-17, 19-21)—fail at step one, because "the Constitution does not confer a freestanding right on commercial proprietors to sell firearms." *Teixeira*, 873 F.3d at 673. The remaining claims fail at step two, because even if the Health Orders incidentally burden a Second Amendment right to acquire arms, intermediate scrutiny applies, and the Orders satisfy it.

### a.  At Most, The Health Orders Elicit Intermediate Scrutiny

The appropriate level of scrutiny turns on (1) "how closely the law comes to the core of the Second Amendment right;" and (2) how severely, if at all, the law burdens that right. *Jackson,* 746 F.3d at 963. "Intermediate scrutiny is appropriate if [either] the regulation . . . does not implicate the core Second Amendment right *or* does not place a substantial burden on that right." *Fyock v. Sunnyvale*, 779 F.3d 991, 998–99 (9th Cir. 2015). The core Second Amendment right is that of "law-abiding, responsible citizens to use arms in defense of hearth and home." *Bauer v. Becerra*, 858 F.3d 1216, 1222 (9th Cir. 2017).

Here, Plaintiffs initially argue that the Health Orders are "categorically unconstitutional." Mot. at 13:13-14. Citing *Heller*, they claim that because the Orders effect "a destruction of a fundamental, individual right" (Mot. at 14:19-20), "any interest-balancing test, including tiered scrutiny, is inappropriate" (*id.* at 15:8-10). But *Heller* did not announce a new categorical standard for firearms regulations. It instead held that "[u]nder any of the standards of scrutiny that we have applied to enumerated constitutional rights," the regulation challenged there "would fail constitutional muster." *Heller*, 554 U.S. at 628-629. In the language Plaintiffs cite about "interest-balancing," the Court rejected not the application of those traditional standards but a new form of analysis Justice Breyer proposed in dissent. *Id.* at 634. ("Justice Breyer . . . proposes. . . *none of the traditionally expressed levels* (strict scrutiny, intermediate scrutiny, rational basis), but rather a judge-empowering "interest-balancing inquiry . . . .") (emphasis added); *see also Binderup v.*

15

*Attorney Gen. United States of Am.*, 836 F.3d 336, 344-45 (3d Cir. 2016) (rejecting view that *Heller* announced categorical rule); *Kachalsky v. Cty. of Westchester*, 701 F.3d 81, 89 n.9 (2d Cir. 2012) (same).  The Ninth Circuit has not applied Plaintiffs' theory in any precedential opinion.  Of the two panel opinions that recognized it, one was reheard—and effectively overruled—en banc; the other awaits rehearing.  *See Peruta v. Cty. of San Diego*, 742 F.3d 1144, 1170 (9th Cir. 2014), *on reh'g en banc,* 824 F.3d 919 (9th Cir. 2016) (affirming summary judgment for counties that regulated concealed carry of firearms); *Young v. Hawaii*, 896 F.3d 1044, 1071 (9th Cir. 2018), *reh'g en banc granted*, 915 F.3d 681 (9th Cir. 2019).

Even if the rule exists, it finds no home here.  Far from "destr[oying]… [the] fundamental, individual right" to keep and bear arms, the Health Orders do not limit firearms possession or use at all, and the indirect restrictions they do impose are temporary.  Mot. at 14:18-20.  Just as limited geographical boundaries take *per se* rules off the table, the Health Orders' temporal limits make any categorical analysis inappropriate.  *See GeorgiaCarry.Org, Inc. v. U.S. Army Corps of Engineers*, 788 F.3d 1318, 1325-26 (11th Cir. 2015) (rejecting "swing-for-the-fences" argument that law was *per se* unconstitutional under *Heller*; noting that, far from "totally banning" handguns, it only prevented their possession in recreational area," allowing plaintiffs to "freely exercise their right to bear arms for self-defense elsewhere").  Plaintiffs' fallback bid for "strict scrutiny," which they base on exactly the same assertion—that the Orders "completing [*sic*] destroy[] the right to keep and bear arms . . . ."—fails for precisely the same reason.  Mot. at 16:24-17:3.  Even if the Orders impact the right of "law-abiding…citizens to use arms in defense of hearth and home," *Bauer,* 858 F.3d at 1222, they do so indirectly and modestly.

