George M. Lee (SBN 172982)
gml@seilerepstein.com
**SEILER EPSTEIN LLP**
275 Battery Street, Suite 1600
San Francisco, California 94111
Phone: (415) 979-0500
Fax: (415) 979-0511

Raymond M. DiGuiseppe (SBN 228457)
law.rmd@gmail.com
**THE DIGUISEPPE LAW FIRM, P.C.**
4320 Southport-Supply Road, Suite 300
Southport, North Carolina 28461
Phone: 910-713-8804
Fax: 910-672-7705

Adam Kraut, Esq. (admitted *pro hac vice*)
akraut@fpclaw.org
**FIREARMS POLICY COALITION**
1215 K Street, 17th Floor
Sacramento, CA 95814
Phone: (916) 476-2342

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JANICE ALTMAN, an individual, et al.<br><br>            Plaintiffs,<br>   vs.<br><br>COUNTY OF SANTA CLARA, CALIFORNIA, et al.<br><br>            Defendants. | Case No. 4:20-cv-02180-JST<br><br>**REPLY MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**<br><br>Date:   May 20, 2020<br>Time:   2:00 p.m.<br>Judge:  Hon. Jon S. Tigar |

**TABLE OF CONTENTS**

I.   INTRODUCTION ............................................................................................................... 1

II.  ARGUMENT IN REPLY ..................................................................................................... 1

    A.   JACOBSON DOES NOT AND CANNOT DETERMINE THE OUTCOME OF THIS CASE. .......... 1

    B.   THE ORDERS FAIL TO SATISFY THE REQUIRED HEIGHTENED SCRUTINY. ...................... 5

        1.   Rational Basis Review Cannot Apply in Second Amendment Cases. .................. 5

        2.   Defendants Fail to Meet Their Burden to Show That There Are No Less Restrictive Alternatives. ......................................................................................... 8

    C.   INJUNCTIVE RELIEF IS IN THE PUBLIC INTEREST. ............................................................ 12

III. CONCLUSION ................................................................................................................... 15

# TABLE OF AUTHORITIES

**CASES**

*Adams & Boyle, P.C. v. Slatery*, ___ F.3d ___, 2020 WL 1982210 (6th Cir. Apr. 24, 2020) ..2, 12

*Arcara v. Cloud Books, Inc.*, 478 U.S. 697 (1986)...........................................................................6

*Ashcroft v. ACLU*, 542 U.S. 656 (2004) ...........................................................................................8

*Ass'n of New Jersey Rifle & Pistol Clubs, Inc. v. Attorney Gen. New Jersey*,
   910 F.3d 106 (3d Cir. 2018) ........................................................................................................9

*Bonidy v. U.S. Postal Serv.*, 790 F.3d 1121 (10th Cir. 2015).............................................................9

*District of Columbia v. Heller*, 554 U.S. 570 (2008) ...............................................................passim

*Duncan v. Becerra*, 265 F.Supp.3d 1106 (S.D. Cal. 2017),
   aff'd, 742 F. App'x 218 (9th Cir. 2018) ....................................................................................12

*Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011) ................................................................8, 9

*First Baptist Church v. Kelly*, ___ F.3d.Supp ___, 2020 WL 1910021 (D. Kan. Apr. 18, 2020)...4

*Golden Gate Rest. Assn. v. City and County of San Francisco*, 512 F.3d 1112 (9th Cir. 2008)...13

*Heller v. District of Columbia*, 801 F.3d 264 (D.C. Cir. 2015) ("*Heller III*") ................................9

*Hobby Lobby Stores, Inc. v. Sibelius*, 723 F.3d 1114 (10th Cir. 2013),
   aff'd sub nom., *Burwell v. Hobby Lobby Stores, Inc.*, 134 S.Ct. 2751 (2014) ..........................12

*In re Abbott*, 954 F.3d 772 (5th Cir. 2020).......................................................................................4

*In re Salon A La Mode*, __ S.W.3d ___, 2020 WL 2125844 (Tex. May 5, 2020) ..................14, 15

*Jackson v. City and County of San Francisco*, 746 F.3d 953 (9th Cir. 2014)..................................8

*Jacobson v. Commonwealth of Massachusetts*, 197 U.S. 11 (1905) .......................................passim

*Lukumi Babalu Aye, Inc. v. City of Hialeh*, 508 U.S. 520 (1993) ....................................................3

*Maryville Baptist Church, Inc. v. Beshear*, ___ F.3d ___,
   2020 WL 2111310 (6th Cir. May 2, 2020)..................................................................................3

*McCarthy v. Gov. Baker*, D. Mass. No. 1:20-cv-10701-DPW .......................................................10

*McCullen v. Coakley*, 573 U.S. 464, 134 S.Ct. 2518 (2014)............................................................9

*McDonald v. City of Chicago*, 561 U.S. 742 (2010) ............................................................. 5, 9, 11

*Moore v. Madigan*, 702 F.3d 933 (7th Cir. 2012) ........................................................................ 9

*Planned Parenthood of Southeastern Pennsylvania v. Casey*,
    505 U.S. 833, 112 S.Ct. 2791 (1992) ....................................................................................... 3

