1  JAMES R. WILLIAMS, County Counsel (S.B. #271253)
   MELISSA R. KINIYALOCTS, Lead Deputy County Counsel (S.B. #215814)
2  JASON M. BUSSEY, Deputy County Counsel (S.B. #227185)
   HANNAH KIESCHNICK, Deputy County Counsel (S.B. # 319011)
3  OFFICE OF THE COUNTY COUNSEL
   70 West Hedding Street, East Wing, Ninth Floor
4  San José, California 95110-1770
   Telephone: (408) 299-5900
5  Facsimile: (408) 292-7240

6  Attorneys for Defendants
   COUNTY OF SANTA CLARA, LAURIE SMITH,
7  JEFFREY ROSEN, and SARA CODY

8  ADDITIONAL COUNSEL FOR DEFENDANTS
   ON SIGNATURE PAGE
9

10                    UNITED STATES DISTRICT COURT
                  FOR THE NORTHERN DISTRICT OF CALIFORNIA
11                         (Oakland Division)

12

13  JANICE ALTMAN, et al.,                    No. 20CV02180JST

14          Plaintiffs,                       **DEFENDANTS' JOINT OPPOSITION TO
                                              PLAINTIFFS' SUPPLEMENTAL BRIEF**
15  v.

16  COUNTY OF SANTA CLARA, et al.

17          Defendants.

18

19

20

21

22

23

24

25

26

27

28

## I.   INTRODUCTION

Plaintiffs previously argued that Defendants, by barring face-to-face transactions, completely prevented them from acquiring or practicing proficiency with firearms.  Defendants now allow retailers (including firearms dealers) to sell goods in person—either at the storefront or by delivery—and they permit outdoor businesses (including shooting ranges) to operate.  Thus, Plaintiffs now articulate a new theory: that they cannot exercise their rights because federal and state laws require firearms retailers to operate exclusively inside licensed buildings.  But Plaintiffs adopt incorrect and formalistic interpretations of laws regulating firearms dealers, misapply various California Penal Code provisions, and overlook solutions to the obstacles they insist stand in their way.  Plaintiffs also ignore federal guidance—specifically drafted for the COVID-19 pandemic—that allows firearm transactions to occur "curbside."

As a result, Plaintiffs fail to overcome the presumption of mootness that arises from the termination of the health orders they originally sought to enjoin.  Even if enough of the case survives to support jurisdiction, the nature of the dispute has changed dramatically.  No longer can Plaintiffs credibly claim to be suffering categorical deprivations.  Instead, at most, they now have less convenient opportunities to acquire firearms and fewer places to practice proficiency than before the pandemic began.  That is not enough to establish a Second Amendment claim, let alone a request for extraordinary injunctive relief.  Plaintiffs would apparently rather be aggrieved than made whole, but their refusal to admit their rights have been restored is no reason to upend orders that continue to protect the Bay Area from a deadly disease.

## II.   ARGUMENT

## A.   PLAINTIFFS' REQUEST FOR A PRELIMINARY INJUNCTION IS MOOT

"[T]he repeal, amendment, or expiration of challenged legislation is generally enough to render a case moot and appropriate for dismissal."  *Bd. of Trustees of Glazing Health & Welfare Tr. v. Chambers*, 941 F.3d 1195, 1198 (9th Cir. 2019) (en banc).  Here, Plaintiffs sought to enjoin enforcement of health orders issued in March 2020 because those orders allowed only "Essential Businesses" to sell retail goods in person but did not deem firearms retailers essential.  Each of the four county defendants has since superseded the challenged directives with new orders ("Revised

1  Health Orders") that are "essentially the same" as one another for purposes of Plaintiffs' motion.

2  Supp. Br. at 4:28.[1]  The Revised Health Orders differ from their predecessors, however, in three key

3  respects: First, they allow "Additional Businesses," including retailers, to sell goods by delivery and

4  "curbside"—the latter term defined broadly to include any transaction in which the customer does

5  not enter a store, regardless of whether the retail employee remains inside.  *See, e.g.*, Dkt. No. 50,

