UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JANICE ALTMAN, et al., | Case No. 20-cv-02180-JST |
| Plaintiffs, | |
| v. | **ORDER DENYING PRELIMINARY INJUNCTION** |
| COUNTY OF SANTA CLARA, et al., | Re: ECF No. 20 |
| Defendants. | |

We are in the midst of the COVID-19 pandemic.  Over 1.8 million people in the United States have been infected, and more than 20,000 new cases were reported yesterday alone.  In order to limit the spread of this deadly disease, four Bay Area counties – among many others throughout the state – issued shelter-in-place orders limiting their residents' ability to travel, eliminating gatherings, and closing businesses within their borders.  The orders made exceptions for certain "essential businesses" to ensure their residents' continued health, safety, and sanitation, but did not exempt firearms retailers or shooting ranges.  Plaintiff firearms retailers, Second Amendment-related nonprofits, and individuals seeking to exercise their right to keep and bear arms now seek a preliminary injunction requiring the counties to exempt firearms retailers and shooting ranges from the shelter-in-place orders.  ECF No. 20.  Since the lawsuit was filed, three of the counties at issue now permit in-store retail, and the case is now moot as to those counties.  Only the Alameda County order remains at issue.

Having carefully considered the extensive briefing submitted by the parties and the arguments presented by counsel, the Court concludes that Alameda County's shelter-in-place order passes constitutional muster.  The order has a real and substantial relation to the important goal of protecting public health; it reasonably fits that goal; it is facially neutral and does not target

1    firearms retailers or shooting ranges in particular; and it is limited in time.  Thus, the burden the

2    order places on the exercise of the Second Amendment right is constitutionally reasonable.

3           The Court will deny the motion.

4    **I.      BACKGROUND**

5           Our state, our country, and the entire world are in the middle of an unparalleled public

6    health emergency.  The novel coronavirus and the disease it causes, COVID-19, "first appeared in

7    December 2019 and has since spread to most countries in the world, including the United States."

8    ECF No. 46-6 ¶ 6.  In the short time since, the virus "has thrust humankind into an unprecedented

9    global public health crisis."  *Gayle v. Meade*, No. 20-21553-CIV, 2020 WL 2086482, at \*1 (S.D.

10   Fla. Apr. 30, 2020), *order clarified*, No. 20-21553-CIV, 2020 WL 2203576 (S.D. Fla. May 2,

11   2020).  "Experts consider this outbreak the worst public health epidemic since the influenza

12   outbreak of 1918."  ECF No. 46-6 ¶ 6.  The virus "is extremely easy to transmit, can be

13   transmitted by infected people who show no symptoms, has no cure, and the population has not

14   developed herd immunity."  ECF No. 46-7 ¶ 5.  COVID-19 "is fatal to up to eighty percent of

15   patients who go into intensive care units in hospitals."  *Id.*

16          As of the date of this order, COVID-19 has sickened at least 6,325,303 people worldwide

17   and 1,820,523 in the United States, and has killed 377,460 people globally and 105,644 nationally.

18   Center for Systems Science and Engineering at Johns Hopkins Univ., *COVID-19 Dashboard* (last

19   visited June 2, 2020),

20   https://gisanddata.maps.arcgis.com/apps/opsdashboard/index.html#/bda7594740fd40299423467b4

21   8e9ecf6 (last visited June 2, 2020).  In California alone, 115,908 have been infected and 4,235

22   have died.  L.A. Times Staff, *Tracking Coronavirus in California*, *L.A. Times* (last visited June 2,

23   2020), https://www.latimes.com/projects/california-coronavirus-cases-tracking-outbreak/.  In just

24   the four counties that are the subject of this lawsuit, the numbers are 9,976 sick and 361 dead.

25   Chronicle Digital Team, *Coronavirus Tracker*, *S.F. Chronicle* (last visited June 2, 2020),

26   https://projects.sfchronicle.com/2020/coronavirus-map/.  And these numbers, as shocking as they

27   are, actually understate the damage inflicted by the virus, because a lack of testing masks the true

28   number of infections and underreporting masks the true number of fatalities.  *See* ECF No. 46-3

United States District Court
Northern District of California

¶ 5 (noting that "limited testing capacity means that case counts represent only a small portion of actual cases").

In response to this extraordinary challenge, both the State of California and individual counties have issued what are known as "shelter-in-place" orders. Such orders typically require non-essential businesses to close; limit individuals' ability to travel; and require individuals to avoid behaviors that make transmission of the virus more likely. The purpose of such orders is "[t]o slow virus transmission as much as possible, to protect the most vulnerable, and to prevent the health care system from being overwhelmed." ECF No. 46-6 ¶ 10. The orders are formulated based on guidance from the Centers for Disease Control and Prevention, the California Department of Public Health, and other public health officials throughout the United States and around the world. *See id.*; ECF No. 46-7 ¶ 6 ("Right now, shelter-at-home orders are being used worldwide to minimize the potential for people infected with the novel coronavirus to spread it."), *id.* ¶ 10 ("Effective containment of the virus requires limiting people's contact with each other because of the way that the virus is transmitted."). Shelter-in-place orders have inarguably slowed the spread of the virus, ECF No. 46-6 ¶¶ 17, 20, resulting in the saving of innumerable lives.

Defendants Santa Clara County, Alameda County, San Mateo County, and Contra Costa County first issued shelter-in-place orders on March 16, 2020. First Amended Complaint ("FAC"), ECF No. 19 ¶¶ 80, 93, 103, 114; *see* ECF No. 46-6 at 11-17 ("Mar. 16 Order"). The Orders required most businesses to "cease all activities at facilities located within the County."[1] FAC ¶ 81. The Orders exempted 21 categories of "essential businesses," *id.*, such as grocery stores, health care operations, and banks, *see* Mar. 16 Order ¶ 10.f. The Orders authorized law enforcement officials to "ensure compliance with and enforce this Order." *Id.* ¶ 11. Firearm and ammunition retailers and shooting ranges were not exempted. FAC ¶ 81.

On March 31, 2020, Defendant Counties issued additional orders superseding the March 16 Orders and extending the shelter-in-place period until May 3, 2020. FAC ¶ 83; *see* ECF No.

---

[1] In their motion, Plaintiffs refer to the Orders as "substantively identical." ECF No. 20-1 at 10, 12, 13. Unless otherwise indicated, the Court looks to Alameda County's Orders, *see* ECF No. 46-6 at 11-17, 19-33, as representative of all four Counties' Orders.

United States District Court
Northern District of California

United States District Court
Northern District of California

1   46-6 at 19-33 ("Mar. 31 Order").  These Orders also did not exempt firearm and ammunition

2   retailers and shooting ranges as essential businesses.  FAC ¶ 84.  The March 31 Orders stated that

3   "violation of any provision of this Order constitutes an imminent threat and menace to public

4   health, constitutes a public nuisance, and is punishable by fine, imprisonment, or both."  Mar. 31

5   Order ¶ 15.  On April 29, 2020, Defendant Counties issued a new set of Orders extending the

6   shelter-in-place period until May 31, 2020.  *See* ECF No. 46 at 13 n.5.

7            On May 15 and May 18, 2020, the Counties updated their Orders yet again.  *See* ECF No.

8   50 at 25-44 ("May 18 Order").[2]  "[I]n light of progress achieved in slowing the spread of COVID-

9   19," the new Orders permit a new category of "Additional Businesses," including all retail

10  businesses, to resume operation "subject to specified conditions and safety precautions to reduce

11  associated risk of COVID-19 transmission."  *See id.* ¶ 1.  These conditions include offering goods

12  for curbside pickup and, in two Counties, delivery.  *See id.*, App. C-1 ¶1(b)(i)(1).  The May 15 and

13  18 Orders also permit the socially distanced operation of "Outdoor Businesses" as well as travel to

14  and from all permitted activities.  *Id.* ¶¶ 3, 15.i, 15.l.  Unlike their prior iterations, these Orders

15  have no set end date.  Rather, they specify that "[t]he Health Officer will continually review

16  whether modifications to the Order are warranted" based on "progress on the COVID-19

17  Indicators[,]" including but not limited to new cases and hospitalizations, hospital, testing, and

18  contract tracing capacity, and availability of personal protective equipment; "developments in

19  epidemiological and diagnostic methods for tracing, diagnosing, treating, or testing for COVID-

20  19"; and "scientific understanding of the transmission dynamics and clinical impact of COVID-

21  19."  *Id.* ¶ 11.

22           On May 29, 2020, San Mateo County issued a superseding Order that permits retail

23  businesses to resume socially distanced in-store sales.  ECF No. 58 at 20.  Santa Clara County

24  issued a similar Order on June 1, 2020, to take effect on June 5, 2020.  ECF No. 59.  Contra Costa

25  _____

26  [2] The Court grants Defendants' request for judicial notice of these four Orders, which are matters
    of public record.  *See* ECF No. 50; *see* Fed. R. Evid. 201 ("The court may judicially notice a fact
27  that is not subject to reasonable dispute because it . . . can be accurately and readily determined
    from sources whose accuracy cannot reasonably be questioned.").  Unless otherwise indicated, it
28  looks to Alameda's order, *see* ECF No. 50 at 25-44, as representative of all four Counties' orders.