Two Ninth Circuit cases illustrate how the Orders' burden should be weighed and why they justify imposing nothing stricter than intermediate review.  The first, *Silvester v. Harris*, 843 F.3d 816 (9th Cir. 2016), involved a challenge to California's mandatory 10-day waiting period for firearm purchases.  *Id.* at 818.  Weighing that burden, the Ninth Circuit emphasized that the law's temporal limitation did "not prevent, restrict, or place any conditions on how guns are stored or used after a purchaser takes possession."  *Id.* at 827.  They also did not disqualify any "individuals from owning a firearm."  *Id.*  For both reasons, and because "[t]here is . . . nothing new in having to wait"

16

for firearms —"delivery took time" in the 18th and 19th centuries—the burden was "very small" and the appropriate level of scrutiny intermediate. *Id.*

In *Wilson v. Lynch*, 835 F.3d 1083 (9th Cir. 2016), the Ninth Circuit considered federal laws and guidance from an enforcement agency that, together, barred dealers from selling firearms to individuals, such as the plaintiff, to whom Nevada had issued state-law medical marijuana cards. *Id.* at 1089. The court observed that the regulations prohibited "only the sale of firearms to [plaintiff]— not her possession of firearms." *Id.* at 1093. Thus, she "could have amassed legal firearms before acquiring a registry card," and nothing "impede[d] her right to keep her firearms or to use them to protect herself and her home." *Id.* Finally, she "could acquire firearms and exercise her right to self-defense at any time by surrendering her registry card . . . ." *Id.* For all three reasons, the burden was "not severe" and the court "appl[ied] intermediate scrutiny to determine whether the[] laws and guidance pass constitutional muster." *Id.*

Here, as in *Silvester*, the Health Orders do not limit who can bear arms, where, or when; what types of weapons one may own; how one stores them at home; or whether one can carry them in public. As in both *Silvester* and *Lynch*, they only limit arms-related commerce: the ability to acquire *new* weapons, *more* ammunition, and to target-shoot at commercial facilities. And even the first two of those restrictions are not absolute, as California law does not require dealer participation in all transactions. *See* Cal. Penal Code § 27875 (permitting family transfers); *id.* § 27881 (loans at lender's residence); *id.* § 27885 (three-day loans); *id.* (loans within family). Most important, all of the Orders' burdens are *temporary*. The first Health Order issued March 16, 2020 and the second expires May 3, 2020—a little over four weeks after Plaintiffs filed this lawsuit. Their limited temporal scope is far closer to the 10-day wait *Silvester* characterized as imposing a "very small" burden than the limitless ban *Heller* struck down. *See also United States v. Torre*s, 911 F.3d 1253, 1263 (9th Cir. 2019) (finding burden of law barring firearms possession by undocumented immigrants "tempered" by fact that it applied only so long as person's status remained unlawful); *Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 700 F.3d 185, 207 (5th Cir. 2012) (holding that "the temporary nature" of burden imposed by law preventing 18-20 year-olds from purchasing handguns "reduces its severity" and emphasizing that everyone subject to

17

it "will soon grow up and out of its reach").

The burden, moreover, is particularly insubstantial here. None of the individual Plaintiffs claims he or she did not already own guns and ammunition before the Health Orders issued, and none of their organizational counterparts claim their members are so situated either. Thus, there is no evidence that any of *these* Plaintiffs has been deprived—even temporarily—of the core Second Amendment right to self-defense. And "if there is no constitutional defect in the application of the statute to a litigant, he does not have standing to argue that it would be unconstitutional if applied to third parties in hypothetical situations." *Cty. Court of Ulster Cty., N.Y. v. Allen,* 442 U.S. 140, 155 (1979); *see also United States v. Salerno,* 481 U.S. 739, 745 (1987) (noting that, for facial challenge, plaintiff "must establish that no set of circumstances exists under which the Act would be valid"); *Wright v. Incline Vill. Gen. Improvement Dist.*, 665 F.3d 1128, 1134 (9th Cir. 2011) ("if we find that Ordinance 7 and Policy 136 are constitutional as applied to Wright, the facial challenge also fails"); *Kachalsky*, 701 F.3d at 101 ("In view of our determination that New York's proper cause [firearm regulation] is constitutional under the Second Amendment as applied to Plaintiffs, we also reject their facial overbreadth challenge.").