*Rhode v. Becerra*, S.D. Cal. No. 18-cv-802-BEN,
    Order Granting Plaintiffs' Motion for Preliminary Injunction (S.D. Cal. Apr. 23, 2020) ........ 15

*Robinson v. Attorney General*, ___ F.3d ___, 2020 WL 1952370 (11th Cir. 2020) ...................... 3

*Smith v. Avino*, 91 F.3d 105 (11th Cir. 1996) ................................................................................. 7

*Stormans, Inc. v. Selecky*, 586 F.3d 1109 (9th Cir. 2009) ...................................................... 12, 13

*Talk of the Town v. Dept. of Fin. & Bus. Servs. ex rel City of Las Vegas*,
    343 F.3d 1063 (9th Cir. 2003) .................................................................................................. 6

*Teixeira v. County of Alameda*, 873 F.3d 670 (9th Cir. 2017) (en banc) ................................... 7, 8

*United States v. Chalk*, 441 F.2d 1277 (4th Cir. 1971) .................................................................. 7

*United States v. Chovan*, 735 F.3d 1127 (9th Cir. 2013) ............................................................ 6, 7

*United States v. Reese*, 627 F.3d 792 (10th Cir. 2010) .................................................................. 9

*Ward v. Rock Against Racism*, 491 U.S. 781 (1989) ...................................................................... 9

**OTHER AUTHORITIES**

Goston, *Jacobson v. Massachusetts at 100 Years: Police Power and Civil Liberties in Tension*,
    95 Am. J. Pub. Health 576 (2005) ............................................................................................ 2

Note, *Toward a Twenty-First Century Jacobson v. Massachusetts*, 121 Harv. L. Rev. 1820
    (2008) ........................................................................................................................................ 2

Wendy K. Mariner, *Jacobson v. Massachusetts: It's Not Your Great-Great-Grandfather's Public
    Health Law*, 95 Am. J. Pub. Health 581 (2005) ..................................................................... 14

## I. INTRODUCTION

Defendants urge this Court to adopt their preferred deferential standard of review of their orders and enforcement actions that they admit infringe upon enumerated fundamental rights. But their reliance on *Jacobson v. Commonwealth of Massachusetts*, 197 U.S. 11 (1905), misses the context of that 115-year old case, which addressed general liberty interests, not enumerated rights incorporated against the States and local governments, and thus applied scrutiny not appropriate for the kinds of pre-existing rights at issue here.

Even under *Jacobson*'s general framework, *Heller*'s categorical scrutiny must apply, and to the extent tiered scrutiny is applied under the Ninth Circuit's non-*Heller* approach, strict scrutiny should be applied against the Defendants' actions and orders. All other courts examining similar COVID-19 orders and enforcement practices agree that, contrary to Defendants' novel yet misguided arguments, *Jacobson* does not allow governments to skip normal constitutional analysis for fundamental, enumerated rights and—unilaterally, without even legislative process—implement orders and enforcement practices that suspend the guarantees of the Bill of Rights and Fourteenth Amendment. Defendants' shoulder-shrugging excuse that they "cannot exempt them all," (Opp. 20:27), misses the point that they at least must start by exempting activities expressly protected by enumerated constitutional rights—just like they did with their favored First Amendment-protected businesses.

The Constitution restrains government and protects rights; citizens are not required to justify the exercise of their rights. And thus, the public interest is *always* served when the courts uphold constitutional liberty, especially in times like these. Plaintiffs' motion should be granted.

## II. ARGUMENT IN REPLY

**A.  *JACOBSON* DOES NOT AND CANNOT DETERMINE THE OUTCOME OF THIS CASE.**

Defendants' primarily rely on *Jacobson*, 197 U.S. 11, to assert their core argument that they possess near total, unchallengeable authority during times they declare an emergency, limited only where government actions bear "'no real or substantial relation to th[eir] objects' or 'beyond all question' effect 'a plain, palpable invasion of rights.'" (Opp. at 7:21-23 (citing 197

1  U.S. at 31.)) Their view of *Jacobson* reflects an arcane constitutional jurisprudence concerning an inchoate, non-enumerated liberty interest—"the inherent right of every freeman to care for his own body and health in such way as to him seems best," 197 U.S. at 25—long before the evolution of modern constitutional scrutiny applied to enumerated fundamental rights. In today's parlance, it effectively applied a rational basis-like test for restraints on general liberty interests not specifically protected by other provisions of the Constitution. But under modern jurisprudence, that lenient test cannot apply to infringements of the rights protected under the Second Amendment.