6  Ex. A, at App'x C-1(1).  Second, they permit "Outdoor Businesses," defined as entities that

7  "primarily operate[] outdoors," to open.  *Id.* at ¶¶ 3, 15l.  And, third, they allow individuals to travel

8  to provide or access any "Additional Businesses" or "Outdoor Businesses."  *Id.* at ¶ 15(i).  Plaintiffs

9  insist that, despite these differences, the Revised Health Orders do not moot their request for

10 injunctive relief because: (i) they still cannot acquire or practice proficiency with firearms; (ii)

11 Defendants are likely to resurrect the more restrictive rules; and (iii) the restrictions may both recur

12 and evade review.  They are wrong on all counts.

13      **1.      Plaintiffs Can Acquire and Practice Proficiency with Firearms**

14      According to Plaintiffs, the Revised Health Orders "do not allow [them] to engage in the

15 constitutionally protected conduct at stake."  Supp. Br. at 4:5-6.  They even claim the situation today

16 is "the same as it was on day one. " *Id.* at 7:19-22.  But that is clearly not so.  Plaintiffs misrepresent

17 and exaggerate any obstacles to firearms acquisition under federal and state law.  They also identify

18 no obstacle to visiting outdoor shooting ranges.

19          *a)      Federal Regulations of Firearms Retailers Do Not Prevent Curbside*
                     *Transactions*
20

21      Plaintiffs first insist federal law stands in their way because it requires firearms dealers to

22 operate from their "business premises," which 27 C.F.R. § 478.11 defines as "the property on which

23 the dealing of firearms is or will be conducted."  Supp. Br. at 6:13-16.  But, inexplicably, Plaintiffs

24

25 _____

26 [1] Plaintiffs note that the City Defendants have filed neither requests for judicial notice attaching
   updated city policies (Supp. Br. at 3:4-6) nor "evidence…that they have enacted or are enforcing any
27 different policies" than those issued in March (*id.* at 3:24-28).  But the City Defendants have always
   only enforced the County-issued orders.  There are no separate City policies.  *See, e.g.,* Dkt. No. 50,
28 Ex. A ¶ 3 (stating order applies to "[a]ll individuals currently living within the County," not just
   individuals in unincorporated areas of County).

Defendants' Joint Opposition to Plaintiffs' Supplemental Brief                                20CV02180JST

1   ignore April 10, 2020 guidance from the Bureau of Alcohol, Tobacco, Firearms, and Explosives

2   ("ATF"), which was written expressly to address COVID-19 shelter-in-place orders, and which

3   interprets the same provision they cite as permitting drive-through and curbside transactions.  *See*

4   Supp. Bussey Decl., Ex. A (ATF Letter).  Specifically, according to the ATF, federal regulations

5   permit dealers to conduct business: (i) "through a drive-up or walk-up window or doorway where the

6   customer is on the licensee's property on the exterior of the brick-and-mortar structure;" or (ii) from

7   "a temporary table or booth located in a parking lot or other exterior location on the licensee's

8   property…."  *Id.* at 2.  Plaintiffs do not explain why, as a practical matter, those options do not exist

9   here.  They say nothing, for example, about the configurations of their own businesses or other

10  firearms retailers, at least many of which appear to be sited in privately owned strip malls with

11  access to private outdoor spaces.  *See* Dkt. No. 20-2 (Lee Decl.), Ex. 6 (photo of third-party gun

12  shop); *id.*, Ex. 9 (photo of City Arms East).

13          **b)      *State Regulations of Firearms Retailers Do Not Prevent Curbside***
                     ***Transactions***
14

15          Second, Plaintiffs rely on two state law regulations of firearms retailers in Penal Code section

16  26805.  The first requires that the "business of the licensee" be conducted "only in the buildings

17  designated in the license."  Penal Code § 26805(a).  Plaintiffs offer no evidence or argument that

18  "building," which the statute does not define, is strictly limited to the space inside a store's four

19  exterior walls.  California courts have construed "building" in other Penal Code provisions more

20  broadly.  *See People v. LaDuke*, 30 Cal. App. 5th 95, 103 (2018) (holding that stand-alone sign at