County issued a similar Order on June 2, 2020, to take effect on June 3, 2020.  ECF No. 60.[3]

On March 31, 2020, Plaintiffs filed a complaint challenging these orders and their effect on firearms retailers and shooting ranges.  Plaintiffs make a single claim under the Second and Fourteenth Amendments of the United States Constitution and seek injunctive and declaratory relief.  ECF No. 1.  Plaintiffs fall into three categories: (1) eight individual residents of Defendant counties ("Individual Plaintiffs") who wish to "exercise [their] right to keep and bear arms . . . and would do so, but for the reasonable and imminent fear of arrest and criminal prosecution under Defendants' laws, policies, orders, practices, customs, and enforcement, and because Defendants' orders and actions have closed firearm and ammunition retailers and ranges," *Id.* ¶¶ 6-12; (2) three firearms retailers located in three different Defendant counties ("Retailer Plaintiffs") who "would conduct training and education, perform California [Firearm Safety Certificate ('FSC')] testing for and issue FSC certificates to eligible persons, and sell and transfer arms . . . but for the reasonable and imminent fear of criminal prosecution and loss of [their] licenses because of Defendants' laws, policies, orders, practices, customs, and enforcement thereof," *id.* ¶¶ 13-15; and (3) five nonprofit entities focused on Second Amendment rights ("Institutional Plaintiffs") who bring the action on behalf of themselves and their members, *id.* ¶¶ 16-20.  Defendants include the four Counties as well as various law enforcement and public health officials associated with them, along with the cities of San Jose, Mountain View, Pacifica, and Pleasant Hill and various officials associated with them.  *Id.* ¶¶ 21-40.

On April 10, 2020, Plaintiffs amended their complaint as of right, adding a second claim under the Fifth and Fourteenth Amendments and seeking declaratory and injunctive relief as well as nominal damages and attorney's fees and costs.  FAC ¶¶ 147-55.  That same day, Plaintiffs filed a motion for temporary restraining order or, in the alternative, preliminary injunction.  ECF No. 20.  On April 10, finding that Plaintiffs had failed to make the required showing under Rule 65(b)(1), the Court denied the application for a temporary restraining order and set a hearing on the application for a preliminary injunction.  ECF No. 22.  On May 1, 2020, Defendants filed a

---

[3] The Court grants all three Counties' requests for judicial notice of these Orders.  *See supra*, 2 n.3.  The Court is not aware of a new order issued by Alameda County.

1  consolidated opposition.  ECF No. 46.  Plaintiffs replied on May 8, 2020, ECF No. 48, and the

2  Court held a video-conference hearing on May 20, 2020.

3        Plaintiffs filed a supplemental brief on May 22, 2020 addressing whether the case was

4  mooted by the May 15 and 18 Orders.  ECF No. 54.  Defendants filed a supplemental opposition

5  on May 27, ECF No. 55, and Plaintiffs replied on May 29, ECF No. 57.  The Court took the matter

6  under submission without an additional hearing.

7  **II.  JURISDICTION**

8        This Court has jurisdiction pursuant to 28 U.S.C. § 1331.

9  **III.  LEGAL STANDARD**

10        The Court applies a familiar four-factor test on a motion for a preliminary injunction.  *See*

11  *Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 839-40 & n. 7 (9th Cir. 2001).

12  To obtain preliminary injunctive relief, the moving party must show: (1) a likelihood of success on

13  the merits; (2) a likelihood of irreparable harm to the moving party in the absence of preliminary

14  relief; (3) that the balance of equities tips in favor of the moving party; and (4) that an injunction is

15  in the public interest.  *Id.* at 20.  Preliminary relief is "an extraordinary remedy that may only be

16  awarded upon a clear showing that the plaintiff is entitled to such relief."  *Winter v. Nat. Res. Def.*

17  *Council, Inc.*, 555 U.S. 7, 22 (2008).

18        To grant preliminary injunctive relief, a court must find that "a certain threshold showing

19  [has been] made on each factor."  *Leiva-Perez v. Holder*, 640 F.3d 962, 966 (9th Cir. 2011) (per

20  curiam).  Assuming that this threshold has been met, "serious questions going to the merits and a

21  balance of hardships that tips sharply towards the plaintiff can support issuance of a preliminary

22  injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and

23  that the injunction is in the public interest."  *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127,

24  1135 (9th Cir. 2011) (internal quotation marks omitted).

25  **IV.  DISCUSSION**

26        Under California's firearm regulations, an individual is generally required to obtain an

27  FSC, undergo a background check, and wait ten days before acquiring a gun.  *See* Cal. Penal Code

28  §§ 27545, 28050 *et seq.*, 30342 *et seq.*, 30370 *et seq.*, 31615.  Moreover, anyone wishing to buy

United States District Court
Northern District of California

6

ammunition must conduct the transaction through a licensed vendor in a face-to-face transaction. *Id.* § 30312.  As stated by Plaintiffs, this means that, with "few very limited exceptions," FAC ¶ 65, individuals "must visit a retailer at least once for ammunition, and at least twice for firearms," ECF No. 20-1 at 6.  Because firearms retailers are not considered "essential businesses" under the shelter-in-place orders, Plaintiffs argue that "millions of Californians in an entire region" are prohibited "from exercising fundamental rights guaranteed by the Second Amendment," including the right to possess, acquire, and maintain proficiency with firearms.  ECF No. 20-1 at 16-17.  They also argue that the Orders abridge their due process rights because they are "arbitrary and capricious, overbroad, [and] unconstitutionally vague." *Id.* at 26.

Plaintiffs argue that they are likely to succeed on their Second Amendment and due process claims and that these constitutional violations constitute irreparable injury that tips the public interest and balance of the equities in their favor. *Id.* at 28-29.

## A.    Mootness

Plaintiffs' FAC challenges only the March 16 and March 31 orders.  At the hearing, Plaintiffs stipulated that they also challenged the Orders issued on April 29, May 15, and May 18.  ECF No. 53.  The Court ordered supplemental briefing on whether the May 15 and 18 Orders, which allow for curbside retail sales and, in two Counties, delivery retail, mooted Plaintiffs' claims.  After this briefing had been submitted, San Mateo, Santa Clara, and Contra Costa Counties requested judicial notice of their May 29, June 1, and June 2 Orders, respectively, which permit the resumption of all in-store retail sales, subject to certain social distancing requirements.  *See* ECF Nos. 58, 59, 60.

The doctrine of mootness requires a court to dismiss a case "when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013) (quoting *Murphy v. Hunt*, 455 U.S. 478, 481 (1982) (per curiam)).  "The party alleging mootness bears a 'heavy burden' in seeking dismissal." *Rosemere Neighborhood Ass'n v. U.S. Envtl. Prot. Agency*, 581 F.3d 1169, 1173 (9th Cir. 2009) (quoting *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000)).  A case "becomes moot only when it is impossible for a court to grant any effectual relief whatever to the

United States District Court
Northern District of California

prevailing party." *Chafin v. Chafin*, 568 U.S. 165, 172 (2013) (quoting *Knox v. Serv. Emps. Int'l Union, Local 1000*, 567 U.S. 298, 307 (2012)). "As long as the parties have a concrete interest, however small, in the outcome of the litigation, the case is not moot." *Id.* (quoting *Knox*, 567 U.S. at 307-08).

Because Plaintiffs in San Mateo, Santa Clara, and Contra Costa Counties are now clearly able to purchase firearms and ammunition (or will be once the Orders go into effect), the Court holds that the case is moot as to those Defendants. The San Mateo, Santa Clara, and Contra Costa Defendants are hereby dismissed.

As for Alameda County, Plaintiffs argue that existing state and federal statutes and regulations prohibit them from purchasing firearms or ammunition curbside or via delivery. [4] ECF No. 54 at 4-7. Under California law, anyone selling, leasing, or transferring a firearm must obtain a license, Cal. Penal Code § 26500, and "the business of a licensee shall be conducted only in the buildings designated in the license," *id.* § 26805(a). *See also id.* § 30348(a) (requiring that sale of ammunition "be conducted at the location specified in the license"). A licensee must keep all firearms in its inventory "within the licensed location." *Id.* § 26885(a). A firearm "may be delivered to the purchaser, transferee, or person being loaned the firearm" at "the building designated in the license" or at "[t]he place of residence of, the fixed place of business of, or on private property owned or lawfully possessed by, the purchaser, transferee, or person being loaned the firearm." *Id.* § 26805(d).

Plaintiffs argue that a plain reading of these statutes mandates that firearms transactions occur "in the licensee's building," not on an adjacent sidewalk or parking lot. ECF No. 54 at 6; ECF No. 57 at 2; *see also* Cal. Penal Code § 16810 (defining "licensed premises," "licensee's business premises," or "licensee's place of business" in relevant articles as "the *building* designated in the license") (emphasis added). They argue that home delivery is not an option in

---

[4] Defendants argued at the hearing and in their supplemental brief that, beginning with the April 29 Orders, outdoor shooting ranges have been permitted to operate. *See* ECF No. 55 at 7. Plaintiffs do not dispute this interpretation of the Orders. *See* ECF No. 57 at 2 (arguing only that use of an indoor range is prohibited). The Court will address this issue in its consideration of Plaintiffs' likelihood of success on their Second Amendment claim.

United States District Court
Northern District of California

1    practice due to "the totality of statutes and regulations imposing both pre and post-delivery

2    requirements [that] prevent firearm and ammunition transactions and transfers to take place

3    outside a licensee's building."  ECF No. 57 at 3.[5]  Plaintiffs argue that curbside and delivery sales

4    of firearms are further complicated by the requirement that the recipient perform a "safe handling

5    demonstration" of the firearm in question, which Plaintiffs assert would violate California's open-

6    carry prohibition.  *See* ECF No. 54 at 6; Cal. Penal Code §§ 26850 (handguns); 26853

7    (semiautomatic pistols); 26856 (double-action revolvers); 26859 (single-action revolvers); 26860

8    (long guns); 26350(a)(1)(A) (open-carry prohibition).  The Court notes an additional potential

9    conflict with the requirement that dealers administering FSC tests "designate a separate room or

10    partitioned area" for an applicant to take the test and "maintain adequate supervision to ensure that

11    no acts of collusion occur while the objective test is being administered."  *Id.* § 31640(f).