*Silvester* and *Lynch* are not outliers. They reflect the "near unanimity . . . that when considering regulations that fall within the scope of the Second Amendment, intermediate scrutiny is appropriate." *Silvester*, 843. F.3d at 823. Defendants know of no post-*Heller* Ninth Circuit case (Plaintiffs certainly cite none) that strictly scrutinized a firearms regulation. *See Jackson*, 746 F.3d at 968 (applying intermediate scrutiny to ordinance regulating handgun storage and ammunition sales); *Fyock*, 779 F.3d at 999 (same, to ordinance restricting possession of large-capacity magazines); *Chovan*, 735 F.3d at 1137-38 (9th Cir. 2013) (same, to law preventing domestic violence misdemeanants from possessing firearms); *Torres*, 911 F.3d at 1262-63 (same, to law barring undocumented immigrants from possessing firearms); *Mai v. United States*, 952 F.3d 1106, 1115 (9th Cir. 2020) (same, to law preventing firearms purchases by individuals involuntarily committed to mental health institutions); *Bauer v. Becerra,* 858 F.3d 1216, 1222 (9th Cir. 2017) (same, to state law imposing fees on firearms purchases); *Silvester,* 843 F.3d at 827 (same, to law establishing 10-day waiting period); *Lynch*, 835 F.3d at 1089 (same, to regulations preventing

18

firearms purchases by holders of marijuana cards).  It makes no sense to apply greater scrutiny to Orders that do not specifically regulate firearms.

Two district courts in California recently reached the same conclusion when considering Second Amendment challenges to substantially similar orders.  Request for Judicial Notice ("RJN"), Ex. A at p. 5 (applying intermediate scrutiny to shelter-in-place orders that the City and County of Los Angeles enacted from March 19, 2020 through April 19, 2020 that did not deem firearms retailers essential, because they were "not as sweeping as the complete handgun ban at issue in" *Heller*) (quoting *Fyock*, 779 F.3d at 999); *id.* Ex. B at p. 2 (same, as to public health order Ventura County enacted from March 20, 2020 through April 19, 2020 unless extended).  In the former case, an individual plaintiff alleged that he "does not own or possess any ammunition."  *Id.*, Ex. C ¶ 65. His burden, slight as it was, exceeded that of any Plaintiff here.

**b.      The Orders Satisfy Intermediate Scrutiny**

The Orders readily survive intermediate review.  "The test is not a strict one."  *Silvester,* 843 F.3d at 827.  It requires "only that the law be substantially related" to an "important government interest."  *Id.*  Fighting the greatest pandemic since 1918 satisfies the second requirement, as Plaintiffs concede.  *See* Mot. at 25:2-3 (recognizing the Defendants' interests are "serious in nature").  Regarding fit, "intermediate scrutiny does not require the least restrictive means of furthering a given end."  *Id. Silvester* is instructive here as well.  The 10-day waiting period there served two purposes: It allowed authorities to run background checks confirming would-be buyers were eligible to purchase firearms, and it provided a "cooling-off" period to deter impulsive acts of self-harm and violence.  *Id.* at 824.  The plaintiffs had all purchased firearms previously.  They pointed out that their background checks often cleared before the full 10 days ran; at that point, the only legislative interest possibly served by making them wait longer was to deter impulsive acts of violence, which, as prior gun purchasers, they already had the means to commit.  *Id.* at 828. Making them wait therefore served no legislative purpose at all.  The district court agreed and, following a trial, entered judgment in their favor.  *Id.*

The Ninth Circuit reversed.  It reasoned that some serial purchasers may no longer have operable firearms and that others may want weapons that "will do more damage when fired into a

19

crowd." *Id.* at 828.  In both cases, a cooling-off period served the Legislature's purpose, satisfying intermediate scrutiny.  That most serial firearms purchasers satisfied neither description—that, in other words, the law lacked a narrow means-end fit—did not matter.  *Silvester's* application of intermediate scrutiny is consistent with a large body of precedent.  *See Jackson*, 746 F.3d at 960-61 (allowing city to require all owners store handguns in safe, mainly to protect children, even though many households had only adult habitants); *Torres*, 911 F.3d at 1262-63 (upholding law disqualifying all undocumented immigrants from buying firearms, even though most such individuals are non-violent); *Bauer* 858 F.3d at 1222 (deeming fees imposed on all firearm purchasers lawful even though they funded background investigations that ended up disqualifying only small subset of buyers); *Mai*, 952 F.3d at 1115 (holding that government may prevent all individuals previously committed to mental health institutions from obtaining firearms, even those who could demonstrate years-long freedom from illness); *Chovan*, 735 F.3d at1137-38 (rejecting attack on law that prevented all domestic violence misdemeanants from possessing firearms, even the subset at low risk for recidivism).