"Supreme Court jurisprudence has progressed markedly from the deferential tone of *Jacobson* and its progressive-era embrace of the social compact." Note, *Toward a Twenty-First Century Jacobson v. Massachusetts*, 121 Harv. L. Rev. 1820 (2008); Goston, *Jacobson v. Massachusetts at 100 Years: Police Power and Civil Liberties in Tension*, 95 Am. J. Pub. Health 576, 580 (2005). *Jacobson* must be read with its historical limitations in mind, as the Sixth Circuit recently did in *Adams & Boyle, P.C. v. Slatery*, ___ F.3d ___, 2020 WL 1982210 (6th Cir. Apr. 24, 2020). In that case, abortion services providers obtained preliminary injunctive relief against the Tennessee governor's COVID-19 order barring surgical abortions for a three-week period as part of a temporary ban on "elective" surgeries. Upholding the injunction, the Sixth Circuit cautioned that "[a]ffording flexibility [] is not the same as abdicating responsibility, especially when well-established constitutional rights are at stake…" 2020 WL 1982210 at *1. And, importantly, it was nature of the specific constitutional right at stake that drove the analysis, not the framework of *Jacobson*:

> The bottom line is that, even accepting *Jacobson* at face value, it does not substantially alter our reasoning here. As of today, a woman's right to a pre-viability abortion is a part of "the fundamental law." And, for the reasons set forth above, EO-25, at least in some applications—most notably, those that would prevent a woman from exercising her right in-state altogether, or would require her to undergo a more invasive and costlier procedure than she otherwise would have—constitutes "beyond question, a plain, palpable invasion of rights secured by [that] fundamental law."

2020 WL 1982210 at *9 (citing *Jacobson*, 197 U.S. at 31).

Similarly, in *Robinson v. Attorney General*, ___ F.3d ___, 2020 WL 1952370 (11th Cir. 2020), both the district court and the Eleventh Circuit rejected Alabama's attempt to wield the *Jacobson* case as a dispositive hammer in support of its COVID-19 driven restriction on abortions. Rather, the Eleventh Circuit agreed with the district court that *Jacobson* does not supplant *other cases* applying the specific constitutional right at stake and the framework for protecting that right as defined throughout the decades of jurisprudence since *Jacobson*, when such a right had not even been recognized. 2020 WL 1952370 (citing *Planned Parenthood of Southeastern Pennsylvania v. Casey*, 505 U.S. 833, 878, 112 S.Ct. 2791 (1992)). Indeed, the Eleventh Circuit used the modern *Roe-Casey* framework to conclude that Alabama's COVID-19 order "impinge[d] the right to an abortion" in a "plain, palpable" fashion as contemplated by *Jacobson*. *Id.* at *8. The *Jacobson* framework is not a substitute for modern constitutional analysis, it merely *applied* the constitutional analysis then applicable to the generic liberty interests being asserted.

These contemporaneous cases supporting Plaintiffs' arguments and relief are not limited to the abortion context. For instance, in *Maryville Baptist Church, Inc. v. Beshear*, ___ F.3d ___, 2020 WL 2111310 (6th Cir. May 2, 2020), the Sixth Circuit reversed the district court's denial of a TRO to enjoin the Kentucky governor's COVID-19 related orders and enforcement actions shutting down worship services, regardless whether they met or exceeded social distancing and hygiene guidelines for permitted non-religious activities. In so doing, the Sixth Circuit found that the government's orders and actions likely prohibited the free exercise of religion in violation of the First and Fourteenth Amendments, especially with respect to drive-in services. 2020 WL 211310 at *2. As in other cases, again, what drove the analysis was the nature of the specific constitutional right at stake scrutinized in the manner required under *Supreme Court* precedents since the time of *Jacobson*—for example, "a law that discriminates against religious practices will usually be invalidated unless the law 'is justified by a compelling interest and is narrowly tailored to advance that interest.'" *Id.* at *3 (citing *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeh*, 508 U.S. 520, 553 (1993)). The Sixth Circuit cited *Jacobson* merely as a historical reference for purposes of recognizing that the governor was well-intentioned in doing his best to

1  lessen the spread of the virus, *id.* at * 4, but the orders were ultimately adjudged under strict
2  scrutiny according to the nature of the right at stake—not any lesser form akin to rational basis.
3       And in *First Baptist Church v. Kelly*, ___ F.3d.Supp ___, 2020 WL 1910021 (D. Kan.
4  Apr. 18, 2020), the district court ruled that *Jacobson* "d[id] not provide the best framework in
5  which to evaluate the governor's executive orders" restricting First Amendment free exercise
6  rights in response to the COVID-19 pandemic, and the court instead applied the modern-day
7  jurisprudence on free exercise rights as the proper framework for reviewing the orders'
8  constitutionality. 2020 WL 1910021 at *6. A temporary and preliminary injunction was granted.
9       Defendants here cite the Fifth Circuit's opinion in *In re Abbott*, 954 F.3d 772 (5th Cir.
10 2020) to support their sweeping view of *Jacobson*, but they conveniently mention *only* the
11 court's concern about the district's failure to give *Jacobson* any credence, Opp. at 8:15-18,
12 leaving out the rest that shatters their arguments. Indeed, the problems with the district court's
13 analysis in that case went well beyond ignoring *Jacobson*, and included the more fundamental
14 failure to consider the essential *Casey* undue-burden test. *Abbott*, 954 F.3d at 790.
15      All of these recent COVID-19 cases roundly support Plaintiffs' position here, which is
16 that *Jacobson* is, at most, a framework for the exercise of general police powers relating to public
17 health that does not and cannot reasonably be interpreted to *supplant* the Supreme Court's
18 jurisprudence defining the nature and contours of specific enumerated constitutional rights.
19 Defendants assert *Jacobson* as holding that all individual rights must simply "give way" to
20 emergency authority, and that courts may invalidate emergency measures *only* when they bear no
21 "real or substantial relation" to their objects. (Opp. at 7:18-23.) But just as the Defendants cannot
22 suspend the Constitution, they cannot use *Jacobson* to suspend over a century of Supreme Court
23 jurisprudence inconvenient to their preferred policies.
24      Moreover, *Jacobson* offers little help to Defendants here for the further reason that it was
25 bottomed on a substantial degree of *legislative* deference to which Defendants' Orders and
26 enforcement practices are simply not entitled. *Jacobson*'s partial and qualified deference to the
27 *legislative* process was at the core of its decision; indeed, the Court repeatedly emphasized the
28 power of Massachusetts to *enact* "such reasonable regulations established directly by legislative