21  front of property exterior to primary structure was part of "building" for purposes of vandalism

22  statute; rejecting definition limiting "building" to "structure that has four walls and a roof"); *People*

23  *v. Thorn*, 176 Cal. App. 4th 255, 263 (2009) (rejecting argument that "carports are not part of the

24  inhabited building under the burglary statutes").  The "in-the-building" language, which dates to the

25  statute's initial enactment in 1953 (Supp. Bussey Decl., Ex. B), appears intended to ensure dealers

26  operate where they can store firearms securely, maintain a register of sales, post legal notices, and be

27  inspected.  *See* Penal Code §§ 26810; 26835; 26885; 26890; 26900.  Those aims are met by allowing

28  sales in front of or behind a store—for example in an outdoor walkway covered by the same roof.

3

1    *See* Lee Decl. Ex. 6 (depicting such a space).

2            But even if section 26805(a) requires firearms retail business to occur inside a store's four

3    exterior walls, the requirement could still be met as the ATF describes: with the customer and dealer

4    on opposite sides of an open door or window.  In that case, the dealer would conduct his or her

5    business inside the "building" under any definition of that term (thereby satisfying the Penal Code),

6    while the customer remains outside (consistent with the Revised Health Orders).  Plaintiffs do not

7    explain why this sales model would violate the statute and can point to no actual or threatened

8    enforcement against it.  They also cannot credibly argue the 1950s-era language requires *every*

9    aspect of "the business of the licensee" (including actions taken by customers) to occur in the

10   building.  Customers, having placed orders online for decades now, can presumably perform that

11   same act while standing immediately outside the store; no cited provision prevents them from

12   presenting their identification or taking a written test there either.[2]

13           Plaintiffs insist such a sales model would violate state law because firearms delivery must

14   happen "at…[t]he building designated in the license."  Cal. Penal Code § 26805(d).  But the

15   language they quote does not require anyone to be *in* the building; a walk-up customer could take

16   delivery "at" a doorway or window.  And they cite only subsection (1) while ignoring subsection (3),

17   which permits delivery "at…[t]he place of residence of, …or on private property owned or lawfully

18   possessed by, the purchaser…."  *Id.*  The latter provision, added by the Legislature in 1995, means

19   just what it says, as its legislative history confirms:

20           Finally, it is an open question whether dealers can deliver guns to purchasers at
             their homes, fixed places of business or on land they own or lawfully possess.
21           These places are all places where a person can possess guns without the need for
             carry permits under Penal Code Section 12026….Former President Reagan was, in
22           fact, delivered a gun and filled out a Federal Form 4473 at his ranch in Santa
             Barbara County under this procedure. In so far as there is a question whether this is
23           allowed under state law, this bill would clarify that it is legal.

24   Supp. Bussey Decl., Ex. C (California Bill Analysis, S.B. 23 Sen., 6/13/1995).  And, importantly, the

25

26   _____

27   [2] For this reason, and because (as Plaintiffs' counsel pointed out at the hearing), firearms dealers also
     sell unregulated accessories, Plaintiffs' circular suggestion that those entities cannot operate at all
28   and thus "by definition" fail to qualify as "Additional [B]usinesses to which residents may lawfully
     travel" under the Revised Health Orders, is inaccurate.  Supp. Br. at 4:19-5:5.

1    Revised Health Orders allow "Additional Businesses" to deliver goods to customers' homes.  *See,*

2    *e.g.,* Dkt. No. 50, Ex. A at App'x C-1 ("Goods may be provided to customers only by

3    curbside/outside pickup *or by delivery*.") (emphasis added).