12          Defendants respond that Plaintiffs' interpretation of these provisions is "incorrect and

13    formalistic."  ECF No. 55 at 2.  They point to case law interpreting "building" in California's

14    vandalism and burglary statutes to include certain outdoor areas.  *Id.* at 4 (citing *People v. LaDuke*,

15    30 Cal. App. 5th 95, 103 (Cal. Ct. App. 2018); *People v. Thorn*, 176 Cal. App. 4th 255, 263

16    (2009)).  They also cite an April 10, 2020 guidance from the Bureau of Alcohol, Tobacco,

17    Firearms, and Explosives stating that federal regulations pose no bar to curbside and drive-through

18    firearms transactions.  *Id.*; ECF No. 55-1 at 4-6.  Defendants cite no precedent, however – nor is

19    the Court aware of any – regarding the legality of curbside or drive-through firearms transactions

20    under California law.  Since this question would turn on how various state and municipal law

21    enforcement agencies interpret the regulations discussed above, different entities might take

22    different approaches.  Plaintiffs who attempt to exercise their right to acquire firearms and

23    ammunition in the manner Defendants claim is currently permitted would risk potential criminal

24    liability.  *See* Cal. Penal Code § 26500 (making violation of California's firearms licensing

25    requirements a misdemeanor).

26    _____

27    [5] Plaintiffs submit a supplemental declaration from Plaintiff Roman Kaplan, co-owner of Plaintiff
      City Arms East LLC, in support of this argument.  ECF No. 57-1.  The Court disregards this

28    evidence because it was presented for the first time on reply.  *See In re Hansen Natural Corp. Sec.
      Litig.*, 527 F. Supp. 2d 1142, 1150 (C.D. Cal. 2007).

United States District Court
Northern District of California

1    The Court need not resolve these questions definitively now.  It is sufficient to hold that,

2    given the uncharted legal landscape for selling firearms and ammunition curbside or via delivery,

3    Defendants have not met their "heavy burden" to establish mootness as to the Alameda County

4    Defendants.  *See Rosemere*, 581 F.3d at 1173.

5    **B.      Likelihood of Success on the Merits**

6    **1.      Second Amendment Claim**

7    "The Second Amendment protects an individual right to keep and bear arms . . . that is

8    fully applicable to the states and municipalities."  *Fyock v. Sunnyvale*, 779 F.3d 991, 996 (9th Cir.

9    2015) (citing *District of Columbia v. Heller*, 554 U.S. 570 (2008) and *McDonald v. City of*

10   *Chicago*, 561 U.S. 742, 750 (2010)).  Plaintiffs argue that Alameda County's Order infringes this

11   right by preventing them from "acquiring or practicing with firearms or ammunition, and during a

12   time of national crisis," when they claim these rights are most important.  ECF No. 20-1 at 6-7,

13   19-20 (emphasis omitted).

14   **a.      Standard of Review**

15   The parties dispute which standard of review governs Plaintiffs' Second Amendment

16   claim.  Plaintiffs argue that the Order constitutes a "complete and unilateral suspension on the

17   right of ordinary citizens to acquire firearms and ammunition" that is "categorically

18   unconstitutional" under *Heller*.  ECF No. 20-1 at 18.  By this, they mean that "any interest-

19   balancing test, including tiered scrutiny, is inappropriate under *Heller*."  *Id.* at 20.  Plaintiffs

20   acknowledge their suggested approach is contrary to Ninth Circuit law, *see* ECF No. 20-1 at 20,

21   which applies either intermediate or strict scrutiny to laws that burden Second Amendment rights

22   depending on "how close the law comes to the core of the Second Amendment right" and "the

23   severity of the law's burden on the right," *Wilson v. Lynch*, 835 F.3d 1083, 1092 (9th Cir. 2016)

24   (quoting *United States v. Chovan*, 735 F.3d 1127, 1138 (9th Cir. 2013)).  "The result is a sliding

25   scale.  A law that imposes such a severe restriction on the fundamental right of self defense of the

26   home that it amounts to a destruction of the Second Amendment right is unconstitutional under

27   any level of scrutiny."  *Silvester v. Harris*, 843 F.3d 816, 821 (9th Cir. 2016) (quoting *Jackson v.*

28   *City and County of San Francisco*, 746 F.3d 953, 961 (9th Cir. 2014)).  "A law that implicates the

1    core of the Second Amendment right and severely burdens that right warrants strict scrutiny.

2    Otherwise, intermediate scrutiny is appropriate." *Id.* (internal citation omitted).  This Court is

3    bound by Ninth Circuit precedent.

4           Defendants, meanwhile, urge the Court to review the Order under the "deferential

5    standards for emergency directives."[6]  ECF No. 46 at 13-15.  They rely on *Jacobson v.*

6    *Massachusetts*, 197 U.S. 11 (1905), in which the Supreme Court upheld a mandatory vaccination

7    law imposed by the Cambridge, Massachusetts board of health during the midst of a smallpox

8    epidemic.  The Supreme Court acknowledged states' police power to enact quarantine and public

9    health laws while noting that these laws "must always yield in case of conflict with . . . any right

10   which [the Constitution] gives or secures." *Id.* at 25.  However, "the liberty secured by the

11   Constitution . . . does not import an absolute right in each person to be, at all times and in all

12   circumstances, wholly freed from restraint." *Id.* at 26.  Evaluating a Fourteenth Amendment

13   challenge to the vaccination law, the Court held that

14              if a statute purporting to have been enacted to protect the public
                health, the public morals, or the public safety, has no real or
15              substantial relation to those objects, or is, beyond all question, a plain,
                palpable invasion of rights secured by the fundamental law, it is the
16              duty of the courts to so adjudge, and thereby give effect to the
                Constitution.
17
     *Id.* at 31.
18
19          Given that smallpox was "prevalent and increasing" in Cambridge, the Court held that the

20   vaccination program had a "real or substantial relation to the protection of the public health and

21   the public safety." *Id.*  Because the law was "applicable equally to all in like condition" and

22   because "in every well-ordered society charged with the duty of conserving the safety of its

23   members the rights of the individual in respect of his liberty may at times, under the pressure of

24   great dangers, be subjected to such restraint, to be enforced by reasonable regulations, as the safety

25   of the general public may demand," the Court concluded that mandatory vaccination could not "be

---

26   [6] Defendants also alternatively argue that the Court should apply rational basis review because the
     Order is a "neutral and generally applicable regulation[]" that only "incidentally implicates arms."
27   ECF No. 46 at 15.  Defendants admit that this approach "has not been applied in Second
     Amendment contexts," citing only two dissents by Ninth Circuit judges as support for applying it
28   here. *Id.* at 20.  The Court will not apply rational basis review.

United States District Court
Northern District of California

1    affirmed to be, beyond question, in palpable conflict with the Constitution." *Id.* at 29-31.  It noted,

2    however, that

3            the police power of a state, whether exercised directly by the
             legislature, or by a local body acting under its authority, may be
4            exerted in such circumstances, or by regulations so arbitrary and
             oppressive in particular cases, as to justify the interference of the
5            courts to prevent wrong and oppression.

6    *Id.* at 38.

7            Although Plaintiffs attempt to dismiss *Jacobson* as "arcane constitutional jurisprudence,"

8    ECF No. 48 at 6, the case remains alive and well – including during the present pandemic.  *See S.*

9    *Bay United Pentecostal Church v. Newsom*, No. 19A1044, 2020 WL 2813056, at *1 (May 29,

10   2020) (mem.) (Roberts, C.J., concurring) (citing *Jacobson* in denying injunctive relief regarding

11   California's COVID-19-related restrictions on religious gatherings).  Two circuits have recently

12   held that district courts erred by not using *Jacobson* to evaluate pandemic-related restrictions on

13   constitutional rights.  *See In re Abbott*, 954 F.3d 772, 785 (5th Cir. 2020) (evaluating temporary

14   restraining order on Texas pandemic restrictions as they related to abortion); *In re Rutledge*, 956

15   F.3d 1018, 1028 (8th Cir. Apr. 16, 2020) (same as to Arkansas restrictions).  In *Abbott*, the Fifth

16   Circuit referred to *Jacobson* as "the controlling Supreme Court precedent that squarely governs

17   judicial review of rights-challenges to emergency public health measures."  954 F.3d at 785.  Two

18   other circuits have endorsed approaches that combine *Jacobson* with the legal framework

19   particular to the right in question.  *See Robinson v. Marshall*, No. 2:19-cv-365-MHT, 2020 WL

20   1847128, at *8 (M.D. Ala. Apr. 12, 2020), *denying stay pending appeal*, *Robinson v. Att'y Gen.*,

21   No. 20-11401-B, 2020 WL 1952370 (11th Cir. Apr. 23, 2020) (regarding Alabama's COVID-19

22   restrictions on abortion); *Adams & Boyle, P.C. v. Slatery*, 956 F.3d 913, 925-26 (6th Cir. 2020)

23   (regarding Tennessee's COVID-19 restrictions on abortion).  And while the Ninth Circuit has not

24   yet announced a rule, district courts within the circuit have relied on *Jacobson* to evaluate the

25   burdens that California and Arizona's pandemic orders have placed on religious exercise and

26   travel.  *See McGhee v. City of Flagstaff*, No. CV-20-08081-PCT-GMS, 2020 WL 2308479, at *5

27   (D. Ariz. May 8, 2020); *Cross Culture Christian Ctr. v. Newsom*, No. 2:20-cv-00832-JAM-CKD,

28   2020 WL 2121111, at *3-4 (E.D. Cal. May 5, 2020); *Gish v. Newsom*, No. EDCV 20-755 JGB

United States District Court
Northern District of California

1    (KKx), 2020 WL 1979970, at *5 (C.D. Cal. Apr. 23, 2020).