  The Orders' means more closely fit their ends here.  Plaintiffs fault the Orders for not allowing firearms retailers to operate even though they could follow the same social distancing requirements that Essential Businesses follow.  Mot. at 19:23-20:22.  But "best practices" reduce infection risks; they do not eliminate them.  Thus, whereas most serial firearms purchasers in *Silvester* did not implicate that law's aims, here, every individual Plaintiff *is* a potential vector for infection, so preventing them from transacting business, in person, *does* further the Orders' objectives.  To the extent Plaintiffs premise their argument on their subsidiary claim that the Orders, by exempting certain businesses but not firearms retailers, are "pierced with . . . inconsistencies" (Mot. at 19:15-16), it fails for reasons provided above.  Defendants had sound epidemiological reasons to exempt the smallest possible number of businesses, and they reasonably focused on those that directly or indirectly meet basic needs.  Many institutions—bookstores, houses of worship, libraries, schools, businesses that "present erotic dancing" to name a few—can claim some constitutional status.  Defendants cannot exempt them all.

  And, again, this Court comes to the question not as a matter of first or even second

impression.  In the Los Angeles County case, Judge Birotte noted that COVID-19 "spreads where an infected person coughs, sneezes, or otherwise expels aerosolized droplets containing the virus" and thus held that "the closure of non-essential businesses, including firearms and ammunition retailers, reasonably fits the City's and County's stated objectives of reducing the spread of this disease." RJN, Ex. A at pp. 5-6.  Judge Marshall likewise held that the Ventura County plaintiffs were not likely to succeed because "mitigation efforts" would be less effective "without the closure of non-essential facilities."  *Id.*, Ex. B at p. 2.  The same reasoning applies to the same degree here; it defeats Plaintiffs' Second Amendment claim.

### C.    PLAINTIFFS' DUE PROCESS CLAIM WILL NOT SUCCEED

Plaintiffs' second claim—that the Orders violate substantive due process—appears to assert three predicates: "arbitrariness" (Mot. at 21:3), "separation of powers" (*id.* at 22:13), and "vagueness" (*id.* at 21–23).  None has merit.

The first merely recasts Plaintiffs' failed Second Amendment claim.  Plaintiffs argue the Health Orders are "arbitrary" because the list of businesses they deem essential is over- and under-inclusive.  *See* Mot. at 21:3-15.  But their Second Amendment claim rests on the same argument, and "if a constitutional claim is covered by a specific constitutional provision . . . , the claim must be analyzed under the standard appropriate to that specific provision, not under the rubric of substantive due process." *County of Sacramento v. Lewis,* 523 U.S. 833, 843 (1998).  Thus, Plaintiffs' substantive due process claim cannot succeed where its Second Amendment analogue fails.  *See, e.g., Mahoney v. Holder*, 62 F. Supp. 3d 1215, 1223 (W.D. Wash. 2014) (rejecting due process claim based on alleged Second Amendment deprivation).  Moreover, even if Plaintiffs could allege a freestanding substantive due process claim, they could not, as they must to support such a claim, establish that the Health Orders shock the conscience or lack any arguably legitimate rationale.  *See, e.g.*, *Samson v. City of Bainbridge Island,* 683 F.3d 1051, 1060 (9th Cir. 2012) (rejecting substantive due process claim based on allegedly arbitrary nature of building moratorium where it was "at least fairly debatable" that moratorium furthered legitimate interest); *Kawaoka v. City of Arroyo Grande,* 17 F.3d 1227, 1234 (9th Cir. 1994) (same).