enactment as will protect the public health and the public safety," and that the elected state legislature was "primarily the judge" of the "good and welfare of the commonwealth" regarding quarantine and health laws. *Jacobson*, 197 U.S. at 24-25, 27. Defendants' orders and enforcement actions at issue in this case were not subject to any sort of legislative process, let alone enacted by a legislative body (though they would still be unconstitutional even if they were). To the contrary, the declaration of defendant Sarah H. Cody, M.D., offered by the defense (ECF No. 46-11), admits that her original shelter-in-place order was only made after consideration of epidemiologic trends in other countries "and guidance from public health officials throughout the United States[.]" Cody Decl., ¶ 14. Likewise, she admits that "additional restrictions on the list of essential businesses were imposed based upon my and the other Bay Area Health Officers' judgment that we needed to further limit business activities by more narrowly defining the goods and services that provide for the basic necessities of life and functioning of society." (*Id.*, at ¶ 22.) In other words, she and her colleagues, and Defendants herein, imposed their own policy preferences—deeming arms retailers and those who would use them to exercise their rights to be "non-essential" while leaving many other categories of businesses and people untouched—based upon a clique of public health officials who were not elected nor otherwise directly accountable to the millions whose fundamental Second and Fourteenth Amendment rights they unilaterally restricted. Of course, that perfectly suited their policy preferences. As defendant Mayor Liccardo admitted, shuttering firearm transactions was animated by a desire to curtail transfers for reasons *other* than public health. (Lee Decl., Ex. 6 at p. 0051.) Thus, Defendants simply cannot stake their position around *Jacobson*.

### B.   THE ORDERS FAIL TO SATISFY THE REQUIRED HEIGHTENED SCRUTINY.

#### 1.   Rational Basis Review Cannot Apply in Second Amendment Cases.

The Supreme Court has made clear the Framers and ratifiers of the Fourteenth Amendment counted the right to keep and bear arms among those fundamental rights *necessary* (i.e., essential) to our system of ordered liberty, *McDonald v. City of Chicago*, 561 U.S. 742, 778, 791 (2010), and a privilege and immunity of citizenship, *id*. at 805 (Thomas, J., concurring).

1  Defendants' call for pre-*Heller* rational basis review is an invitation to error. Thankfully for all
2  involved here, this isn't a close call, as *Heller* forecloses this deferential review. 554 U.S. 570,
3  628 (at FN27).[1] And even under the Ninth Circuit's two-step test first articulated in *United States*
4  *v. Chovan*, 735 F.3d 1127, 1136-37 (9th Cir. 2013), the Court recognized that, when a regulation
5  burdens Second Amendment rights, *Heller* requires that it must reject rational basis review "and
6  conclude that some sort of heightened scrutiny must apply." *Id.* (citing *Heller*, 554 U.S. at 628
7  n.27.)

8        Defendants here attempt to bypass the clear requirement of heightened scrutiny under
9  *Heller* and *Chovan* by claiming that their orders and enforcement actions are only an "incidental"
10 burden on Second and Fourteenth Amendment rights. Defendants rely upon two cases, *Arcara v.*
11 *Cloud Books, Inc.*, 478 U.S. 697 (1986), and *Talk of the Town v. Dept. of Fin. & Bus. Servs. ex*
12 *rel City of Las Vegas*, 343 F.3d 1063 (9th Cir. 2003) for their assertion. Unlike *Arcara* and *Talk*
13 *of the Town*, however, the present case is not about an enforcement action specifically targeting
14 *other* alleged criminal conduct or the statutes under which they were brought. Here, the
15 Defendants' orders and enforcement practices themselves are at issue—and their resulting total
16 ban on firearm and ammunition transactions by Bay Area residents and retailers enforced on pain
17 of criminal penalty. Moreover, by completely banning the protected activity, and thus travel to
18 and from the activity, they allow for *no alternatives at all* (e.g., going to another location), as the
19 Court found to be a factor in *Arcara*. 478 U.S. at 705.[2]

---

[1] Contrary to Defendants' clear preference, *Heller* and *McDonald* do not have a *Jacobson* or because-they-say-they-need-it exception (nor, for that matter, does the Second and Fourteenth Amendments' text, as informed by our Nation's history and tradition).