4              c)       **State Firearms Possession Laws Do Not Prevent Curbside Delivery or**
                       **Delivery at Purchaser's Home**
5

6              Third, Plaintiffs—continuing to search for an obstacle to that which they purportedly want to

7    do—fret that customers could face criminal penalties for performing firearms safety demonstrations

8    outside, citing Penal Code Sections 26350(a)(1)(A) and 26400, both of which bar carrying exposed

9    firearms in a "public place or public street."  But Plaintiffs ignore separate statutory provisions

10   providing that safety demonstrations and other firearms transfer processes are exempt from open

11   carry laws when conducted on the premises of a firearms retailer.  *See* Cal. Penal Code § 26374

12   ("Section 26350 does not apply to, or affect, the open carrying of an unloaded handgun by a person

13   engaged in firearms-related activities, while on the premises of a fixed place of business that is

14   licensed to conduct … activities related to the sale … of firearms…."); Cal. Penal Code § 26405

15   (same with respect to § 26400 and non-handguns).  Defendants are unaware of any authority limiting

16   "premises" here to within the four walls of a building.  These exceptions presumably exist because

17   open carry provisions aim to avoid instances where firearms "alarm[] unsuspecting individuals and

18   caus[e] issues for law enforcement."  *Flanagan v. Harris*, No. LACV1606164JAKASX, 2018 WL

19   2138462, at *7 (C.D. Cal. May 7, 2018) (discussing legislative history).  The sight of a gun is not

20   particularly alarming on the premises of a gun retailer.[3]

21             The open carry statutes—which prohibit carrying visible firearms in a "public place or public

22   street"—are also not implicated by deliveries to private houses or apartment complexes.  And

23   Plaintiffs cite no authority preventing the statutorily-mandated safety demonstration from occurring

24   _____

25   [3] Plaintiffs also speculate that "raised eyebrows" might result should safety demonstrations occur
     outside, on their premises.  Supp. Br. at 6:23.  But the demonstrations could take place discreetly at
26   the front or rear of a business, where a customer may remain outside a store on a private sidewalk or
     parking lot, reach into the store to pick up a firearm that remains within that building, and conduct
27   the safe handling demonstration at arms' length.  Based on the pictures Plaintiffs previously
     submitted, the private entrances to firearms stores are often located in private shopping centers and
28   meaningfully separated from public streets and sidewalks.

1  at such a residence, incident to delivery.  On the contrary, they say the demonstration must happen

2  "at the time of transfer."  Supp. Br. at 6:20-21.  Given that delivery can legally occur at a "place of

3  residence," it follows that the safety demonstration can as well.  The open carry laws also apply only

4  when a person carries a firearm "outside a vehicle" (Penal Code 26350(a)(1)(A)); thus, to the extent

5  any local firearms dealers can provide drive-through services, which the Revised Health Orders

6  permit (*see* Dk. 50 Ex. A at App'x C-1 (allowing pickup through "any mode of travel")), they would

7  avoid the statutes for that reason as well.

8          *d)*       **Gun-Free School Zones Do Not Prevent Curbside Purchases**

9        Finally, Plaintiffs raise the specter that potential customers might unwittingly violate statutes

10  barring firearms possession near school zones if they were forced to conduct the safe-handling

11  demonstration or other purchase requirements outside.  But Plaintiffs identify no firearms retailer

12  within 1000 feet of a school zone and certainly do not claim all—or most—such stores are located

13  within that radius.  Regardless, neither state nor federal law affects the "curbside" transactions

14  contemplated here.  Both California and federal gun-free school zone laws do not apply to firearm

15  possession "[w]ithin…a place of business or on private property."  Penal Code § 626.9(c)(1); *see*

16  *also* 18 U.S.C. § 922(q)(2)(B)(i).  Potential customers may possess a firearm on the private property

17  owned or leased by firearms retailers, so neither provision creates any meaningful risk to customers.

18  Plaintiffs attempt to rely on a distinguishable case imposing criminal liability for possessing a

19  firearm on a public sidewalk in front of a house within a school zone, *People v. Tapia*, 129

20  Cal.App.4th 1153, 1160 (2005).  Supp. Br. at 7.  But Plaintiffs fail to address the fact that the court's

21  holding turned on the fact that the possession occurred on a publicly owned easement, not on private

22  property.  *Tapia*, 129 Cal. App. 4th at 1163-65.