2        Plaintiffs also seek to distinguish *Jacobson* by characterizing the case as "bottomed on a

3    substantial degree of *legislative* deference to which Defendants' Orders and enforcement practices

4    are simply not entitled."  ECF No. 48 at 8.  This argument misrepresents the case.  At issue in

5    *Jacobson* were two laws: (1) a state statute providing that "the board of health of a city or town, if,

6    in its opinion, it is necessary for the public health or safety, shall require and enforce the

7    vaccination and revaccination of all the inhabitants thereof . . . ," and (2) a Cambridge board of

8    health regulation mandating vaccination to combat the smallpox outbreak.  *Jacobson*, 197 U.S. at

9    12.  While the *Jacobson* plaintiff challenged only the state statute, the Court considered the

10   interplay of state and local power in setting a deferential standard:

11            According to settled principles, the police power of a state must be
             held to embrace, at least, such reasonable regulations established
12            directly by legislative enactment as will protect the public health and
             the public safety. . . .  It is equally true that the state may invest local
13            bodies called into existence for purposes of local administration with
             authority in some appropriate way to safeguard the public health and
14            the public safety.

15   *Id.* at 25 (internal citations omitted).  The Court further held that "surely it was appropriate for the

16   legislature to refer" the question of when to impose mandatory vaccination "to a board of health

17   composed of persons residing in the locality affected, and appointed, presumably, because of their

18   fitness to determine such questions."  *Id.* at 27.

19       We find ourselves in much the same situation here.  The Order in this case was imposed by

20   Alameda County's health officer, pursuant to authority granted to her by the California Health and

21   Safety Code.  *See* ECF No. 46 at 9; Cal. Health & Safety Code § 101040 ("The local health officer

22   may take any preventive measure that may be necessary to protect and preserve the public health

23   from any public health hazard during any 'state of war emergency,' 'state of emergency,' or 'local

24   emergency,' as defined by Section 8558 of the Government Code, within his or her jurisdiction.");

25   *id.* §§ 101085, 120175.  Accordingly, the rationale in *Jacobson* applies with equal force here as it

26   did there.

27       The Court need not decide whether *Jacobson* or the Ninth Circuit's Second Amendment

28   framework applies here because, as explained below, the Court concludes that the Order survives

review under either test.[7]  *See Robinson*, 2020 WL 1847128, at *8 ("The court need not decide which legal framework applies, and instead assumes that they can and should be applied together in these circumstances.").

### b.    *Jacobson* **Standard**

Under *Jacobson*, an emergency "statute purporting to have been enacted to protect the public health, the public morals, or the public safety" must yield to a fundamental right if it "has no real or substantial relation to those objects, or is, beyond all question, a plain, palpable invasion" of the right.  197 U.S. at 31.

Defendants argue that the Order substantially relates to "their objectives – minimizing COVID-19 transmission rates and conserving healthcare resources – by limiting the number and types of organizations that can expose their employees, customers, and business partners to infection."  ECF No. 46 at 14.  In support, they submit a declaration from Dr. Erica Pan, the Interim Health Officer for the Alameda County Public Health Department, explaining that the goal of such orders is:

> to lower the number of total people who become sick and to save lives by slowing the spread of the coronavirus in order to ensure that communities have enough space and resources in their hospitals for people who develop severe illness.  Sheltering in place is proven to slow the spread of the virus if everyone decreases the number of people with whom they come in contact because it decreases the number who might get sick from someone who is infected.

ECF No. 46-6 ¶ 12.  Dr. Pan states that her decision to issue the Order "was based on evidence of the rapidly increasing case rate of COVID-19 within Alameda County and surrounding Bay Area counties and scientific evidence and best practices regarding the most effective approaches to slow the transmission of COVID-19," *id.* ¶ 14, and that it is informed by "consideration of guidance from the Centers for Disease Control and Prevention, the California Department of Public Health, and other public health officials throughout the United States and around the world," *id.* ¶ 10.

---

[7] *Jacobson*, which involved a Fourteenth Amendment claim, appears to apply to all constitutional claims.  Defendants do not argue, however, that *Jacobson* should govern Plaintiffs' due process claim.  Because the Court finds that Plaintiffs have not demonstrated a likelihood of success on the merits of that claim under the traditional due process framework, the Court need not consider whether the claim would also be precluded under *Jacobson*.

United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Addressing the need for the additional restrictions contained in the March 31 Order as well as the

effectiveness of shelter-in-place orders, Dr. Pan states:

> The need for the March 31 orders could not be starker.  When I and
> the other Bay Area health officers issued shelter-in-place orders on
> March 31, 2020, the public health emergency had substantially
> worsened since our March 16, 2020 shelter-in-place orders, with a
> significant escalation in the number of positive cases,
> hospitalizations, and deaths, and a corresponding increasing strain on
> health care resources.  At the same time, evidence suggested that the
> restrictions on mobility and social distancing requirements imposed
> by the prior orders were slowing the rate of increase in community
> transmission and confirmed cases by limiting interactions among
> people, consistent with scientific evidence of the efficacy of similar
> measures in other parts of the country and world.

*Id.* ¶ 17.

Defendants also submit a declaration from Dr. George W. Rutherford, an epidemiologist

who is leading a COVID-19 contact tracing program in San Francisco at the request of the city's

Department of Public Health.  ECF No. 46-7.  Dr. Rutherford states that because "[t]he

effectiveness of containment measures depends not only on how soon they are enacted but how

strict they are[,] . . . [e]xceptions must be narrowly defined because each exception increases the

risks of community transmission."  *Id.* ¶ 11.  Dr. Rutherford also provides empirical evidence of

the success of shelter-in-place orders in reducing the transmission of COVID-19 in Italy, as well

as comparisons of United States jurisdictions showing that earlier implementation of shelter-in-

place has led to a slower spread of the disease.  *Id.* ¶¶ 9, 17-18.

Plaintiffs dispute neither the need for the Order nor whether the Order has a real or

substantial relationship to the legitimate public health goal of reducing COVID-19 transmission

and preserving health care resources, and the Court easily concludes that the Order bears such a

relationship to this goal.  *See Rutledge*, 956 F.3d at 1029 ("On the record before us, the State's

interest in conserving PPE resources and limiting social contact among patients, healthcare

providers, and other staff is clearly and directly related to public health during this crisis.");

*Abbott*, 954 F.3d at 787 ("In sum, it cannot be maintained on the record before us that GA-09

bears 'no real or substantial relation' to the state's goal of protecting public health in the face of

the COVID-19 pandemic.") (quoting *Jacobson*, 197 U.S. at 31).

15

The Court next turns to whether the Order effects a "plain, palpable invasion" of Plaintiffs' Second Amendment rights.  *See Jacobson*, 197 U.S. at 31.  Defendants argue that the Order is not "'beyond question' arbitrary or unreasonable, as [it was] drawn neutrally, appl[ies] temporarily, and reasonably make[s] limited exceptions only for businesses that support the basic needs of residents."  ECF No. 46 at 14 (citing *Jacobson*, 197 U.S. at 31).  Plaintiffs focus their *Jacobson* argument on why that standard does not apply but make no argument as to why it is not met here.  While the Court has found no authority applying *Jacobson* in the Second Amendment context, it sees significant overlap between the "plain, palpable invasion" prohibited by *Jacobson* and the "complete prohibition" on the Second Amendment right that *Heller* deemed categorically unconstitutional.  *See Heller*, 554 U.S. at 629.  It will thus consider whether the Order effects such a prohibition in order to determine whether it can be upheld under *Jacobson*.

"[T]he Second Amendment protects the right to possess a handgun in the home for the purpose of self-defense."  *McDonald*, 561 U.S. at 791 (citing *Heller*, 554 U.S. at 635); *see also id.* (Second Amendment right incorporated to the states via the Fourteenth Amendment).  Moreover, the right is not limited to possession; the Ninth Circuit has observed that "the core Second Amendment right to keep and bear arms for self-defense 'wouldn't mean much' without the ability to acquire arms."  *Teixeira v. County of Alameda*, 873 F.3d 670, 677 (9th Cir. 2017) (en banc) (quoting *Ezell v. City of Chicago*, 651 F.3d 684, 704 (7th Cir. 2011)).  While *Teixeira* did not "define the precise scope of any such acquisition right under the Second Amendment," it made clear that such a right exists.  *Id.* at 678; *see also Pena v. Lindley*, 898 F.3d 969, 976 (9th Cir. 2018), *petition for cert. filed*, No. 18-843 (Dec. 28, 2018) ("bypass[ing] the constitutional obstacle course of defining the parameters of the Second Amendment's individual right in the context of commercial sales").  *Teixera* likewise confirms that the Second Amendment right extends to "maintaining proficiency in firearms use."  873 F.3d at 677; *see also Ezell*, 651 F.3d at 711 (remanding with instructions to preliminarily enjoin ordinance prohibiting firing ranges in city limits).

Plaintiffs argue that "the effect of Defendants' expansive Orders and actions, among other restrictions," is an absolute firearm ban of the kind rejected in *Heller*.  ECF No. 20-1 at 18.  They

16

contend that, "[d]ue to the ever-expanding nature of the laws regulating firearm transfers, in-person visits to gun stores and retailers are the only legal means for ordinary, law-abiding citizens to acquire and purchase" firearms and ammunition within California.  *Id.* at 18-19.  These laws include requirements that all firearm transfers be processed through licensed dealers, Cal. Penal Code § 27545; all ammunition transactions be made through licensed vendors in face-to-face transfers, *id.* § 30312; and firearm and ammunition retailers initiate background checks at the point of transfer, collect various information from the buyer, and require the buyer to perform a safe handling demonstration, *id.* §§ 28200; *id.* §§ 28150 *et seq*; *id.* § 26850.  As a result of these regulations, Plaintiffs allege, firearm purchases "cannot be done remotely as many other, non-firearm online retailers are able to do."  *Id.* at 19 (citing firearm delivery requirements at Cal. Penal Code § 27540).

Defendants argue that because the May 18 Order allows for curbside pickup and delivery of firearms, it makes it less convenient for Plaintiffs to exercise their right to acquire firearms rather than eliminating the right all together.  ECF No. 55 at 2.  As discussed in the mootness section above, *see supra* IV.A., it is far from clear that curbside pickup and delivery of firearms is permitted under California law.  Accordingly, the Court will treat the Order as barring most individuals in Alameda County from purchasing firearms.  Because it is undisputed that outdoor shooting ranges have been permitted to operate in all Defendant Counties since the April 29 Orders, however, any infringement on the right to maintain proficiency with firearms is clearly not categorical.