Plaintiffs offer their second theory—separation of powers—without a single supporting authority or any explanation of how the Orders violate the doctrine they cite. They simply declare, without elaboration, that the Orders "bypass[] the constitutionally authorized method for enacting laws" because "[l]egislatures are supposed to enact laws" while "executive agencies are supposed to enforce them." Mot. 22:7-10. These are assertions, not arguments, and "[i]ssues raised in a brief which are not supported by argument are deemed abandoned." *Kohler v. Inter-Tel Techs.*, 244 F.3d 1167, 1182 (9th Cir. 2001). The claims are also incorrect. A state's police power permits it to "invest local bodies . . . with authority in some appropriate way to safeguard the public health;" the "manner in which those results are to be accomplished is [also] within the discretion of the state." *Jacobson*, 197 U.S. at 25. Here, California Health and Safety Code sections 101040, 101085, and 120175 all delegate to "local health officer[s]" the power to take various preventative and responsive measures to "prevent the spread of [] disease." The County Health Officers appropriately relied on these grants when issuing the Health Orders.

Plaintiffs do even less to develop their void-for-vagueness theory. The standard requires them to establish the Health Orders are "so vague that [they] fail[] to give ordinary people fair notice of the conduct [they] punish[], or [are] so standardless that [they] invite[] arbitrary enforcement." *Johnson v. United States*, 135 S. Ct. 2551, 2556 (2015). Plaintiffs identify this standard and assert that the Orders "do not define critical terms, . . . permit and encourage arbitrary and erratic arrests," and exhibit similar flaws. Mot. at 22:16-27. But they do not identify any term that lacks clear definition or otherwise explain what about the Orders makes them vague. Parroting a legal standard and declaring it satisfied does not state a claim; it certainly cannot establish likely success on the merits of that claim. The Health Orders, in any event, do define their terms, including "Essential Businesses" in detail, with examples. And, elsewhere, Plaintiffs attack the Orders at length precisely because they *do* understand the lines they draw. Judge Birotte rejected similar attacks against orders worded similarly those here, finding them "clear and explicit" with "extensive[] defin[itions]." RJN, Ex. A at 6. This Court should, too.

### D. THE PUBLIC INTEREST DOES NOT FAVOR INJUNCTIVE RELIEF

Plaintiffs devote just one substantive sentence to the third and fourth preliminary injunction

factors, declaring that if the Orders likely inflict constitutional harm, it follows automatically that "both the public interest and the balance of the equities [also] favor a preliminary injunction." Mot. at 24:1-22. Not so. Plaintiffs, for the reasons set forth above, have not established any likely constitutional injury. Even if they did, even if their injuries would be irreparable, and even if the equities favored injunctive relief, the analysis would not end there. For it is *not* in the public's interest to enjoin every colorable constitutional violation. *See Winter*, 555 U.S. at 32 ("An injunction is a matter of equitable discretion; it does not follow from success on the merits as a matter of course."). For example, in *Stormans, Inc. v. Selecky*, 586 F.3d 1109 (9th Cir. 2009), the district court "clearly erred" by enjoining enforcement of Washington's pharmacy statutes, in part because it considered only the strength of the plaintiffs' claims and its inability, should they prevail, to repair their injuries. *Id.* at 1140. After noting that "simply raising a serious [First Amendment] claim is not enough to tip the hardship scales," the Ninth Circuit considered whether an injunction would serve the public's interests. *Id.* at 1138.

It emphasized two related considerations for remand. First, the district court's obligation to "give due weight to the serious consideration of the public interest . . . that has already been undertaken by the responsible state officials in Washington, who unanimously passed the rules that are the subject of this appeal." *Id.* at 1140. Second, that the "general public has an interest in the health of state residents." *Id.* at 1139. A preliminary injunction, regardless of whether it applied generally or solely to the named plaintiffs, implicated that concern by making prescriptions for contraceptives and other medications more difficult to fill. *Id.* The court concluded by observing that the case "may present a situation in which 'otherwise avoidable human suffering' results from the issuance of the preliminary injunction." *Id.* at 1140; *see also Abbott*, 954 F.3d at 791 (holding that district court clearly erred by "rotely conclud[ing] that all injunctions vindicating constitutional rights serve the public interest" and that, "at the very least," the district court must "weigh the potential injury to the public health when it considers enjoining state offices from enforcing emergency public health laws").

*Stormans* moves the public-interest factor squarely against Plaintiffs. First, they "bear the initial burden of showing that the injunction is in the public interest." *Stormans*, 586 F.3d at 1139.