[2] It further goes without saying that nobody here is attempting to use the Constitution as some sort of "cloak" or excuse for the furtherance of *unlawful* conduct—Plaintiffs here wish to exercise their rights and comply with the law regarding firearm and ammunition transfers—unlike in *Arcara* and *Talk of the Town*, where those claiming the constitutional infringements had themselves *violated* the law. *See Talk of the Town*, 343 F.3d at 1064-65 (noting that the claimed expression right was "burdened *solely* as a result of TOT's *violation* of a generally applicable liquor license law"). Simply put, the Defendants' orders and enforcement practices proscribe protected conduct, and make no accommodations or exceptions to its exercise, "reasonably" or

1    Therefore, the Defendants' cited cases (which involve enforcement of laws which
2 incidentally burdened expressive activity) present a flawed analogy. Expression may generally
3 find another outlet even where the underlying criminal conduct (e.g., prostitution, violation of
4 liquor licensing laws) is prohibited. And, more to the point, where the result of the law is a ban
5 on the exercise of a constitutionally enumerated right, that law cannot be justified—and certainly
6 not upon mere rational basis review. Perhaps one could characterize the *12-hour* and *9-hour*
7 curfews at issue in *Smith v. Avino*, 91 F.3d 105, 108 (11th Cir. 1996) and *United States v. Chalk*,
8 441 F.2d 1277, 1278 (4th Cir. 1971), respectively, as merely an inconvenient constitutional
9 burden, but Defendants cannot hope to draw any sort of credible comparison between hours-long
10 daily curfews and their around-the-clock bans that continue to be extended for weeks or months
11 at a time.

    Defendants' Opposition cites *Teixeira v. County of Alameda*, 873 F.3d 670 (9th Cir.
13 2017) (en banc) (and surprisingly, Judge Bea's dissent), for the proposition that this is not really
14 a Second Amendment case, but more akin to a zoning restriction. (Opp. at 14:16-19). But their
15 creative fiction falls flat on the law. In his dissent, cited approvingly by Defendants, Judge Bea
16 opined that the majority opinion had erroneously read *Chovan* to *require* a meaningful or
17 "substantial" burden in order to proceed to the second step of the two-part analysis. 873 F.3d at
18 695 (Bea, J., dissenting). We agree with Judge Bea, *id*., that heightened scrutiny must be applied
19 where Second Amendment rights are at stake, as in this case.

    And notably, the outcome of *Teixeira*, as framed by the Ninth Circuit's en banc panel
21 majority, was premised on the existence of consumer choice. 873 F.3d at 679 ("[t]he exhibits
22 attached to and incorporated by reference into the complaint, which we may consider […]
23 demonstrate that Alameda County residents may freely purchase firearms within the County"),
24 and at 679-80 ("potential gun buyers in Alameda County generally, and potential gun buyers in
25 the unincorporated areas around San Lorenzo in particular, do have access to a local gun store

---

27 even at all. They are hardly "indistinguishable" from the health directive orders in *Arcara* and
28 *Talk of the Town*, as Defendants claim. (Opp. at 11:3-4.)

just 600 feet from where Teixeira proposed to locate his store. And if the Big 5 Sporting Goods store does not meet their needs, they can visit any of the nine other gun stores in the County as a whole, including the three other gun stores in the unincorporated parts of the County"). But there is no such choice here. Defendants' orders and enforcement practices operate as a complete ban on all business they consider "non-essential" within this large geographic region, and criminalize the operation of and individuals' travel to non-essential businesses both inside and outside of the Bay, prohibiting the lawful acquisition and transfer of all firearms and ammunition within the greater Bay Area. And thus, to the extent that Defendants' orders and enforcement actions are akin to a "zoning measure of general application," as Defendants suggest (Opp. at 14:18), they would be like a zoning rule that banned operation of churches, synagogues, or Mosques until they said otherwise.

### 2. Defendants Fail to Meet Their Burden to Show That There Are No Less Restrictive Alternatives.

The en banc panel in *Teixeira* itself recognized that a prohibition on the sale of even *certain types* of ammunition "burdened the core Second Amendment right." 873 F.3d at 677 (citing *Jackson v. City and County of San Francisco*, 746 F.3d 953, 968 (9th Cir. 2014)); *see also Ezell v. City of Chicago*, 651 F.3d 684, 704 (7th Cir. 2011). And *Teixeira* flatly stated that the Ninth Circuit "and other federal courts of appeals have held that the Second Amendment protects ancillary rights necessary to the realization of the core right to possess a firearm for self-defense." 873 F.3d at 677. Defendants' orders and enforcement actions are a prohibition on the acquisition and transfer of *all types* of firearms and ammunition. It cannot get more "core" than that. Under *Heller*'s test, Defendants' orders and actions are categorically unconstitutional.

And if, as Defendants must concede, their policies and practices infringe core Second Amendment rights, then they did not and cannot meet their burden to show that less restrictive alternatives either are not available, or are not a reasonable fit. As such, Defendants' orders and enforcement practices fail all forms of heightened scrutiny.