23      **2.**    <u>**Outdoor Shooting Ranges May Operate and Have Opened**</u>

24        Finally, Plaintiffs do not actually dispute that the Revised Health Orders allow outdoor

25  shooting ranges to operate.  *See* Dkt. No. 50 at Ex. A ¶¶ 3, 16.1 (permitting "Outdoor Businesses" to

26  operate).  Defendants have confirmed that several such businesses recently resumed operations.  *See*

27  Supp. Bussey Decl. Exs. D-F. Accordingly, Plaintiffs can "practice and remain proficient" with

28  firearms at appropriate locations and need not—as their brief suggests—do so "curbside."  Supp. Br.

1  at 7:19-20.  That right clearly has been restored.

2  **B.      THE VOLUNTARY CESSATION DOCTRINE DOES NOT APPLY**

3          Plaintiffs next claim that even if their rights have been restored, "the voluntary cessation

4  doctrine would intercede to preserve this Court's jurisdiction over the controversy."  Supp. Br. at

5  8:3-9.  Not so.  The Ninth Circuit recently clarified the framework that applies when determining

6  whether the repeal, amendment, or expiration of an enactment moots related litigation.  *Welfare*

7  *Trust*, 941 F.3d at 1199.  It explained that because courts should treat "the voluntary cessation of

8  challenged conduct by government officials…with more solicitude than similar action by private

9  parties," they must "presume that the repeal… of legislation" moots related litigation "unless there is

10  a reasonable expectation that the legislative body will reenact the challenged provision or one similar

11  to it."  *Id.* at 1197 (quoting *America Cargo Transp., Inc. v. United States*, 625 F.3d 1176, 1180 (9th

12  Cir. 2010)).  While "[t]he party challenging the presumption of mootness need not show" that

13  reenactment "is a virtual certainty," any determination that a reasonable expectation exists "must be

14  founded in the record … rather than on speculation alone."  *Id.*

15          Plaintiffs fail to cite *Welfare Trust*, relying instead on precedent that case overruled.

16  Applying the correct test, the Court should presume Plaintiffs' application for a preliminary

17  injunction is moot because the challenged public health orders were superseded by orders that

18  restore their rights.  Plaintiffs, moreover, cannot overcome the presumption.  They say "there is

19  certainly no guarantee that the challenged actions will not recur," and that there could be a "second

20  wave" of COVID-19 cases that lead to stricter orders.  Supp. Br. at 8:28-10:1.  But those

21  possibilities—"speculation alone"—are insufficient.  As of now, all indications are to the contrary,

22  as the number of new cases is declining and hospital capacity, testing, and contact tracing are all

23  increasing.  It is thus more likely that the orders will continue to become more lenient, consistent

24  with the "gradual and measured resumption of activity" that has already begun and is intended "to

25  prevent a surge in COVID-19 cases."  Dkt. No. 50, Ex. A ¶ 1.  Even if the disease does resurge, it is

26  not likely, given the progress that has been and will be made, that anything like the March orders

27  will result.  For that reason, and because, here, repeal occurred due to new data about COVID-19

28  cases, testing, and treatment capacity—not the "prodding effect of litigation"—the voluntary

7

1   cessation doctrine does not apply.  *Welfare Trust*, 941 F.3d at 1199.

2   **C.      THE MARCH RESTRICTIONS ARE NOT "CAPABLE OF REPETITION, YET**
        **EVADING REVIEW"**
3

4           Plaintiffs also claim "mootness would not deprive this Court of jurisdiction because the

5   controversy is … 'capable of repetition, yet evading review.'"  Supp. Br. at 10:2-4; *see also*

6   *Hamamoto v. Ige*, 881 F.3d 719, 722 (9th Cir. 2018).  But this exception applies only where: "(1) the

7   challenged action is in its duration too short to be fully litigated prior to cessation or expiration; and

8   (2) there is a reasonable expectation that the same complaining party will be subject to the same

9   action again."  *Id.*  Because mootness concerns whether courts have power to hear a case, the

10  "capable of repetition, yet evading review" exception must be applied sparingly, and only in

11  "exceptional situations."  *Protectmarriage.com-Yes on 8 v. Bowen*, 752 F.3d 827, 836-37 (9th Cir.

12  2014).  The exception applies only "where the type of injury involved inherently precludes judicial

13  review, not … where review is precluded as a practical matter."  *Id.*

14          Here, the first prong (short duration) is arguably met because the prior health orders that

15  sparked Plaintiffs' application for a preliminary injunction remained extant for less than two months.