As to the prohibition on in-store sales of firearms and ammunition, Defendants argue that the Order's "temporal limits make any categorical analysis inappropriate."  ECF No. 46 at 22.  Defendants also emphasize certain exceptions to California's requirement that licensed dealers participate in firearms transactions.  *Id.* at 23.  For example, firearms may be transferred between family members, presuming the acquirer has a valid FSC, *see* Cal. Penal Code § 27875; loaned between family members for 30 days, presuming the lendee has a valid FSC, *see id.* § 27880; loaned for use at the lender's residence, *see id.* § 27881; and loaned for three days if the lender "is

at all times within the presence of the person being loaned the firearm," *see id.* § 27885.[8]

Defendants also make a brief argument that Individual Plaintiffs do not have standing because the Order "only limit[s] arms-related commerce: the ability to acquire *new* weapons, *more* ammunition, and to target-shoot at commercial facilities," and "[n]one of the individual Plaintiffs claims he or she did not already own guns and ammunition before the Health Orders issued, and none of their organizational counterparts claim their members are so situated either." ECF No. 46 at 23-24. Because "there is no evidence that any of these Plaintiffs has been deprived – even temporarily – of the core Second Amendment right to self-defense," Defendants argue, Plaintiffs lack standing "to argue that [the Order] would be unconstitutional if applied to third parties in hypothetical situations." *Id.* at 24 (quoting *Cty. Ct. of Ulster Cty., N.Y. v. Allen*, 442 U.S. 140, 155 (1979)).

This argument is unpersuasive. For one thing, Defendants cite no authority for the proposition that the *Heller* right is limited to a single firearm. Moreover, the Ninth Circuit has observed that "permitting an overall ban on gun sales 'would be untenable under *Heller*' because a total prohibition would severely limit the ability of citizens to *acquire* firearms." *Teixeira*, 873 F.3d at 688 (quoting *United States v. Marzzarella*, 614 F.3d 85, 92 n.8 (3d Cir. 2010)) (emphasis in original). The *Teixeira* court also did not discuss whether the constitutionality of such a prohibition would differ based on whether particular would-be purchasers already owned firearms. The Court will not impose a previously unannounced limitation on the *Heller* right, especially when the issue has not been directly raised or briefed. The Court holds that Individual Plaintiffs who reside in Alameda County do have standing to challenge the Order. Because the only Retailer Plaintiffs named in the FAC are located in San Mateo, Contra Costa, and Santa Clara Counties, however, the Court holds that these Plaintiffs do not have standing to challenge the

---

[8] In their reply brief, Plaintiffs mention in a footnote that they "cannot even privately transfer firearms and ammunition under State law." ECF No. 48 at 15 n.4. Without further explanation of why the exceptions cited by Defendants do not apply in the current circumstances, the Court disregards this argument. *See Estate of Saunders v. Comm'r*, 745 F.3d 953, 962 n.8 (9th Cir. 2014) ("Arguments raised only in footnotes, or only on reply, are generally deemed waived."); *Sanders v. Sodexo, Inc.*, No. 2:15-cv-00371-JAD-GWF, 2015 WL 4477697, at *5 (D. Nev. July 20, 2015) ("Many courts will disregard arguments raised exclusively in footnotes." (quoting Bryan Garner, *The Redbook: A Manual on Legal Style* 168 (3d ed. 2013))).

United States District Court
Northern District of California

1    Alameda County Order.

2          Turning to the merits of Plaintiffs' argument, the Court concludes that the Order is not the

3    equivalent of the handgun ban in *Heller*.  The District of Columbia made it a crime to carry an

4    unregistered firearm and prohibited the registration of handguns, thus "totally ban[ning] handgun

5    possession in the home."  *Heller*, 554 U.S. at 574-75.  By contrast, the Order in this case

6    effectively bans most residents of Alameda County from purchasing handguns *for the limited*

7    *duration of the Order*.  Plaintiffs argue that the Court should treat the ban as permanent given that

8    the latest Order "ha[s] no end date and can be renewed and revised *infinitum* per [its] own terms."

9    ECF No. 54 at 4.  But Alameda County's May 18 Order imposes clear and well-defined criteria

10   for its termination, requiring the County's health officer to "continually review whether

11   modifications to the Order are warranted" based on progress on certain enumerated, empirical

12   "COVID-19 Indicators."  May 18 Order ¶ 11.  It was review of these indicators that prompted the

13   Counties to revise their Orders to allow for certain outdoor activities as well as curbside pickup

14   and delivery of retail items.  *Id.*  Plaintiffs have presented no reason to believe that the remaining

15   restrictions will be kept in place long term.  Indeed, the recent decisions by the Santa Clara, San

16   Mateo, and Contra Costa Defendants to permit in-store retail sales, including of firearms and

17   ammunition, is strong evidence of the temporally limited nature of the Order.  Because this short-

18   term restriction falls short of the permanent ban in *Heller*, it is not "unconstitutional under any

19   level of scrutiny."  *Silvester*, 843 F.3d at 821.

20         The same reasoning leads the Court to conclude that the Order does not effect a "plain,

21   palpable invasion" of Plaintiffs' Second Amendment rights.  This conclusion is supported by the

22   fact that the Order, like the vaccination law in *Jacobson* and unlike the handgun ban in *Heller*, is

23   facially neutral.  Apart from a reference to "shooting and archery ranges" as an example of

24   recreational facilities that were forced to close by the early Orders, *see* Mar. 31 Order ¶ 13.a.iii.3.,[9]

25   _____

26   [9] This Order sweeps broadly to include "shared facilities for [any] recreational activities outside of
     residences, including, but not limited to, golf courses, tennis and pickle ball courts, rock parks,
27   climbing walls, pools, spas, shooting and archery ranges, gyms, disc golf, and basketball courts."
     *Id.*  Moreover, outdoor shooting ranges have, along with other outdoor recreational facilities, been
28   permitted to reopen starting with the April 29 Orders.  *See supra*, 7 n.5.

United States District Court
Northern District of California

1    none of the Orders have mentioned firearms.  While Plaintiffs provide examples of the Orders

2    being enforced against firearms retailers, *see* ECF No. 20-1 at 10-12, 14, they do not argue that the

3    Orders are being *selectively* enforced, i.e., that other non-exempt businesses are not also being

4    forced to close.  Plaintiffs make a passing reference to "Defendants' motivations," but offer in

5    support only a statement attributed to the mayor of San Jose: "We are having panic buying right

6    now for food.  The one thing we cannot have is panic buying of guns."  ECF No. 20-1 at 25; ECF

7    No. 20-2 at 56.  The mayor's statement postdates the issuance of the Orders and was not made by

8    a decision-maker in any of the four Counties – much less the County that remains a Defendant in

9    this case – and so provides no basis to question Defendants' motivations.  Nor does it undermine

10   the facial neutrality of the Orders.

11          Courts applying *Jacobson* to other COVID-19 restrictions have found that facial neutrality

12   weighed in favor of upholding them.  *See Abbott*, 954 F.3d at 789 (holding that postponement of

13   all non-essential medical procedures was not an "outright ban" on pre-viability abortion partly

14   because it "applie[d] to 'all surgeries and procedures'" and did "not single out abortion") (internal

15   quotation omitted); *Rutledge*, 956 F.3d at 1030 (agreeing with *Abbott* that facially neutral

16   postponement of non-essential medical procedures "does not constitute anything like an 'outright

17   ban' on pre-viability abortion") (quoting *Abbott*, 954 F.3d at 789); *compare First Baptist Church*

18   *v. Kelly*, No. 20-1102-JWB, 2020 WL 1910021, at *5-6 (D. Kan. Apr. 18, 2020) (declining to

19   apply *Jacobson* in part because Kansas's orders "expressly purport to restrict in-person religious

20   assembly by more than ten congregants" and are thus "not facially neutral").

21          For these reasons, the Court concludes that the Order cannot "be affirmed to be, beyond

22   question, in palpable conflict with" the Second Amendment.  *See Jacobson*, 197 U.S. at 29-31.

23   Plaintiffs have thus failed to demonstrate a likelihood of success on their Second Amendment

24   claim under *Jacobson*.

25                          **c.      Second Amendment Standard**

26          "To evaluate post-*Heller* Second Amendment claims, the Ninth Circuit, consistent with the

27   majority of our sister circuits, employs a two-prong test: (1) the court 'asks whether the challenged

28   law burdens conduct protected by the Second Amendment'; and (2) if so, what level of scrutiny

United States District Court
Northern District of California

should be applied.'" *Fyock*, 779 F.3d at 996 (quoting *Chovan*, 735 F.3d at 1136).

### i.   Burden on Conduct Protected by Second Amendment

Defendants argue that Individual and Retailer Plaintiffs' claims fail at step one of the *Chovan* test because "the Constitution does not confer a freestanding right on commercial proprietors to sell firearms." ECF No. 46 at 21 (quoting *Teixeira*, 873 F.3d at 673). But Plaintiffs' complaint is premised on the right to *acquire* firearms, not *sell* them. *See* FAC ¶ 130 (alleging that the Orders "stand as a bar on firearms acquisition, ownership, and proficiency training at shooting ranges, and thus amount to a categorical ban on and infringement of the right to keep and bear arms"). *Teixeira* confirms that this right, as well as the right to "maintain[] proficiency in firearms use," falls within the Second Amendment's protections and that both individuals and retailers have standing to challenge regulations that burden their or their customers' "right to acquire arms." 873 F.3d at 677-78.

Even if the Ninth Circuit had not already established these baseline protections, the Court would follow the "'well-trodden and judicious course' of assuming that the Second Amendment applies and analyzing the regulation under the appropriate level of scrutiny." *Brandy v. Villanueva*, No. 10-cv-2874-AB (SKx), ECF No. 29 (C.D. Cal. Apr. 6, 2020) (quoting *Pena*, 898 F.3d at 976).