They cannot carry that burden by asserting, incorrectly, that they do not need to. And yet that is all they have done; their brief offers no separate argument or evidence about the public's stake in this case. Second, their request, like the one in *Stormans*, implicates public health and safety, and it does so to a greater degree. Whatever interests the public has in ensuring contraceptives remain readily available, it has a greater interest in staying alive. And whereas making contraceptives unavailable affects mainly the individuals who need them, spreading a contagious disease affects every member of society. It is thus difficult to imagine a clearer example of a case where "otherwise avoidable human suffering" would "result[] from …. [a] preliminary injunction." *Id.* at 1140. Finally, many experts gave "serious consideration" to the Health Orders; the considered decisions of public health officials—about public health—"should be given due weight." *Id.* at 1140; *see also Winter*, 555 U.S. at 24 (emphasizing that case "involve[d] complex, subtle, and professional decisions" entitled to deference). Plaintiffs' request must be denied.

///

///

///

///

///

///

///

///

///

///

///

///

///

///

///

///

# IV. CONCLUSION

Plaintiffs, attempting to prove they will likely succeed, have instead demonstrated they shall certainly fail. For the Health Orders they challenge enact emergency measures that deserve great deference; those Orders are drawn neutrally, apply generally, and burden Second Amendment rights only temporarily; and they impose their modest, incidental burdens for the greatest good of all: saving lives. Plaintiffs' desire to purchase or sell guns and practice target shooting must temporarily yield to the public's interest in repelling a deadly disease. The Court should therefore deny Plaintiffs' request for extraordinary injunctive relief.

I hereby attest that I have on file all holographic signatures corresponding to any signatures indicated by a conformed signature /S/ within this and associated e-filed documents.

Respectfully submitted,

JAMES R. WILLIAMS
COUNTY COUNSEL

Dated: May 1, 2020       By: */S/ Jason M. Bussey*
                               JASON M. BUSSEY
                               Deputy County Counsel

                               Attorneys for Defendants
                               COUNTY OF SANTA CLARA, LAURIE
                               SMITH, JEFFREY ROSEN, and SARA CODY

RICHARD DOYLE
CITY ATTORNEY

Dated: May 1, 2020       By: */S/ Margo Laskowska*
                               MARGO LASKOWSKA
                               Sr. Deputy City Attorney

                               Attorneys for Defendants
                               CITY OF SAN JOSÉ, SAM LICCARDO and
                               EDGARDO GARCIA

| | | |
|---|---|---|
| Dated: May 1, 2020 | By: | /S/ *Krishan Chopra* |
| | | KRISHAN CHOPRA |
| | | City Attorney |
| | | |
| | | Attorneys for Defendants |
| | | MOUNTAIN VIEW and MAX BOSEL |

DONNA R. ZIEGLER
County Counsel, in and for the County of
Alameda, State of California

Dated: May 1, 2020        By:  /S/ *Raymond L. MacKay*
RAYMOND L. MACKAY
Senior Deputy County Counsel

Attorneys for Defendants
COUNTY OF ALAMEDA, GREGORY J.
AHERN, and ERICA PAN

JOHN C. BEIERS, COUNTY COUNSEL

Dated: May 1, 2020        By:  /S/ *Daniel McCloskey*
DANIEL MCCLOSKEY, DEPUTY
SARAH H. TRELA, DEPUTY

Attorneys for Defendants
COUNTY OF SAN MATEO, CARLOS
MOLANOS, and SCOTT MORROW

BURKE, WILLIAMS & SORENSEN, LLP

Dated: May 1, 2020        By:  /S/ *Michelle Marchetta Kenyon*
MICHELLE MARCHETTA KENYON
KEVIN D. SIEGEL

Attorneys for Defendants
CITY OF PACIFICA and DAN STEIDLE

SHARON L. ANDERSON
COUNTY COUNSEL

Dated:  May 1, 2020          By:  /S/ *Thomas L. Geiger*
                                  THOMAS L. GEIGER
                                  Assistant County Counsel

                                  Attorneys for Defendants
                                  COUNTY OF CONTRA COSTA, CHRIS
                                  FARNITANO, and DAVID O. LIVINGSTON




                                  BEST BEST & KRIEGER LLP

Dated:  May 1, 2020          By:  /S/ *Gene Tanaka*
                                  GENE TANAKA
                                  DAKOTAH BENJAMIN

                                  Attorneys for Defendants
                                  CITY OF PLEASANT HILL and BRYAN HILL

2197295

Defendants' Joint Opposition to Plaintiffs' Application for a          20CV02180JST
Preliminary Injunction