And even under a tiered heightened scrutiny analysis, it is the Defendants—not the Plaintiffs—who bear the burden of proving less restrictive alternatives do not exist or would be

1  inadequate. *Ashcroft v. ACLU*, 542 U.S. 656, 669 (2004). "It is not enough for the Government to show that [its chosen action] has some effect." *Id.* It must prove that any substantially less restrictive alternatives would be less effective or ineffective. *Id*. This same evidentiary burden must apply with equal force in Second Amendment cases, where equally fundamental rights are similarly at stake. See e.g., *Ezell*, 651 F.3d at 706–07 ("Both *Heller* and *McDonald* suggest that First Amendment analogues are more appropriate, and on the strength of that suggestion, we and other circuits have already begun to adapt First Amendment doctrine to the Second Amendment context") (citing *Heller*, 554 U.S. at 582, 595, 635; *McDonald*, 130 S.Ct. at 3045). Thus, contrary to Defendants' repeated attempts to shift *their* responsibility, Plaintiffs bear no burden to prove less restrictive alternatives do not exist or would be inadequate (just as they have no burden prove Defendants' orders and enforcement actions are *non*-neutral and do *not* target the rights enshrined in the Second Amendment; *see* Opp. at 12).

Under intermediate scrutiny, a court must ensure that "the means chosen are not substantially broader than necessary to achieve the government's interest." *Ward v. Rock Against Racism*, 491 U.S. 781, 800 (1989). Thus, in the First Amendment context, "the government must demonstrate that alternative measures that burden substantially less speech would fail to achieve the government's interests, not simply that the chosen route is easier." *McCullen v. Coakley*, 573 U.S. 464, 495, 134 S.Ct. 2518 (2014). Even Justice Breyer's intermediate scrutiny-like balancing test proposed in his *Heller* dissent—notably, an approach expressly rejected by the Court—considered "reasonable, but less restrictive, alternatives." 554 U.S. at 710 (Breyer, J., dissenting). Many circuit courts recognize this bare-minimum obligation in the Second Amendment context. *Heller v. District of Columbia*, 801 F.3d 264, 277–78 (D.C. Cir. 2015) ("*Heller III*"); *Ass'n of New Jersey Rifle & Pistol Clubs, Inc. v. Attorney Gen. New Jersey*, 910 F.3d 106, 124 n.28 (3d Cir. 2018); *Ezell*, 651 F.3d at 709; *Moore v. Madigan*, 702 F.3d 933, 940 (7th Cir. 2012); *United States v. Reese*, 627 F.3d 792, 803 (10th Cir. 2010); *Bonidy v. U.S. Postal Serv.*, 790 F.3d 1121, 1128 (10th Cir. 2015).

Defendants' laws and enforcement fail to satisfy their burden. Beyond a *generalized* appeal to public health, not one of the declarations offered in support of Defendants' Opposition

offers any explanation as to why less restrictive alternatives—like those used in other retail settings Defendants consider essential—cannot be applied to firearm and ammunition retailers, why Plaintiffs and others like them must be prevented from travelling to and from firearm retailers in other jurisdictions, or how the orders are narrowly tailored as to them—because, plainly, they cannot carry their burden, and their orders and enforcement actions banning firearm and ammunition transactions are not tailored at all. Defendants simply shrug their shoulders, whistle past the Second and Fourteenth Amendments, and say, well, "[can't] exempt them all." (Opp. at 20:27.) There is no reasonable fit between the Defendants' orders and enforcement actions that prohibit firearm and ammunition transfers—as required under federal and state laws—and individuals' training at shooting ranges,[3] and the Defendants' general desire to abate the spread of a viral pandemic. Firearm and ammunition retailers and ranges, and the people who would go to and use them, could abide by maximum occupancy limitations like all other retailers who are exempt from the Defendants' orders and enforcement actions or otherwise allowed to operate. And to the extent that statutorily mandated face-to-face transactions activities take place, such as the physical transfer of firearms, ammunition, and the safe handling demonstration, these activities can be safely conducted while adhering to the minimum distancing requirements—just like at a grocery store or a hardware store. Access to the primary inventory kept in firearm retailers—i.e., constitutionally protected arms, including firearms and ammunition—are required to be kept strictly controlled by certain State-approved employees, which could easily sanitize items after handling and returning protect to storage or a transferee. No such requirements or guarantees exist in a grocery store as to their produce or canned goods, or a hardware store as to their home-repair supplies or hammers. Defendants have not and do not even make an attempt to

---

[3] Outdoor shooting ranges are not unlike golf courses Defendants allow to operate. *See*, *e.g.*, the current Order of the Health Officer of the County of Santa Clara, online at https://www.sccgov.org/sites/covid19/Pages/order-health-officer-050420.aspx, at Section 16.a.iii (last visited May 8, 2020). And in the case of indoor shooting ranges, physical barriers form lanes to separate parties at safe distances, and extensive air handling systems scrub the air for contaminates—measures than exceed virtually all normal retail environments, including those Defendants allow to operate.

examine this, nor do any of their declarations offered address these possibilities.

That is because, when a government is actually put to this test for orders and practices like Defendants' here, it fails. In *McCarthy v. Gov. Baker*, D. Mass. No. 1:20-cv-10701-DPW, the district court yesterday rejected the Commonwealth's arguments that a lesser standard should apply and applied heightened level of scrutiny to the governor's similar COVID-19 order which halted firearm and ammunition retail transactions in Massachusetts.[4] The Commonwealth could not meet this burden, and the district court's order granted the plaintiffs preliminary injunctive relief, allowing firearm and ammunition retailers to reopen this weekend. (Amended Prelim. Injunction Order entered May 7, 2020, ECF No. 92).