16  But the reasonable expectation prong is not because, for reasons set forth above, Defendants are not

17  likely to reimpose the original restrictions.

18  **D.      EVEN IF THE REVISED HEALTH ORDERS DO NOT MOOT THE CASE, THEY**
        **MAKE INJUNCTIVE RELIEF INAPPROPRIATE**
19

20          At the May 20, 2020 hearing, the Court asked whether defense counsel would stipulate that

21  an analysis of the March 16 and March 31, 2020 Health Orders applies to the Revised Health Orders

22  as well.[4]  It would be inappropriate to extend any such analysis without accounting for the

23  qualitative differences between those orders.  Plaintiffs sought injunctive relief claiming the earlier

24  orders completely prevented them from acquiring and practicing proficiency with firearms.  Now,

25  even if the Court determines enough of dispute remains to support jurisdiction, that dispute has taken

26  a markedly different complexion.  At most, Plaintiffs can claim the Revised Health Orders create

27

28  _____

[4] The operative complaint still does not challenge any orders issued since March.

8

1    somewhat more limited opportunities for target shooting than normal, and make firearms acquisition,

2    though possible, less convenient than before.

3    Those differences matter when assessing the degree to which Plaintiffs' rights have been

4    infringed.  *See Teixeira v. Cty. of Alameda*, 873 F.3d 670, 679-80 n. 13 (9th Cir. 2017) (finding fact

5    that some stores were available to customers, even if less conveniently located, and with inferior

6    services, fatal to Second Amendment claim); *Jackson v. City & Cty. of San Francisco*, 746 F.3d 953,

7    968 (9th Cir. 2014) (ordinance that only made it "more difficult to purchase certain types of

8    ammunition" did not substantially burden Second Amendment rights, in part because customers

9    could obtain ammunition elsewhere).  Plaintiffs' ability to exercise their Second Amendment rights

10   also factors into the balancing of the equities and consideration of the public interest.  Whereas

11   Plaintiffs' claimed injuries either no longer exist or have been significantly mitigated since they

12   sought injunctive relief, the public's interests are undiminished.

13   And while the Revised Health Orders are, as Plaintiffs emphasize, temporally indefinite

14   (Supp. Br. at 4:7-12), that difference does not make any burdens they impose more substantial.  Each

15   of the three prior orders was superseded before the occurrence of the respective end dates identified

16   therein.  If the Revised Health Orders had also included a definite end date, that provision likely

17   would have been prematurely mooted as well.  Put differently, in context, the absence of a fixed date

18   does not suggest the current orders will be permanent or even long-lasting but the opposite: that they

19   will remain extant only briefly, as indicated by the Health Officers' commitment to "continually

20   review whether modifications to the Order[s] are warranted" based on objective COVID-19

21   indicators.  Dkt. No. 50, Ex. A ¶ 11.

22   Finally, for at least three reasons, the relaxed terms of the Revised Health Orders impact the

23   merits analysis not only of those orders but of the earlier directives from March as well.  First, the

24   Revised Health Orders (and their immediate predecessors) temporally bound the stricter limits that

25   were imposed in March—at about six weeks.  Second, the orders that have issued since March

26   impose progressively less restrictive provisions responsive to objective indicators—a trend

27   inconsistent with the suggestion that the orders will likely be "renewed and revised *infinitum*." Supp.

28   Br. at 4:10-11.  Finally, the orders that have issued since March relaxed their restrictions in a neutral

manner.  Plaintiffs' prior complaint, for example, that golf courses and outdoor shooting ranges should be treated the same (Dkt. No. 48 at 10:25-28) missed the mark because the orders already treated them that way.  This even-handed treatment belies any suggestion that the orders were ideologically driven and further supports the application of rational basis review.  In fact, last Friday, the Ninth Circuit affirmed the denial of a church's request for a temporary restraining order enjoining enforcement of a COVID-19 health order.  Emphasizing that the health order did not restrict religious activities because they were religious or impose burdens on them selectively, the court closed with the following observation:

> We're dealing here with a highly contagious and often fatal disease for which there presently is no known cure.  In the words of Justice Robert Jackson, if a [c]ourt does not temper its doctrinaire logic with a little practical wisdom, it will convert the constitutional Bill of Rights into a suicide pact.