### ii.   Level of Scrutiny

"The appropriate level of scrutiny for laws that burden conduct protected by the Second Amendment 'depend[s] on (1) how close the law comes to the core of the Second Amendment right and (2) the severity of the law's burden on the right.'" *Lynch*, 835 F.3d at 1092 (quoting *Chovan*, 735 F.3d at 1138). A regulation "implicates the core" of the Second Amendment right when it "applies to law-abiding citizens, and imposes restrictions on the use of handguns within the home." *Jackson*, 746 F.3d at 963. In *Lynch*, the Ninth Circuit held that federal statutes, regulation, and guidance that prevented the plaintiff from purchasing a gun based on her state medical marijuana registry card "burden[ed] the core of [plaintiff's] Second Amendment right because they prevent[ed] her from purchasing a firearm under certain circumstances and thereby impede[d] her right to use arms to defend her 'hearth and home.'" 835 F.3d at 1092 (quoting

1    *Jackson*, 746 F.3d at 961).  In this case, the Order applies to all residents of Alameda County,

2    "law-abiding" or not, and prevents them from purchasing firearms for as long as it is in place.

3    Because the Order "impede[s Plaintiffs'] right to use arms to defend [their] 'hearth and home,'"

4    *see id.*, it burdens the core Second Amendment right.

5          The Court now turns to the severity of that burden.  In the Ninth Circuit, "laws which

6    regulate only the 'manner in which persons may exercise their Second Amendment rights' are less

7    burdensome than those which bar firearm possession completely."  *Jackson*, 746 F.3d at 961

8    (quoting *Chovan*, 735 F.3d at 1138).  "Similarly, firearm regulations which leave open alternative

9    channels for self-defense are less likely to place a severe burden on the Second Amendment right

10   than those which do not."  *Id.*

11         Because the Order regulates the purchase and sale of firearms rather than barring their

12   "possession completely," *Jackson*, 746 F.3d at 961, it constitutes a restriction on the manner in

13   which Plaintiffs may exercise their Second Amendment rights.  In this way, it is similar to the ten-

14   day waiting period upheld in *Silvester*, which did not "prevent any individuals from owning a

15   firearm" but rather delayed their purchases.  843 F.3d at 827.  Because there is "nothing new in

16   having to wait for the delivery of a weapon," the Ninth Circuit held that the waiting period did not

17   place a substantial burden on a Second Amendment right.  *Id.  See also Nat'l Rifle Ass'n of Am.,*

18   *Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 700 F.3d 185, 207 (5th Cir. 2012)

19   (holding that the "temporary nature" of a burden imposed by a law prohibiting 18- to 20-year-olds

20   from purchasing handguns "reduce[d] its severity," as those subject to it would "soon grow up and

21   out of its reach").  To be sure, the delay here – at least two-and-a-half months from the date of this

22   order – is significantly longer than the ten days upheld in *Silvester*.  But Plaintiffs cite no authority

23   concerning nor provide any guidance as to how the Court might determine how long a delay

24   would constitute a severe burden on the acquisition right.

25         Pushing the other way is the fact that, unlike the regulations in *Lynch*, the Order does not

26   "leave open alternative channels for self-defense."  *See Jackson*, 746 F.3d at 961.  *Lynch* held that

27   the restrictions at issue barred "only the sale of firearms to [plaintiff] – not her possession of

28   firearms."  835 F.3d at 1093.  As in this case, the plaintiff "could have amassed legal firearms

United States District Court
Northern District of California

22

before acquiring a [marijuana] registry card, and [the restrictions] would not impede her right to keep her firearms or to use them to protect herself and her home." *Id.* Unlike in this case, however, plaintiff there could also "acquire firearms and exercise her right to self-defense at any time by surrendering her registry card." *Id. See also Chovan*, 735 F.3d at 1138 (finding that burden of lifetime ban on firearm possession by persons convicted of domestic violence misdemeanors was "lightened" by exemptions for "those with expunged, pardoned, or set-aside convictions, or those who have had their civil rights restored"); *United States v. Torres*, 911 F.3d 1253, 1263 (9th Cir. 2019) (holding that ban on firearm possession by undocumented immigrants was "tempered" because an undocumented immigrant seeking to obtain a firearm "may remove himself from the prohibition by acquiring lawful immigration status"). At least while the Order is in effect, Plaintiffs here have no similar way of reacquiring the means to purchase firearms lawfully – i.e., they cannot take any action that would allow them to "exercise [their] right to self-defense at any time." *Lynch*, 835 F.3d at 1093.[10]

Defendants attempt to characterize the Order's restrictions on firearm acquisition as "not absolute," *see* ECF No. 46 at 23, but the exceptions they cite do not allow for full exercise of Second Amendment rights. The ability to borrow someone else's gun for use at their residence or for three days if accompanied by the lender, *see* Cal. Penal Code §§ 27881, 27885, for example, is of little use to someone who wishes to keep a gun in her own home for the purpose of self-defense. And while California law does allow firearm transfers between family members that do not require visiting a retailer, *see id.* §§ 27875, 27880, it goes without saying that not all residents have family members who could loan or sell them a firearm, or have the FSC required to benefit from such a transfer. For someone who does not already have a functioning firearm at home, the Order makes it virtually impossible to exercise the *Heller* right for as long as it is in force.

Plaintiffs argue that this burden merits strict scrutiny, but they cite no case in which the Ninth Circuit – or any other circuit – has applied anything but intermediate scrutiny to a law that

---

[10] The Court notes that, given that the current Order allows outdoor shooting ranges to operate, it leaves ample opportunity to maintain proficiency in firearms use and thus any remaining burden on this right is insubstantial.

burdens a Second Amendment right.  Presumably, this is because "[t]here is . . . near unanimity in the post-*Heller* case law that when considering regulations that fall within the scope of the Second Amendment, intermediate scrutiny is appropriate."  *Silvester*, 843 F.3d at 823.  The only case Plaintiffs cite that applies strict scrutiny to a firearm regulation is *Bateman v. Perdue*, 881 F. Supp. 2d 709 (E.D.N.C. 2012), in which the district court held unconstitutional various North Carolina statutes restricting the possession, sale, and transport of firearms during declared states of emergency.  The court applied strict scrutiny because, "[w]hile the bans imposed pursuant to these statutes may be limited in duration, it cannot be overlooked that the statutes strip peaceable, law abiding citizens of the right to arm themselves in defense of hearth and home, striking at the very core of the Second Amendment."  *Id.* at 716.  The Court is not persuaded that *Bateman* applies here.

The Court first notes that *Bateman* does not cite *Jacobson*, likely because the defendants did not raise it.  *See Bateman v. Perdue*, No. 5:10-cv-265, ECF Nos. 54 (Dec. 15, 2010), 61 (Dec. 16, 2010), 64 (Dec. 16, 2010), 73 (Jan. 10, 2011).  Thus, the *Bateman* court had no occasion to determine whether the *Jacobson* framework applied.  Also, the restrictions at issue in *Bateman* were more onerous than that at issue here, because they were certain to recur – and recur frequently.  *Bateman*, 881 F. Supp. 2d at 711 ("Due to natural disasters and severe weather, states of emergency are declared with some frequency in North Carolina."); *see also id.* (stating that the governor issued four statewide and one county-specific emergency declaration in 2010 alone, in addition to states of emergency declared by local officials).  By contrast, the instant Order was drafted to address the once-in-a-generation circumstances presented by the current pandemic and not be reused for future emergencies.  Finally, the *Bateman* court did not explain how it arrived at its conclusion, and its language would seem to suggest that strict scrutiny applies to any firearms regulation.  That is not the law.  Thus, without deciding the level of scrutiny this Court would apply if faced with the facts in *Bateman*, the Court finds that *Bateman* is not helpful.

Weighing these considerations, the Court concludes that intermediate scrutiny is appropriate.  Without question, the Order burdens the core Second Amendment right "to possess a handgun in the home for the purpose of self-defense."  *McDonald*, 561 U.S. at 791 (citing *Heller*,

554 U.S. at 635).  Given the temporary nature of this burden, however, and the fact that "[t]he case

law in our circuit and our sister circuits . . . clearly favors the application of intermediate scrutiny

in evaluating the constitutionality of firearms regulations," *Silvester*, 843 F.3d at 823, this burden

is not so severe as to merit strict scrutiny.  *See McDougall v. County of Ventura Cal.*, No. 2:20-cv-

02927-CBM-AS, ECF No. 12 at 2 (Apr. 1, 2020) (finding county closure of gun stores pursuant to

COVID-19 stay-at-home order does not substantially burden Second Amendment right because it

"does not specifically target handgun ownership, does not prohibit the ownership of a handgun

outright, and is temporary").  Accordingly, the Court applies intermediate scrutiny to the Order.

### iii.        Application of Intermediate Scrutiny

Intermediate scrutiny is a two-step test that requires "(1) the government's stated objective

to be significant, substantial, or important; and (2) a reasonable fit between the challenged

regulation and the asserted objective." *Jackson*, 746 F.3d at 965 (quoting *Chovan*, 735 F.3d at

1139).  "[I]ntermediate scrutiny does not require the least restrictive means of furthering a given

end." *Id.* at 969.  The government must "show only that the regulation 'promotes a substantial

government interest that would be achieved less effectively absent the regulation.'" *Silvester*, 843

F.3d at 829 (quoting *Fyock*, 779 F.3d at 1000).  "The test is not a strict one," but "requires only

that the law be 'substantially related to the important government interest . . . .'" *Id.* at 827

(quoting *Jackson*, 746 F.3d at 966).