Ultimately, Defendants here don't even attempt to offer why less restrictive alternatives for firearm and ammunition retailers and other protected activity should not apply, because they are unwilling to concede that this is a liberty interest worthy of such consideration in the first place. And thus, they are simply left with their fundamental position that they, alone, get to determine what constitutes an "Essential Business." But their intentional exclusion[5] of Second and Fourteenth Amendment-protected interests from their definition of "Essential Businesses" under the Orders cannot stand in the place of Supreme Court authority which finds otherwise,

---

[4] Here, Defendants' orders and enforcement practices close off all transactions, as Plaintiffs cannot even privately transfer firearms and ammunition under State law.

[5] That Defendants intentionally excluded Second Amendment protected interests from their definition of "Essential Businesses" can be inferred from both their opposition to Plaintiffs' motion, and the declaration of the health officer defendants, who insist that they alone made the determination of what constitutes both "Essential Activity" and "Essential Businesses." See, e.g., Decl. of Sara H. Cody, M.D. (ECF 46-11), at ¶ 15: "Business types were identified as essential because they provide food, shelter, medicine, healthcare services and supplies, personal hygiene products, and products and services that enable people to isolate in their places of residences. Other business types were identified as essential because they are necessary to the continuity of essential infrastructure and the basic functions of society such as financial transactions (e.g. banks), access to critical information (e.g. newspapers), and essential travel (e.g. gas stations and private transportation providers)." Thus, the exclusion of businesses and activity protected by the Second Amendment was not mere oversight, but it was a judgment call. She, and the other health officers apparently placed some value on "access to critical information (e.g., newspapers)" as necessary for the "basic functions of society," but not the liberty interests at stake here.

and has the final word. *See*, *McDonald*, 561 U.S. at 787 ("the right was also valued because the possession of firearms was thought to be essential for self-defense") (quoting *Heller*, 554 U.S. at 599), 792 (the majority opinion "makes the traditions of our people paramount") (Scalia, J., concurring), and 858 ("In my view, the record makes plain that the Framers of the Privileges or Immunities Clause and the ratifying-era public understood—just as the Framers of the Second Amendment did—that the right to keep and bear arms was essential to the preservation of liberty.") (Thomas, J., concurring).

### C.   INJUNCTIVE RELIEF IS IN THE PUBLIC INTEREST.

Plaintiffs have already cited authority that public interest concerns are always implicated when a constitutional right has been violated. Yes, it is *always* in the public interest to prevent government from violating a citizen's constitutional rights. *Hobby Lobby Stores, Inc. v. Sibelius*, 723 F.3d 1114, 1145 (10th Cir. 2013), *aff'd sub nom.*, *Burwell v. Hobby Lobby Stores, Inc.*, 134 S.Ct. 2751 (2014). This unremarkable principle applies to Second Amendment claims as well. "The public interest favors the exercise of Second Amendment rights by law-abiding responsible citizens." *Duncan v. Becerra*, 265 F.Supp.3d 1106, 1136 (S.D. Cal. 2017), *aff'd*, 742 F. App'x 218 (9th Cir. 2018). This is self-evident and holds true notwithstanding the existence of the COVID-19 pandemic. *Adams & Boyle, P.C.*, 2020 WL 1982210 at *12 ("We need not say much on this point. As the district court correctly observed, 'it is always in the public interest to prevent violation of a party's constitutional rights.'") And thus, it is hardly an apologia, as Defendants seem to offer, that they are temporarily banning exercise of *these* constitutional rights, because they are *also* burdening other constitutional rights as well. We welcome others to challenge the scope and impact of the Defendants' Orders on those other liberties, constitutional or otherwise, but our concern is with maintaining the People's fundamental, individual right to keep and bear arms. And here, *Jacobson* is timeless, as the Court emphasized that "[a] local enactment or regulation, even if based on the acknowledged police powers of a state, must always yield in case of conflict with the exercise by the general government of any power it possesses under the Constitution, or with any right which that instrument gives or secures."

*Jacobson*, 197 U.S. at 25.

*Stormans, Inc. v. Selecky*, 586 F.3d 1109 (9th Cir. 2009) does not help Defendants here. In *Stormans*, the court had to weigh highly particularized claims arising from the plaintiffs' religious objections to the dispensation of the Plan B contraceptive against the state law mandating the filling of contraceptive prescriptions. Though the plaintiffs' as-applied claims were sufficient to establish standing, 586 F.3d at 1119-21, the district court clearly went beyond their request for as-applied injunctive relief, and the plaintiffs themselves even seemed to recognize that the injunction was overbroad. *Id.*, at 1118.