*South Bay Pentecostal Church v. Newsom et al.*, ___ F.3d___, 2020 WL 2687079, at *1 (9th Cir. May 22, 2020) (internal citation omitted).  Those observations apply equally to this case, and they should lead to the same result.

### III.  CONCLUSION

The Revised Health Orders allow Plaintiffs to acquire and practice proficiency with firearms, and Plaintiffs identify no federal or state laws that presently stand as obstacles to those activities. The restoration of Plaintiffs' rights moots their Second Amendment claim.  Even if it does not end the case, it undermines their request for injunctive relief.

I hereby attest that I have on file all holographic signatures corresponding to any signatures indicated by a conformed signature /S/ within this and associated e-filed documents.

Respectfully submitted,

JAMES R. WILLIAMS
COUNTY COUNSEL

Dated:  May 27, 2020          By:  /S/ *Jason M. Bussey*
JASON M. BUSSEY
Deputy County Counsel

Attorneys for Defendants
COUNTY OF SANTA CLARA, LAURIE
SMITH, JEFFREY ROSEN, and SARA CODY

10

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

RICHARD DOYLE
CITY ATTORNEY

Dated:  May 27, 2020                    By:  /S/ Margo Laskowska
                                             MARGO LASKOWSKA
                                             Sr. Deputy City Attorney

                                             Attorneys for Defendants
                                             CITY OF SAN JOSÉ, SAM LICCARDO and
                                             EDGARDO GARCIA

Dated:  May 27, 2020                    By:  /S/ Krishan Chopra
                                             KRISHAN CHOPRA
                                             City Attorney

                                             Attorneys for Defendants
                                             MOUNTAIN VIEW and MAX BOSEL

                                             DONNA R. ZIEGLER
                                             County Counsel, in and for the County of
                                             Alameda, State of California

Dated:  May 27, 2020                    By:  /S/ Raymond L. MacKay
                                             RAYMOND L. MACKAY
                                             Senior Deputy County Counsel

                                             Attorneys for Defendants
                                             COUNTY OF ALAMEDA, GREGORY J.
                                             AHERN, and ERICA PAN

                                             JOHN C. BEIERS, COUNTY COUNSEL

Dated:  May 27, 2020                    By:  /S/ Daniel McCloskey
                                             DANIEL MCCLOSKEY, DEPUTY
                                             SARAH H. TRELA, DEPUTY

                                             Attorneys for Defendants
                                             COUNTY OF SAN MATEO, CARLOS
                                             BOLANOS, and SCOTT MORROW

Defendants' Joint Opposition to Plaintiffs' Supplemental Brief                    20CV02180JST

1

2

                                 BURKE, WILLIAMS & SORENSEN, LLP

3

Dated:  May 27, 2020              By:  /S/ *Kevin D. Siegel*
                                      KEVIN D. SIEGEL

4
                                      MICHELLE MARCHETTA KENYON

5
                                      Attorneys for Defendants
                                      CITY OF PACIFICA and DAN STEIDLE

6

7
                                      SHARON L. ANDERSON
                                      COUNTY COUNSEL

8

9
Dated:  May 27, 2020              By:  /S/ *Thomas L. Geiger*
                                      THOMAS L. GEIGER

10
                                      Assistant County Counsel

11
                                      Attorneys for Defendants

12
                                      COUNTY OF CONTRA COSTA, CHRIS
                                      FARNITANO, and DAVID O. LIVINGSTON

13

14
                                    BEST BEST & KRIEGER LLP

15

16
Dated:  May 27, 2020              By:  /S/ *Gene Tanaka*
                                      GENE TANAKA

17
                                    DAKOTAH BENJAMIN

18
                                    Attorneys for Defendants
                                    CITY OF PLEASANT HILL and BRYAN HILL

19

20

21

22

23

24
2217884

25

26

27

28

12