The stated objective of the Orders is "to slow the spread of COVID-19."  May 18 Order

¶ 2.  Defendants' second stated objective – conserving health care resources, *see id.*; ECF No. 46

at 14 – follows naturally from this first goal.  Plaintiffs concede that "Defendants have a legitimate

interest in reducing the population's exposure to COVID-19," a pandemic that is "serious in

nature."  ECF No. 20-1 at 6-7, 30.  They argue, however, that "a governmental interest that is as

inconsistently pursued as Defendants' here is not and cannot be a substantial one for constitutional

purposes." *Id.* at 24.  But this argument is really about fit, not interest.  Defendants do not

seriously contest that preventing the spread of a deadly global pandemic is a "significant,

substantial, or important" government interest.  *See Jackson*, 746 F.3d at 965 (quoting *Chovan*,

735 F.3d at 1139); *Brandy*, No. 20-cv-02874-AB (SKx), ECF No. 29 at 5.

United States District Court
Northern District of California

As for fit, Defendants submit declarations from public health officials and experts supporting their argument that the shelter-in-place order is necessary to prevent the spread of COVID-19.  Dr. Pan, the Alameda County health officer, states that "[c]oronaviruses spread through the air by coughing or sneezing and close personal contact, or by touching contaminated objects or surfaces and then touching your mouth, nose, or eyes."  ECF No. 46-6 ¶ 8.  Moreover, it is not possible to know who is infected, because "[s]ome people who are infected remain asymptomatic and spread the virus."  *Id.*  That means that a person might be at risk for contracting COVID-19 if "they were in close contact (within six feet for a prolonged period of time) with a person confirmed to have COVID-19, for up to 48 hours before the onset of symptoms, or in contact with an asymptomatic carrier of the virus."  *Id.*  Accordingly, Dr. Pan concludes that "[c]ompliance with social distancing guidelines is critical because people without symptoms could be contagious."  *Id.*  Sheltering in place, which is "more rigorous than social distancing," *id.* ¶ 11, "is proven to slow the spread of the virus if everyone decreases the number of people with whom they come in contact because it decreases the number who might get sick from someone who is infected," *id.* ¶ 12.  The "restrictions on mobility and social distancing requirements imposed by the prior orders" are "slowing the rate of increase in community transmission and confirmed cases by limiting interactions among people, consistent with scientific evidence of the efficacy of similar measures in other parts of the country and world."  *Id.* ¶ 17.

Dr. Rutherford, the epidemiologist leading the COVID-19 contact tracing project, states that "[t]he effectiveness of containment measures depends not only on how soon they are enacted but how strict they are."  ECF No. 46-7 ¶ 11.  "Exceptions must be narrowly defined because each exception increases the risks of community transmission."  *Id.*  "Implementing social distancing protocols for non-essential activities and businesses lowers but does not eliminate the increased transmission risks those activities and businesses create."  *Id.* ¶ 12.  Thus, for example, Alameda County's March 16 Order "prohibited all public and private gatherings of any number of people occurring outside a household or living unit, except for the limited purposes of performing [e]ssential [a]ctivities, such as obtaining food and medication, visiting a health care professional, or obtaining products needed to maintain safety and sanitation"; "prohibited all travel, except

1    [e]ssential [t]ravel"; and required "[a]ll businesses with a facility in the County, except [e]ssential

2    [b]usinesses . . . to cease all activities except certain [m]inimum [b]asic [o]perations. . . ."  ECF

3    No. 46-6 ¶¶ 13.  This Order was issued "based on evidence of increasing occurrence of COVID-19

4    within the County and throughout the Bay Area, scientific evidence and best practices regarding

5    the most effective approaches to slow the transmission of communicable diseases generally and

6    COVID-19 specifically, and evidence that the age, condition, and health of a significant portion of

7    the population of the County places it at risk for serious health complications, including death,

8    from COVID-19. "  ECF No. 46-6 at 21.

9         Plaintiffs do not challenge the accuracy or credibility of this evidence.  Rather, they fault

10   these declarations for not offering "any explanation as to why less restrictive alternatives – like

11   those used in other retail settings Defendants consider essential – cannot be applied to firearm and

12   ammunition retailers, why Plaintiffs and others like them must be prevented from travelling to and

13   from firearms retailers in other jurisdictions, or how the orders are narrowly tailored as to them."

14   ECF No. 48 at 14.  The Ninth Circuit, however, does not require narrow tailoring for firearm

15   regulations subject to intermediate scrutiny.  *See Pena*, 898 F.3d at 986 (holding that state had met

16   its burden under intermediate scrutiny to show that regulation was "*reasonably* tailored to address

17   the substantial" state interest) (emphasis added); *compare Chovan*, 735 F.3d at 1150 (Bea, J.,

18   concurring) (arguing that challenged regulation would survive strict scrutiny, which does require

19   narrow tailoring).  In support of their argument that Defendants bear the burden "to show that less

20   restrictive alternatives either are not available, or are not a reasonable fit," ECF No. 48 at 12,

21   Plaintiffs cite the tests for commercial speech, *see* ECF No. 20-1 at 22 (citing *Bd. of Trs. of State*

22   *Univ. of N.Y. v. Fox*, 492 U.S. 469, 480-81 (1989)), and for content-neutral time, place, and

23   manner restrictions on speech, ECF No. 48 at 12 (citing *McCullen v. Coakley*, 573 U.S. 464, 477

24   (2014)).  But notably absent from Plaintiffs' argument is any mention of the ample Ninth Circuit

25   authority applying intermediate scrutiny in the Second Amendment context.

26        The Court concludes that Defendants have demonstrated a reasonable fit between the

27   burden the Order places on Second Amendment rights and Defendants' goal of reducing COVID-

28   19 transmission.  In *Jackson*, the Ninth Circuit found that San Francisco's ban on the sale of

United States District Court
Northern District of California

27

"hollow-point ammunition," which the city had found more fatal than other types of ammunition, was substantially related to the city's interest in reducing the fatality of shootings. 746 F.3d at 969-70. The court rejected the plaintiff's arguments that "San Francisco could have adopted less burdensome means of restricting hollow-point ammunition, for example by prohibiting the possession of hollow-point bullets in public, but allowing their purchase for home defense." *Id.* at 969. Even if this were correct, the Court held, "intermediate scrutiny does not require the least restrictive means of furthering a given end." *Id.* Rather, a "city must be allowed a reasonable opportunity to experiment with solutions to admittedly serious problems." *Id.* at 969-70 (quoting *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 52 (1986)). The *Jackson* court also held that San Francisco's requirement that gun owners keep their guns locked or disabled was substantially related to its interest in reducing firearm-related deaths and injuries, despite the fact that the regulation applied "even when the risk of unauthorized access by children or others is low, such as when a handgun owner lives alone." *Id.* at 966.

Likewise, *Lynch* found a reasonable fit between regulations prohibiting illegal drug users from purchasing guns and the government's interest in preventing gun violence even though the regulations burdened the Second Amendment rights of a "small population of individuals who – although obtaining a marijuana registry card for medicinal purposes – instead h[e]ld marijuana registry cards only for expressive purposes" and thus were not illegal drug users. 835 F.3d at 1094. Because it was "eminently reasonable for federal regulators to assume that a registry cardholder is much more likely to be a marijuana user than an individual who does not hold a registry card," the court found the fit "reasonable but not airtight" and upheld the regulations. *Id. See also Silvester*, 843 F.3d at 827-29 (upholding ten-day waiting period as substantially related to government's interests in giving state time to complete background checks and providing "cooling-off" period, even though the law applied to those who passed background checks in less than ten days as well as to those who already owned guns they could use to commit impulsive acts of violence).

The fit between the Order and Alameda County's interest in reducing the spread of COVID-19 is much closer than the fits upheld in *Jackson*, *Lynch*, and *Silvester*. While the

United States District Court
Northern District of California

1  regulations in all of those cases affected some number of people who did not actually pose the

2  danger the regulations were intended to abate, here, every resident of Alameda County is a

3  potential vector for COVID-19.  Defendants have produced evidence that any decrease in human

4  contact and in-person interaction helps slow the virus's spread, and thus that any exception to the

5  shelter-in-place order makes the order less effective at achieving its goal.  This evidence

6  forecloses Plaintiffs' argument that allowing firearms and ammunition retailers to operate under

7  social distancing and sanitation guidelines would constitute a less restrictive alternative that would

8  further Defendants' goals.  According to the evidence Defendants have submitted, adding these

9  retailers to the list of essential businesses exempted from the Order would "increase[] the risks of

10  community transmission" even when social distancing protocols are followed, as those protocols

11  "lower[] but do[] not eliminate the increased transmission risks."  ECF No. 46-7 ¶¶ 11-12.  And

12  even if this alternative did further the County's goals, "intermediate scrutiny does not require the

13  least restrictive means of furthering a given end."  *Jackson*, 746 F.3d at 969.

14          Plaintiffs further argue that the Order "inconsistently pursues" Defendants' goals because

15  it is "so pierced by exemptions and inconsistencies that [they] cannot hope to exonerate [it]."  ECF

16  No. 20-1 at 24 (quoting *Greater New Orleans Broad. Ass'n v. United States*, 527 U.S. 173, 190

17  (1999)).  Putting aside the fact that Plaintiffs again rely on a commercial speech case for this

18  argument, the exemptions here are a far cry from the regulations in *Greater New Orleans*, which

19  prohibited broadcast advertising by private casinos but not tribal or government-operated casinos.

20  527 U.S. at 190.  The Court found that the government had presented "no convincing reason for

21  pegging its speech ban to the identity of the owners or operators of the advertised casinos," *id.* at

22  191, and that "there was 'little chance' that the speech restriction could have directly and

23  materially advanced [the government's aim of alleviating the social costs of casino gambling by

24  limiting demand], 'while other provisions of the same Act directly undermine[d] and

25  counteract[ed] its effects,'" *id.* at 193 (quoting *Rubin v. Coors Brewing Co.*, 514 U.S. 476, 489

26  (1995)).