The present case does not present the same circumstances, and moreover, the scope of the requested injunction is not unreasonable or overbroad at all. Whether Mayor Liccardo approves or not, the current pandemic, shelter-in-place orders, shortages, and fears about home and personal security have resulted in a surge in demand for firearms and ammunition.[6] But as a result of the Defendants' orders and enforcement practices, millions of residents in the Defendants' respective jurisdictions—the counties of Santa Clara, Alameda, Contra Costa and San Mateo, and the cities of San Jose, Mountain View, Pacifica and Pleasant Hill—are completely foreclosed from acquiring firearms and ammunition for lawful purposes including self-defense, an infringement which Defendants do not dispute, but inappropriately minimize them as trivial or "inconvenient" in an attempt to redline the rights of their citizens. Defendants' policies are not mere inconveniences; rather, they are clear and present violations of our Constitution's guarantees.

On the issue for which it has been cited here, *Stormans* is simply a Rorschach test of competing liberty interests. Ultimately, the Ninth Circuit concluded that "[t]he 'general public

---

[6] *See, e.g.*, Lois Beckett, *Americans purchasing record-breaking numbers of guns amid coronavirus*, The Guardian Apr. 1, 2020, online at https://www.theguardian.com/world/2020/apr/01/us-gun-purchases-coronavirus-record; *see also* Chauncey Alcorn, *Gun sales surge as coronavirus pandemic spreads*, CNN Business, Mar. 19, 2020, online at https://www.cnn.com/2020/03/19/business/coronavirus-gun-sales/index.html. The actual data confirming a spike in NICS background checks in March 2020 can be found in the FBI's "NICS Firearm Background Checks: Month/Year" document for the period of November 30, 1998 through April 30, 2020 at https://bit.ly/3drFvWZ.

has an interest in the health' of state residents. […] There is a general public interest in ensuring that all citizens have timely access to lawfully prescribed medications." 586 F.3d at 1139 (citing *Golden Gate Rest. Assn. v. City and County of San Francisco*, 512 F.3d 1112, 1126 (9th Cir. 2008)). We agree. Now substitute "offered firearms" for "prescribed medications" (and let's set aside sanctimony). Defendants may disapprove of legally eligible people buying firearms and ammunition, and in fact, expressly do so by arguing that, "during a health crisis the most essential businesses are those that directly or indirectly satisfy basic human needs such as food, medicine and shelter." (Opp. at 2:10-12.) That personal security is conspicuously missing from the Defendants' modified version of their own Hierarchy of Needs, substituting their policy judgments for the needs (and fundamental rights) of millions of Americans (see footnote 6, *supra*), is telling. But no amount of disapproval regarding Americans' desire to acquire arms for self-defense in times of crisis allows the Defendants to gerrymander away a constitutional right under the auspices of public health orders. Many people want to buy firearms and ammunition for lawful purposes—and it is not for the Defendants to approve or disapprove of their constitutionally protected choices.

Finally, injunctive relief here serves the public interest because faithful adherence to constitutional norms ensures the public's faith in public health orders, which relies greatly upon the public's voluntary cooperation in the first place. Here, public health experts agree. In examining *Jacobson*'s impact today on public health measures, professors Mariner et al. have observed:

> One practical reason for protecting constitutional rights is that it encourages social solidarity. People are more likely to trust officials who protect their personal liberty. Without trust, public officials will not be able to persuade the public to take even the most reasonable precautions during an emergency, which will make a bad situation even worse. The public will support reasonable public health interventions if they trust public health officials to make sensible recommendations that are based on science and where the public is treated as part of the solution instead of the problem.

Wendy K. Mariner, *Jacobson v. Massachusetts: It's Not Your Great-Great-Grandfather's Public Health Law*, 95 Am. J. Pub. Health 581 (2005). *See also*, *In re Salon A La Mode*, __ S.W.3d ___,

2020 WL 2125844 (Tex. May 5, 2020) ("Any government that has made the grave decision to suspend the liberties of a free people during a health emergency should welcome the opportunity to demonstrate—both to its citizens and to the courts—that its chosen measures are absolutely necessary to combat a threat of overwhelming severity. The government should also be expected to demonstrate that less restrictive measures cannot adequately address the threat.")

### III. CONCLUSION

Second and Fourteenth Amendment rights are always essential. Defendants' orders and enforcement practices fail constitutional scrutiny today, just as they would under other circumstances. "The Constitution is not suspended when the government declares a state of disaster." *In re Salon A La Mode*, 2020 WL 2125844 at *1. Indeed, "[c]ourts are limping by while police make arrests for only the more serious crimes. Maintaining Second Amendment rights are especially important in times like these. Keeping vigilant is necessary in both bad times and good, for if we let these rights lapse in the good times, they might never be recovered in time to resist the next appearance of criminals, terrorists, or tyrants." *Rhode v. Becerra*, S.D. Cal. No. 18-cv-802-BEN, Order Granting Plaintiffs' Motion for Preliminary Injunction (S.D. Cal. Apr. 23, 2020) (ECF Doc. 60) at 118. And while Defendants might prefer otherwise, "[t]he very enumeration of the right takes out of the hands of government—even the Third Branch of Government—the power to decide on a case-by-case basis whether the right is *really worth* insisting upon." *Heller*, 554 U.S. 570 at 634. For these reasons, Plaintiffs' motion for preliminary injunctive relief should be granted.

Dated: May 8, 2020  **SEILER EPSTEIN LLP**

/s/ *George M. Lee*
George M. Lee
Attorney for Plaintiffs