27          By contrast, Defendants here have offered a "convincing reason" for exempting the

28  essential businesses enumerated in the Orders.  *See* ECF No. 46-7 ¶ 11 (explaining that exempted

29

businesses "such as grocery stores, pharmacies, laundromats/dry cleaners, and hardware stores are deemed essential because they provide for the basic needs of residents for food, medicine, hygiene, and shelter.  If people have no opportunity to wash their clothes, they can get fleas and ticks, which can spread other infectious diseases, such as flea-borne (murine) typhus and trench fever. . . .  And hardware stores provide supplies needed to maintain shelter, such as heat, indoor plumbing, and refrigeration, that will require maintenance and repair to keep them working.").  Perhaps a different governmental entity could conclude that firearms and ammunition retailers and shooting ranges are essential, and some have.  *See* Cybersecurity & Infrastructure Security Agency, *Guidance on the Essential Critical Infrastructure Workforce* (last revised Apr. 24, 2020), https://www.cisa.gov/sites/default/files/publications/Version_3.0_CISA_Guidance_on_Essential_ Critical_Infrastructure_Workers_4.pdf (guidance from United States Department of Homeland Security recommending that state and local jurisdictions classify "[w]orkers supporting the operation of firearm, or ammunition product manufacturers, retailers, importers, distributors, and shooting ranges" as essential).[11]  Unlike the regulatory scheme in *Greater New Orleans*, however, the efficacy of the Order is not "undermine[d]" or "counteract[ed]" by the exclusion of firearms and ammunition retailers from the list.  527 U.S. at 193.  In fact, as Defendants have offered evidence that "each exception increases the risks of community transmission," ECF No. 46-7 ¶ 11, excluding these retailers in fact "directly and materially advance[s]" Alameda County's interest in controlling the spread of COVID-19, *see Greater New Orleans*, 527 U.S. at 193.  The Court thus rejects Plaintiffs' argument that inconsistencies in the list of exempted businesses undermines the degree to which the Order is substantially related to Defendants' goal.

For these reasons, the Order survives intermediate Second Amendment scrutiny and Plaintiffs have failed to demonstrate a likelihood of success on their Second Amendment claim.

---

[11] While Plaintiffs attempted to submit this guidance via their counsel's declaration, *see* ECF No. 20-2 at 129-30, the exhibit omits the pertinent portion of the guidance.  The Court thus takes sua sponte judicial notice of this document, which is a public record.  *See* Fed. R. Evid. 201; *Rollins v. Dignity Health*, 338 F. Supp. 3d 1025, 1032 (N.D. Cal. 2018) (explaining that courts often take judicial notice of government agency websites).

United States District Court
Northern District of California

### 2.    Due Process Claim

Plaintiffs premise their due process claim on the argument that the Order and Defendants' enforcement of it is "arbitrary and capricious, overbroad, [and] unconstitutionally vague."  ECF No. 20-1 at 26.  To the degree Plaintiffs intend to invoke substantive due process to argue that the Order arbitrarily designates certain businesses as exempt or overbroadly bars other businesses from operating under the essential business exemption, this claim is precluded by the principle that "if a constitutional claim is covered by a specific constitutional provision, such as the Fourth or Eighth Amendment, the claim must be analyzed under the standard appropriate to that specific provision, not under the rubric of substantive due process."  *County of Sacramento v. Lewis*, 523 U.S. 833, 843 (1998) (quoting *United States v. Lanier*, 520 U.S. 259, 272 n.7 (1997)).  Because the Court has already considered and rejected these arguments in the Second Amendment context, it declines to do so again under the doctrine of substantive due process.

This leaves only Plaintiffs' argument that the Order is unconstitutionally vague.[12]  A criminal law is unconstitutionally vague if it "fails to give ordinary people fair notice of the conduct it punishes, or so standardless that it invites arbitrary enforcement."  *Johnson v. United States*, 135 S. Ct. 2551, 2556 (2015).  Assuming that a county order of the sort issued here, violation of which constitutes a misdemeanor, is a criminal law subject to this standard, it easily satisfies it.  The version of the Order currently in force mandates that "individuals may leave their residence only for" certain enumerated activities.  May 18 Order ¶ 3.  The Order also states that all non-exempted businesses "are required to cease all activities at facilities located within the County except Minimum Basic Operations," which the Order defines in depth.  *Id.* ¶¶ 5, 15.  Prior versions of the Order have provided similar levels of detail as to what was and was not permitted throughout their duration.  Moreover, Plaintiffs provide no explanation as to how the Order "invites arbitrary enforcement," *see Johnson*, 135 S. Ct. at 2556, much less any evidence

---

[12] Plaintiffs briefly argue that the Order is "made even more constitutionally suspect because it bypassed the constitutionally authorized method for enacting laws," thus "violat[ing ] separation of powers."  ECF No. 20-1 at 27.  As Plaintiffs provide no authority for this argument and do not respond to Defendants' counter-arguments in their reply brief, the Court declines to consider this argument.

1    supporting their allegation that the Order is in fact being arbitrarily enforced.  Accordingly, they

2    are unlikely to succeed on the merits of their vagueness argument.

3           For these reasons, Plaintiffs fail to show a likelihood of success on the merits of their due

4    process claim.

5           **C.      Other Factors**

6           Defendants do not dispute that, had Plaintiffs been able to establish a likelihood of success

7    on the merits, they would also have established irreparable harm.  ECF No. 46 at 29; *see*

8    *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) ("It is well established that the

9    deprivation of constitutional rights 'unquestionably constitutes irreparable injury.'") (quoting

10   *Elrod v. Burns*, 427 U.S. 347, 373 (1976).  But they do dispute whether an injunction would be in

11   the public interest, an inquiry that the Court considers alongside the balance of the equities.  *See*

12   *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014) ("When the government is a

13   party, [the public interest and equities] factors merge.").  Plaintiffs bear the burden of showing that

14   both factors weigh in their favor.  *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1138-39 (9th Cir.

15   2009).

16          Plaintiffs argue that "public interest concerns are always implicated when a constitutional

17   right has been violated."  ECF No. 48 at 16.  That point is not debatable.  *See Rodriguez v.*

18   *Robbins*, 715 F.3d 1127, 1146 (9th Cir. 2013) ("Generally, public interest concerns are implicated

19   when a constitutional right has been violated, because all citizens have a stake in upholding the

20   Constitution.") (quoting *Preminger v. Principi*, 422 F.3d 815, 826 (9th Cir. 2005)).  But it does not

21   follow, as Plaintiffs claim, that these concerns "always" weigh in favor of a preliminary

22   injunction.  ECF No. 48 at 16; *see Abbott*, 954 F.3d at 791 (holding that district court erred by

23   "rotely" concluding that "all injunctions vindicating constitutional rights serve the public

24   interest").  Rather, the Court must balance the public's interest in preventing constitutional harm

25   against the government's – and the public's – interest in controlling the spread of a dangerous

26   pandemic.  *See Stormans*, 586 F.3d at 1138 ("In assessing whether the plaintiffs have met [their

27   burden to show that the balance of equities tips in their favor], the district court has a 'duty . . . to

28   balance the interests of all parties and weigh the damage to each.'") (quoting *L.A. Mem'l Coliseum*

1    *Comm'n v. Nat'l Football League*, 634 F.2d 1197, 1203 (9th Cir. 1980)).

2         In the First Amendment context, "[t]he public interest in maintaining a free exchange of

3    ideas, though great, has in some cases been found to be overcome by a strong showing of other

4    competing public interests, especially where the First Amendment activities of the public are only

5    limited, rather than entirely eliminated." *Sammartano v. First Judicial Dist. Ct.*, 303 F.3d 959,

6    974 (9th Cir. 2002), *abrogated on other grounds by Winter*, 555 U.S. 7.  In *Stormans*, for example,

7    the court considered whether the district court had erred in enjoining rules requiring pharmacies to

8    fill all prescriptions based on their likelihood to infringe on the free exercise rights of certain

9    pharmacists.  586 F.3d at 1139.  The court reversed the district court for many reasons, including

10   that the injunction was overbroad and the district court had not applied the proper test in

11   considering the likelihood of success on the merits.  *Id.* at 1137-38, 1141.  The district court also

12   had not considered the public interest, which was implicated by the fact that the injunction

13   "reached non-parties and implicated issues of broader public concern that could have public

14   consequences." *Id.* at 1139.  Even if the injunction had been limited to the plaintiffs, the court

15   noted that the public interest factor may have weighed against an injunction given the "general

16   public interest in ensuring that all citizens have timely access to lawfully prescribed medications."

17   *Id.*  Because the case "may present a situation in which 'otherwise avoidable human suffering'

18   results from the issuance of the preliminary injunction . . . the district court clearly erred by failing

19   to consider the public interest at stake."  *Id.* at 1140.

20        Given Defendants' showing that any loosening of the shelter-in-place order would increase

21   the risk of transmission of COVID-19 – not just for those who visit particular retailers, but for

22   everyone in the community – the Court concludes that this case also presents a situation in which

23   "otherwise avoidable human suffering" would result from the issuance of the requested injunction.

24   *Id.*; *see also City and County of San Francisco v. U.S. Citizenship & Immigration Servs.*, 408 F.

25   Supp. 3d 1057, 1127 (N.D. Cal. 2019) (finding that public interest "in decreasing the risk of

26   preventable contagion" weighed in favor of enjoining rule that would lead to Medicaid

27   disenrollment and thus decreased vaccination rates).  The Court thus finds that the public's interest

28   in controlling the spread of COVID-19 outweighs its interest in preventing the constitutional

United States District Court
Northern District of California

violations alleged here, especially given that Plaintiffs have failed to establish a likelihood of success on the merits.  For these reasons, the balance of equities and public interest weigh against a preliminary injunction.

**CONCLUSION**

For the foregoing reasons, Plaintiffs are not entitled to the "extraordinary remedy" of a preliminary injunction.  *See Winter*, 555 U.S. at 22.  Plaintiffs' motion is therefore DENIED.

**IT IS SO ORDERED.**

Dated:  June 2, 2020



JON S. TIGAR
United States District Judge