George M. Lee (SBN 172982)
gml@seilerepstein.com
**SEILER EPSTEIN LLP**
275 Battery Street, Suite 1600
San Francisco, California 94111
Phone: (415) 979-0500
Fax: (415) 979-0511

Raymond M. DiGuiseppe (SBN 228457)
law.rmd@gmail.com
**THE DIGUISEPPE LAW FIRM, P.C.**
4320 Southport-Supply Road, Suite 300
Southport, North Carolina 28461
Phone: 910-713-8804
Fax: 910-672-7705

Adam Kraut, Esq. (Admitted *pro hac vice*)
akraut@fpclaw.org
**FIREARMS POLICY COALITION**
1215 K Street, 17th Floor
Sacramento, CA 95814
(916) 476-2342
Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JANICE ALTMAN, an individual, et al.<br><br>Plaintiffs,<br><br>vs.<br><br>COUNTY OF SANTA CLARA, CALIFORNIA, et al.<br><br>Defendants. | Case No. 4:20-cv-02180-JST<br><br>**PLAINTIFFS' OPPOSITION TO COUNTY OF ALAMEDA'S MOTION TO DISMISS FIRST AMENDED COMPLAINT**<br><br>Hearing Date: August 12, 2020<br>Hearing Time: 2:00 p.m.<br>Courtroom:  6; 2nd Floor<br>Location:    1301 Clay St., Oakland, CA<br>Judge:      Hon. Jon S. Tigar |

i

TABLE OF CONTENTS

I.    INTRODUCTION .................................................................................................. 1

II.   STATEMENT OF ISSUES TO BE DECIDED ......................................................... 1

III.  FACTUAL AND PROCEDURAL BACKGROUND ................................................. 3

IV.   ARGUMENT ...................................................................................................... 4

      A.   Defendants Cannot Avoid Responsibility Under a Cloak of "Mootness." ............... 4

           1.   The Purpose and Effect of Defendants' Prior Orders ................................ 6

           2.   The Likelihood of Future Similar Orders is Undeniably Real, and Pressing .... 8

      B.  The Lenient Standards to Survive a Motion to Dismiss for Failure to State a Claim ... 11

      C.   Plaintiffs' Second Amendment Claim Easily Satisfies These Lenient Standards .... 12

           1.   The Controlling Legal Framework is the *Heller-McDonald* Paradigm. .......... 13

                i.    The *Jacobson* Framework Devolves into Mere Rational Basis Review. .. 14

                ii.   *Abbott* and *Rutledge* Are Wrong on the Law, and Distinguishable. .......... 15

                iii.  *South Bay* Does Not Dictate the Rule or the Result Here Either. ............. 17

           2.   Application of the Controlling Legal Framework .................................. 19

                i.    The Prior Orders Are Subject to Strict Scrutiny, if Any at All. ................ 19

                ii.   The Prior Orders Fail Intermediate Scrutiny As Well. ......................... 20

      D.   Plaintiffs' Due Process Claim Also Passes Muster Under
           Rule 12(b)(6) Standards. ..................................................................... 23

      E.   This Court Retains the Power to Grant Meaningful, Effective,
           and Necessary Relief. ....................................................................... 25

V.    CONCLUSION ................................................................................................. 25

## TABLE OF AUTHORITIES

**CASES**

*Adams & Boyle, P.C. v. Slatery*, 956 F.3d 913 (6th Cir. 2020) .......................................... 15, 16, 17

*American Diabetes Association v. U.S Dept. of the Army*, 938 F.3d 1147 (9th Cir. 2019)............. 5

*Anderson v. Creighton*, 483 U.S. 635 (1987) .................................................................... 23

*Ashcroft v. ACLU*, 542 U.S. 656 (2004) ........................................................................... 21

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ............................................................................. 12

*Association for Los Angeles Deputy Sheriffs v. County of Los Angeles*,
    648 F.3d 986 (9th Cir. 2011) ..................................................................................... 11

*Bateman v. Perdue*, 881 F.Supp.2d 709 (E.D.N.C. 2012) ............................................. 19, 20

*Bauer v. Becerra*, 858 F.3d 1216 (9th Cir. 2017) ............................................................. 19

*Beckles v. U.S.*, 137 S.Ct. 886 (2017) .............................................................................. 24

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ............................................................. 12

*Bernhardt v. County of Los Angeles*, 279 F.3d 862 (9th Cir. 2002) ............................... 6, 11

*Board of Trustees of Glazing Health and Welfare Trust v. Chambers*,
    941 F.3d 1195 (9th Cir. 2019) ................................................................................ 5, 7

*Board of Trustees of State University of New York v. Fox*, 492 U.S. 469 (1989) ................... 23

*Campbell-Ewald Co. v. Gomez*, __ U.S. __, 136 S.Ct. 663 (2016)................................. 4, 10

*Chadha v. Immigration and Naturalization Service*, 634 F.2d 408 (9th Cir. 1980)................. 7

*Chafin v. Chafin*, 568 U.S. 165 (2013) ............................................................................... 4

*Citizens United v. Federal Election Commission*, 558 U.S. 310 (2010) ................................. 19

*City of Riverside v. Rivera*, 477 U.S. 561 (1986) ............................................................... 6

*Collins v. City of Harker Heights*, 503 U.S. 115 (1992) ..................................................... 23

*Community House, Inc. v. City of Boise*, 623 F.3d 945 (9th Cir. 2010) ................................. 7

*Conley v. Gibson*, 355 U.S. 41 (1957) .............................................................................. 12

*County of Sacramento v. Lewis*, 523 U.S. 833 (1998)..................................................... 2, 11

*Cousins v. Lockyer*, 568 F.3d 1063 (9th Cir. 2009) .................................................. 12

*District of Columbia v. Heller*, 554 U.S. 570 (2008) .......................................... *passim*

*Durst v. Oregon Education Association*,
    __ F.Supp.3d __, 2020 WL 1545484 (D. Oregon 2020) ....................................... 5, 11

*Epona LLC v. County of Ventura*, 2019 WL 7940582 (C.D. Cal. 2019) ...................... 6

*Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011) ........................................... 19

*FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307 (1993) ............................................... 15

*FEC v. Wisconsin Right To Life, Inc.*, 551 U.S. 449 (2007) ....................................... 6

*Feldman v. Bomar*, 518 F.3d 637 (9th Cir. 2008) .................................................... 4

*First Baptist Church v. Kelly*,
    ___ F.3d.Supp ___, 2020 WL 1910021 (D. Kan. Apr. 18, 2020) ............................ 17

*Freestream Aircraft (Bermuda) Ltd. v. Aero Law Grp.*, 905 F.3d 597 (9th Cir. 2018) ............... 13

*Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC)*,
    528 U.S. 167 (2000) ........................................................................ 5, 10

*Geraci v. Homestreet Bank*, 347 F.3d 749 (9th Cir. 2003) ........................................ 12

*Heller v. D.C.*, 670 F.3d 1244 (D.C. Cir. 2011) ..................................................... 21

*In re Abbott*, 954 F.3d 772 (5th Cir. 2020) .................................................... 15, 16

*In re Rutledge*, 956 F.3d 1018 (8th Cir. 2020) .................................................... 16

*Jackson v. City and County of San Francisco*, 746 F.3d 953 (9th Cir. 2014) ............. 19, 21, 22

*Jacobson v. Commonwealth of Massachusetts*, 197 U.S. 11 (1905) ......................... *passim*

*Johnson v. U.S.*, __ U.S. __, 135 S.Ct. 2551 (2015) ............................................. 24

*Koller v. Harris*, 312 F.Supp.3d 814 (N.D. Cal. 2018) .......................................... 6, 7

*Los Angeles Cty. v. Davis*, 440 U.S. 625 (1979) ..................................................... 5

*Mai v. United States*, 952 F.3d 1106 (9th Cir. 2020) ............................................. 13

*Mayfield v. United States*, 599 F.3d 964 (9th Cir. 2010) ........................................ 25

*McDonald v. City of Chicago*, 561 U.S. 742 (2010) ......................................... 14, 18, 19

iv

*McDowell and Craig v. City of Santa Fe Springs*, 54 Cal.2d 33 (1960) ........................................17

*Memphis Cmty. Sch. Dist. v. Stachura*, 477 U.S. 299 (1986)...........................................................6

*Microsoft Corporation v. United States Dept. of Justice*,
  233 F.Supp.3d 887 (W.D. Wash. 2017) .................................................................................25

*Mothership Fleet Cooperative v. Ross*, 426 F.Supp.3d 611 (D. Alaska 2019) .............................5

*Ms. L. v. U.S. Immigration and Customs Enforcement*, 302 F.Supp.3d 1149 (S.D. Cal. 2018)....24

*Native Village of Nuiqsut v. Bureau of Land Management*,
  432 F.Supp.3d 1003 (D. Alaska 2020) ...................................................................................4

*New York State Rifle & Pistol Association, Inc. v. City of New York, New York*,
  140 S.Ct. 1525 (2020)............................................................................................................6

*Outdoor Media Grp. v. City of Beaumont*, 506 F.3d 895 (9th Cir. 2007) ...............................6, 11

*Planned Parenthood of Greater Washington and North Idaho v.
  U.S. Department of Health & Human Services*, 946 F.3d 1100 (9th Cir. 2020) .......................5

*Reynolds v. Sims*, 377 U.S. 533 (1964).........................................................................................7

*Rhode v. Becerra*, __ F.Supp.3d __, 2020 WL 2392655 (S.D. Cal. 2020) ...........................21, 23

*Robinson v. Attorney General*, 957 F.3d 1171 (11th Cir. 2020) ...................................................15

*Rosebrock v. Mathis*, 745 F.3d 963 (9th Cir. 2014) ......................................................................5

*Sanchez v. City of Fresno*, 914 F.Supp.2d 1079 (E.D. Cal. 2012) ...............................................23

*Silvester v. Harris*, 843 F.3d 816 (9th Cir. 2016) ..................................................................21, 22

*South Bay United Pentecostal v. Newsom*, 140 S.Ct. 1613 (2020) ........................................17, 18

*Stamas v. County of Medra*, 795 F.Supp.2d 1047 (E.D. Cal. 2011)..............................................23

*Turner Broadcasting System, Inc. v. F.C.C.*, 512 U.S. 622 (1994) ...............................................21

*U.S v. Hempfling*, 431 F.Supp.2d 1069 (E.D. Cal. 2006)...............................................................11

*United States v. Chester*, 628 F.3d 673 (4th Cir. 2010)................................................................20

*United States v. Chovan*, 735 F.3d 1127 (9th Cir. 2013)........................................................14, 19

*United States v. Mayea-Pulido*  946 F.3d 1055 (9th Cir. 2020) ...................................................15

*United States v. Torres*, 911 F.3d 1253 (9th Cir. 2019) ...............................................................13

*Viet. Veterans of Am. v. C.I.A.*, 288 F.R.D. 192 (N.D. Cal. 2012) ..................................25

*Ward v. Rock Against Racism*, 491 U.S. 781 (1989)......................................................21

*Welch v. U.S.*, __ U.S. __, 136 S.Ct. 1257 (2016)........................................................24

*Wilson v. Lynch*, 835 F.3d 1083 (9th Cir. 2016)...........................................................14

*Wolfson v. Concannon*, 811 F.3d 1176 (9th Cir. 2016) ................................................19

*Zinermon v. Burch*, 494 U.S. 113 (1990) ....................................................................23


**STATUTES**

42 U.S.C. § 1983......................................................................................1, 6, 11, 13


**RULES**

Fed. R. Civ. Pro. 12(b)(1) ..............................................................................................1

Fed. R. Civ. Pro. 12(b)(6) .....................................................................................*passim*


**OTHER AUTHORITIES**

Goston, *Jacobson v. Massachusetts at 100 Years: Police Power and Civil Liberties in Tension*, 95 Am. J. Pub. Health 576 (2005) ............................................................15

Note, *Toward a Twenty-First Century Jacobson v. Massachusetts*, 121 Harv. L. Rev. 1820 (2008)...............................................................................................................15

1

## I.   INTRODUCTION

2   After having deprived Plaintiffs and all similarly situated Alameda County residents of

3   their fundamental right to keep and bear arms under the Second Amendment, the Alameda County

4   defendants ("Defendants") now seek to simply walk away from their unconstitutional conduct

5   without any responsibility or accountability for the injuries inflicted. Indeed, Defendants entirely

6   avoid Plaintiffs' Second Amendment claim, raising no arguments at all against its merits, and yet

7   they still hope to wipe their hands of the situation in getting the case declared "moot" after having

8   left their offending public health directives in place for *95 days*. This, even in the midst of the same

9   pandemic that Defendants invoked as the justification for their actions in shutting down all firearms

10   and ammunition retailers for over three months, and when the likelihood they will do so again

11   increases daily with the steady increase in new COVID-19 cases. This Court should not

12   countenance the affront to the fundamental civil rights protections afforded under 42 U.S.C. § 1983

13   that Defendants' motion to dismiss this case represents. They must be held accountable for the

14   injury they have already inflicted and prevented from inflicting further harm, and this Court has

15   the power to do so despite Defendants' about-face after being sued for their actions.

16   What little Defendants do say about the actual merits of Plaintiffs' claims is short shrift,

17   weak, and falls far short of demonstrating this case cannot survive the lenient pleadings standards.

18   Plaintiffs have put forth more than enough to support "*facially plausible*" claims of relief.

19   Defendants' motion to dismiss should be denied and the case allowed to proceed.

## II.   STATEMENT OF ISSUES TO BE DECIDED

21   Defendants bring this motion on two alternatives bases: (1) primarily that the entire case

22   should be dismissed as moot pursuant to Rule 12(b)(1) in light of Alameda County's most recent

23   Public Health Order issued June 18, 2020; and (2) if the case is not moot, then Count Two of the

24   First Amended Complaint ("FAC"), the due process claim, should be dismissed pursuant to Rule

25   12(b)(6) for failure to sufficiently state a claim for relief. Def. Motion to Dismiss ("MTD") at 1.

26   They do not move to dismiss, or directly address, Count One of the FAC, Plaintiffs' primary claim

27

28

raising the Second Amendment challenge to the prior Public Health Orders ("Prior Orders").[1] Rather, Defendants argue only that Plaintiffs "fail to allege facts in the FAC establishing a plausible Due Process claim," by which Defendants mean a plausible claim that the Prior Orders violate "substantive due process" protections and are unconstitutionally vague. MTD at 9-10.[2]

While Defendants have avoided directly addressing the Second Amendment claim, their challenge to the "substantive due process" component of the due process claim indirectly brings the Second Amendment claim into play based on this Court's analysis in its MPI Order. There, the Court applied the principle that "'if a constitutional claim is covered by a specific constitutional provision, such as the Fourth or Eighth Amendment, the claim must be analyzed under the standard appropriate to that specific provision, not under the rubric of substantive due process.'" MPI Order at 31 (quoting *County of Sacramento v. Lewis*, 523 U.S. 833, 843 (1998)). It then incorporated its analysis of Plaintiffs' Second Amendment claim and rejected their substantive due process claim (that "the Order arbitrarily designates certain businesses as exempt or overbroadly bars other businesses from operating under the essential business exemption") on the same basis. *Id.*

The Second Amendment claim also bears on the question of mootness because Plaintiffs seek nominal damages for the past violations of their right to keep and bear arms.

Thus, the issues to be decided are: (1) whether the claims are moot; (2) whether the FAC plausibly states a substantive due process claim under the standards for analyzing the asserted violations of the Second Amendment that form the basis of this due process claim; and (3) whether the FAC plausibly states a due process claim on the grounds of unconstitutional vagueness.

---

[1] As this Court noted in its ruling on Plaintiffs' motion for a preliminary injunction, ECF No. 61 ("MPI Order"), although "Plaintiffs' FAC challenges only the March 16 and March 31 orders," they have "stipulated that they also challenged the Orders issued on April 29, May 15, and May 18," and the Court analyzed the motion accordingly, MPI Order at 7. "Prior Orders" shall refer to this series of orders issued by Alameda County on April 29, May 15, and May 18.

[2] Defendants also argue that the FAC fails to sufficiently plead a "procedural due process" claim. MTD at 9. However, the FAC does not advance a procedural due process claim.

### III.   Factual and Procedural Background

Plaintiffs brought this action against four Bay Area counties – Santa Clara, San Mateo, Contra Costa, and Alameda Counties – as well as cities within these counties and various responsible county and city public officials – in response to orders of their public health officials forcing the closure of all firearms and ammunition retailers within their respective borders. Such orders were first instituted on March 16, 2020 and, with periodic extensions, continued through May 29 in San Mateo County, June 3 in Contra Costa County, June 5 in Santa Clara County, and June 18 in Alameda County. ECF Nos. 46, 50, 58, 59, 60.[3] The general basis of the orders was that the closure of these retailers was necessary to combat the coronavirus by restricting forms of social interaction with the potential to spread the disease. *Id.* Plaintiffs, residents in all four counties, firearms retailers in three of the counties, and non-profit entities on behalf of themselves and their members, challenged the Prior Orders on the basis that the mandated closures infringed upon the fundamental right to keep and bear arms as guaranteed under the Second Amendment and the Due Process Clause of the Fourteenth Amendment. Plaintiffs also moved for a temporary restraining order or preliminary injunction against the Prior Orders. ECF No. 20.

This Court held a hearing concerning the MPI on May 20, 2020. After taking supplemental briefing and judicial notice of the later orders of San Mateo, Santa Clara, and Contra Costa counties which permitted the resumption firearms and ammunition retail sales, the Court issued its ruling on June 2, 2020. It ruled that the claims against those three counties were mooted by the later orders and dismissed them *sua sponte*, with prejudice, on that basis. ECF No. 61 at 8; ECF No. 65.[4] The Court rejected Defendants' claim that the case against Alameda County was moot

---

[3] While the orders issued on May 15 and May 18 created an exception for "non-essential" retail businesses which permitted them to conduct retail sales via "curbside" and/or "delivery" procedures, ECF No. 50 at App. C-1, it was ineffective here. As this Court has already determined, any "Plaintiffs who attempt[ed] to exercise their right to acquire firearms and ammunition" in this manner "would [have] risk[ed] potential criminal liability" because "it is far from clear that curbside pickup and delivery of firearms is permitted under California law." MPI Order at 9, 17.

[4] The Court issued a separate order on June 18, clarifying that the dismissal applied to all the public

1  because, by that point, it had only permitted "non-essential" retailers to conduct curbside and/or

2  delivery sales (it did not permit the resumption of in-store retail sales until June 18). *Id.* at 8-9. The

3  Court then denied the MPI, finding that Plaintiffs failed to satisfy the high threshold for the

4  "extraordinary remedy" of a preliminary injunction against the Prior Orders. *Id.* at 6-34.

5      The Alameda County Defendants subsequently filed this MTD seeking complete dismissal

6  based on their most recent order of June 18 lifting the prohibition against in-store retail sales, which

7  they claim renders the case moot "just like" with the similar orders of the other counties, or

8  alternatively, dismissal of the due process claim on the basis of failure to sufficiently state a claim.

9                          **IV.   ARGUMENT**

10  **A.      Defendants Cannot Avoid Responsibility Under a Cloak of "Mootness."**

11      The "case and controversy" requirement of federal court jurisdiction requires "an actual

12  controversy ... be extant at all stages of review, not merely at the time the complaint is filed."

13  *Campbell-Ewald Co. v. Gomez*, __ U.S. __, 136 S.Ct. 663, 669 (2016). A case becomes moot, so

14  as to "deprive[] the plaintiff of a personal stake in the outcome of the lawsuit," "only when it is

15  impossible for a court to grant any effectual relief whatever to the prevailing party." *Gomez* at 669

16  (citation omitted); *accord Native Village of Nuiqsut v. Bureau of Land Management*, 432

17  F.Supp.3d 1003, 1021 (D. Alaska 2020). "'As long as the parties have a concrete interest, *however*

18  *small*, in the outcome of the litigation, the case is not moot.'" *Gomez* at 669 (quoting *Chafin v.*

19  *Chafin*, 568 U.S. 165, 171 (2013)) (italics original). Generally, the party challenging the court's

20  jurisdiction on such grounds bears the burden of demonstrating mootness, and it is "'a heavy one.'"

21  *Native Village* at 1021, n. 103 (quoting *Feldman v. Bomar*, 518 F.3d 637, 642 (9th Cir. 2008)).

22      Multiple well-recognized exceptions to "mootness" exist. To start, "'voluntary cessation of

23  allegedly illegal conduct does not deprive the tribunal of power to hear and determine the case,

24  i.e., does not make the case moot,'" except "where the Court determines that (1) the alleged

25  violation will not recur and (2) 'interim relief or events have *completely and irrevocably eradicated*

26

27  ───────────────────

28  officials, and all the cities and responsible officials, within these counties. ECF No. 65.

                                    4

1  the effects of the alleged violation.'" *Durst v. Oregon Education Association*, __ F.Supp.3d __,

2  2020 WL 1545484, *3 (D. Oregon 2020) (quoting *Los Angeles Cty. v. Davis*, 440 U.S. 625, 631

3  (1979)) (italics added). Otherwise, "a dismissal for mootness would permit a resumption of the

4  challenged conduct as soon as the case is dismissed." *American Diabetes Association v. U.S Dept.*

5  *of the Army*, 938 F.3d 1147 (9th Cir. 2019). The burden ordinarily rests on the party claiming

6  mootness. *Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC)*, 528 U.S. 167, 189

7  (2000) ("The 'heavy burden of persua[ding]' the court that the challenged conduct cannot

8  reasonably be expected to start up again lies with the party asserting mootness.").

9  In this context, the Ninth Circuit has held that "a *legislative act* creates a presumption that

10  the action is moot, unless there is a reasonable expectation that the legislative body is likely to

11  enact the same or substantially similar legislation in the future." *Board of Trustees of Glazing*

12  *Health and Welfare Trust v. Chambers*, 941 F.3d 1195, 1197 (9th Cir. 2019) (italics added). Thus,

13  when the defendant's cessation of the challenged action is the product of such an act, "we should

14  presume that the repeal, amendment, or expiration of legislation will render an action challenging

15  the legislation moot, unless there is a reasonable expectation that the legislative body will reenact

16  the challenged provision or one similar to it." *Id.* at 1199. That said, "[t]he party challenging the

17  presumption of mootness need not show that the enactment of the same or similar legislation is a

18  'virtual certainty,' only that there is a reasonable expectation of reenactment." *Id.* And, in the end,

19  "[i]t is the government's burden to show that the challenged conduct 'cannot reasonably be

20  expected to start up again.'" *Mothership Fleet Cooperative v. Ross*, 426 F.Supp.3d 611, 619 (D.

21  Alaska 2019) (quoting *Rosebrock v. Mathis*, 745 F.3d 963, 971 (9th Cir. 2014)).

22  Another "justiciability-saving exception is for challenges to injuries that are 'capable of

23  repetition, yet evading review.'" *Planned Parenthood of Greater Washington and North Idaho v.*

24  *U.S. Department of Health & Human Services*, 946 F.3d 1100 (9th Cir. 2020). This exception to

25  the mootness doctrine "requires (1) the complaining party to reasonably expect to be subject to the

26  same injury again and (2) the injury to be of a type inherently shorter than the duration of

27  litigation." *Id.* at 1109. A party has a reasonable expectation of being "subject to the same injury

28  again" when it reasonably believes it '"will again be subjected to the alleged illegality' or will be

or 'subject to the threat of prosecution' under the challenged law." *Koller v. Harris*, 312 F.Supp.3d 814, 823 (N.D. Cal. 2018) (quoting *FEC v. Wisconsin Right To Life, Inc.*, 551 U.S. 449, 463 (2007)). A canvass of the case law indicates that the Ninth Circuit has not applied a presumption of mootness in the context of challenges to injuries "capable of repetition, yet evading review."

Yet another applicable exception to mootness exists for claims seeking nominal damages based on the injury already inflicted during the enforcement of the challenged action. "'Unlike most private tort litigants, a civil rights plaintiff seeks to vindicate important civil and constitutional rights that cannot be valued solely in monetary terms.'" *Bernhardt v. County of Los Angeles*, 279 F.3d 862, 872 (9th Cir. 2002) (quoting *City of Riverside v. Rivera*, 477 U.S. 561, 574 (1986)). "It is well-established that 'the basic purpose' of § 1983 damages is 'to compensate persons for injuries that are caused by the deprivation of constitutional rights.'" *Epona LLC v. County of Ventura*, 2019 WL 7940582, *5 (C.D. Cal. 2019) (quoting *Memphis Cmty. Sch. Dist. v. Stachura*, 477 U.S. 299, 307 (1986)). "'By making the deprivation of such rights actionable for nominal damages without proof of actual injury, the law recognizes the importance to organized society that those rights be scrupulously observed.'" *Bernhardt* at 872. Accordingly, "[a]s a general rule, amending or repealing an ordinance will not moot a damages claim because such relief is sought for 'a past violation of [the plaintiff's] rights,'" *Epona*, 2019 WL 7940582 at *5 (quoting *Outdoor Media Grp. v. City of Beaumont*, 506 F.3d 895, 902 (9th Cir. 2007)), and such damages "are particularly important in vindicating constitutional interests," *New York State Rifle & Pistol Association, Inc. v. City of New York, New York*, 140 S.Ct. 1525, 1536 (2020) (Alito, J., dissenting). Thus, "[a] live claim for nominal damages will prevent dismissal for mootness." *Bernhardt*, 279 F.3d at 871; *New York State Rifle & Pistol Association* at 1536 (Alito, J., dissenting) ("it is widely recognized that a claim for nominal damages precludes mootness").

### 1.    The Purpose and Effect of Defendants' Prior Orders

All these exceptions apply here to vest in this Court continuing jurisdiction over the case despite the later orders of June 18, 2020, which no longer prohibit in-store firearms and ammunition retail sales within the county but which the County Health Officer retains the power to unilaterally "rescind[], supersede[], or amend[]" at any time. RJN, Ex. H, p. 16, § 18.

1    Nothing about these later orders consists of "a legislative act." Like the first round of orders

2    which Plaintiffs challenged as unconstitutional, these orders were issued by mere proclamation of

3    the County Health Officer with no voice from or accountability to any of the numerous residents

4    they directly impacted. *See Community House, Inc. v. City of Boise*, 623 F.3d 945, 960 (9th Cir.

5    2010) ("The City's actions were formally legislative and bore all the hallmarks of traditional

6    legislation" because they were implemented through City Council resolutions which "must be

7    passed by majority vote and, like ordinances, are binding."); *Reynolds v. Sims*, 377 U.S. 533, 565

8    (1964) (legislatures "should be bodies which are collectively responsive to the popular will").

9    Rather, the County has imposed its judgment upon all residents through the County Health

10   Officer's unilateral exercise of virtually unchecked executive power, and the same will be true of

11   all future orders instituted by such proclamation. *See Chadha v. Immigration and Naturalization

12   Service*, 634 F.2d 408, 431, n. 32 (9th Cir. 1980) ("This emphasizes one danger inherent in

13   departures from the rule of separation of powers: when a governmental power is exercised by a

14   branch other than that ordinarily responsible, the specific guarantees of governmental regularity

15   applicable to the ordinarily responsible branch are in effect short-circuited.").

16   Thus, the installation of the County's new orders through such executive edict cannot give

17   rise a presumption of mootness concerning its previous orders issued in the same way so as to

18   remove the new orders from the "voluntary cessation" exception. Even so, there surely exists a

19   "reasonable expectation of reenactment," *Board of Trustees*, 941 F.3d at 1197, just as there exists

20   a reasonable belief that plaintiffs "will again be subjected to the alleged illegality' or will be or

21   'subject to the threat of prosecution' under the challenged law," *Koller v. Harris*, 312 F.Supp.3d

22   at 823, within the meaning of the "capable of repetition, yet evading review" exception.

23   Throughout the history of Defendants' orders and this ensuing litigation, they have made

24   abundantly clear that they believe sales and transfers of firearms and ammunition – which they

25   know can only be lawfully conducted through a firearms dealer – to be "non-essential" business

26   activities that can and should be cut off as purported means of managing this public health crisis.

27   They do not contest that this has been the effect of the Prior Orders. *See e.g.*, Def. Joint Opp. to

28   Plaintiffs' to MPI, ECF No. 46, at 17 (conceding that the Prior Orders "limit[ed] arms-related

7

1    commerce: the ability to acquire new weapons, more ammunition, and to target-shoot at

2    commercial facilities"). Instead, they admit this effect and simply attempt to excuse and justify it

3    for the entire 95-day period these closure orders were operative between March 16 and June 18.

4    *Id.* at 1 (claiming any burden on the Second Amendment from the restrictions was "incidental"

5    and "weak" subject to nothing more than "rational basis review"); Def. Joint Supp. Opp. to MPI,

6    ECF No. 55, at 1 (claiming that the previous "curbside" and "delivery" options were sufficient for

7    residents to exercise their rights to acquire firearms and ammunition even though, as this Court has

8    explained, "it is far from clear" they could have done so lawfully); MTD at 7 (acknowledging that

9    June 18 was the first date Plaintiffs and others similarly situated have been permitted to purchase

10   firearms in the County since March 16, yet arguing they still fail to state a "plausible" claim).

11        **2.     The Likelihood of Future Similar Orders is Undeniably Real, and Pressing**

12        The asserted basis for the Prior Orders precluding sales and transfers of firearms and

13   ammunition throughout the County was that doing so was *necessary* to combat the spread of

14   COVID-19 to the maximum extent possible and the risks of sickness and death, by restricting the

15   nature and extent of residents' activity outside the home. *See* RJN, Exhs. A-G (Prior Orders from

16   March 16, March 31, April 29, May 18, and June 5).

17        The same health risks that served as Defendants' justification for the Prior Orders not only

18   still exist, but they are increasing all the time. Based on the widely available statistical data tracking

19   the spread of this disease, cases of COVID-19 in Alameda County have steadily been on the rise

20   since the first public health orders in March, and they are now at their highest point ever with 7,976

21   cases in the county as of July 14. *Tracking coronavirus in Alameda County, LA Times*, updated

22   daily [https://www.latimes.com/projects/california-coronavirus-cases-tracking-outbreak/alameda-

23   county/]. In fact, the recent spike in new cases and deaths has already spurred the County to reverse

24   its previous trend of relaxing the public health restrictions and revert back toward more stringent

25   limitations on residents' "essential" activities outside the home. *See e.g., Alameda County COVID-*

26   *19    Health    Emergency    Press    Release*,    June    29,    2020

27   [http://www.acphd.org/media/589530/statement-from--achcsa-alco-hits-pause-on-reopening.pdf]

28   ("Given recent increases in COVID-19 case and hospitalization rates in our county and region, we

are temporarily pausing our reopening plans."); *Mercury News, Coronavirus: Alameda County pauses reopening, cites increasing hospitalization rate*, June 30, 2020 [https://www.mercurynews.com/2020/06/29/coronavirus-alameda-county-pauses-reopening-cites-increasing-hospitalization-rate/]; *As Bay Area coronavirus cases surge, focus on Sonoma and Alameda counties intensifies*, San Francisco Chronicle, July 12, 2020 [https://www.sfchronicle.com/bayarea/article/As-Bay-Area-coronavirus-cases-surge-focus-on-15403289.php] ("Alameda County also just landed on the state watch list. Because of state rules, the county is even revoking permission for restaurants to operate outdoors, leaving it the only Bay Area county relegated to takeout and delivery only.").

Cases are also steadily on the rise throughout the State of California, reaching 329,162 total confirmed cases of COVID-19, and resulting in 7,040 deaths, as of July 14. *COVID-19 Statewide Update* [https://update.covid19.ca.gov/]. There were 8,358 new confirmed cases statewide on July 13 alone. *Id.* This statewide trend has led the Governor to reverse course as well, and order the shutdown of many restaurants and other indoor businesses. San Francisco Chronicle, *Newsom orders new shutdown of restaurants, other indoor business in 19 California counties*, July 1, 2020 [https://www.sfchronicle.com/politics/article/Newsom-orders-shutdown-of-indoor-business-in-19-15380217.php] ("Gov. Gavin Newsom ordered 19 counties with surging coronavirus outbreaks to close indoor restaurants, wineries, movie theaters and other venues Wednesday, saying California must act to keep the pandemic from spiraling out of control.") Notably, Alameda County's neighbor, and former defendant in this lawsuit, Santa Clara County, just advised it residents, "the Governor [has taken] bold statewide action to respond to the rapid and troubling growth of COVID-19 cases and hospitalizations across California," and "[t]he County of Santa Clara was added to the State's monitoring list on Sunday July 12, 2020." *Statement of the Santa Clara County Public Health Department Regarding the Governor's Announcement*, July 13, 2020 [https://www.sccgov.org/sites/covid19/Pages/press-statement-07-13-2020-state-order.aspx]. Consequently, numerous business industries previously required to close are being required to close again, including a growing list of indoor retailers. *Id.* The County's Health Officer (also a former defendant in this lawsuit) warned residents "[t]he fight against COVID-19 is unfortunately

1   far from over" and that "[w]e strongly urge everyone to rigorously and consistently follow the

2   State and local health orders." *Id.* This latest round of closures is apparently for an indefinite

3   duration, as the notice includes no expiration date and simply tells residents that the County "will

4   provide additional information to the community as soon as it becomes available." *Id.*

5       According to the CDC, this trend of increasing cases and deaths from COVID-19 is the

6   same across the country, with the total confirmed cases at 3,296,599 and 134,884 deaths as of July

7   14 – and 60,469 of the new cases were diagnosed on July 13 alone.

8   [https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/us-cases-deaths.html]. Further, it is

9   widely believed that a second, potentially more deadly wave of the contagion is coming. Johns

10  Hopkins Medicine, *COVID-19 Update* [https://www.hopkinsmedicine.org/health/conditions-and-

11  diseases/coronavirus/first-and-second-waves-of-coronavirus], last visited July 14, 2020 ("Around

12  the world, according to the World Health Organization, a resurgence of COVID-19 is a threat.")

13      Defendants themselves continue to speak of the same concerns. *See* MTD 2 ("In California,

14  as of Monday, June 29, 2020, there have been 216,550 confirmed cases of COVID-19, and 5,936

15  deaths. *See* State of California, COVID-19 Dashboard, https://covid-19.ca.gov/ (June 29, 2020).

16  In Alameda County alone (not including the City of Berkeley, which has its own Public Health

17  Department), as of June 28, 2020, there have been 5,615 confirmed cases and 132 deaths.")

18      Having clearly demonstrated they believe sales and transfers of firearms and ammunition

19  within the county can and should be precluded in the name of combatting these pervasive and ever-

20  increasing health risks, and having acted on that belief by shutting down all such activity for several

21  weeks already, it is eminently reasonable to expect they will do so again. This is particularly true

22  when Defendants have expressly reserved the power to unilaterally "repeal," "supersede," or

23  "amend" their orders at will, and when the COVID-19 statistics on which they previously relied

24  are now all substantially *worse*. Simply put, it is not "absolutely clear that the allegedly wrongful

25  behavior could not reasonably be expected to recur." *Laidlaw*, 528 U.S. at 189.

26      Under these circumstances, Plaintiffs retain a *substantial* concrete interest in the outcome

27  more than sufficient to preserve this Court's jurisdiction. *Gomez*, 136 S.Ct. at 669 ("As long as the

28  parties have a concrete interest, *however small*, in the outcome of the litigation, the case is not

1   moot."). And, in addition to declaratory relief, Plaintiffs have properly pled for nominal damages,

2   FAC at p. 29, in seeking redress of the constitutional injuries already inflicted, something

3   Defendants cannot avoid by simply claiming "mootness," *Outdoor Media Grp.*, 506 F.3d at 902 –

4   especially when they clearly have not "*completely and irrevocably eradicated* the effects of the

5   alleged violation," *Durst*, 2020 WL 1545484, *3. It would defeat the important purposes of 42

6   U.S.C. § 1983 claims, which an organized society must "scrupulously observe[]," if Defendants

7   can claim "mootness" to avoid any responsibility for this deprivation of rights. *Bernhardt*, 279

8   F.3d at 872. With the surge in new COVID-19 cases and deaths occurring throughout the Bay

9   Area, including in the Counties of Santa Clara, San Mateo, and Contra Costa, and the cities within

10  them, *see* https://www.sfchronicle.com/bayarea/article/As-Bay-Area-coronavirus-cases-surge-

11  focus-on-15403289.php – against whom Plaintiffs also sought nominal damages based on their

12  prior orders forcing the closures of firearms and ammunition retailers – the above analysis applies

13  with equal force to the claims against those counties, the cities within them, and the responsible

14  public officials whom Plaintiffs sued through this action. Respectfully then, Plaintiffs must observe

15  here that this Court's *sua sponte* dismissal of those other defendants was in error.

16  **B.    The Lenient Standards to Survive a Motion to Dismiss for Failure to State a Claim**

17          Defendants make no effort to argue that Plaintiffs have failed to sufficiently state a claim

18  for relief on Count I of the FAC based on a violation of the Second Amendment; indeed, they avoid

19  any direct engagement with the merits of that claim by directly challenging only Count II of the

20  FAC concerning the due process claim, and then they do so only in general terms with no mention

21  of the relationship between the two claims. The Second Amendment is at the heart of Plaintiffs'

22  substantive due process claim, *County of Sacramento v. Lewis*, 523 U.S. at 843, and it stands on

23  solid ground, particularly under the lenient standards of Rule 12(b)(6).

24          "A Rule 12(b)(6) motion is disfavored and rarely granted." *U.S v. Hempfling*, 431

25  F.Supp.2d 1069, 1075 (E.D. Cal. 2006). With such a motion, "we accept all factual allegations in

26  the complaint as true and construe the pleadings in the light most favorable to the nonmoving

27  party." *Association for Los Angeles Deputy Sheriffs v. County of Los Angeles*, 648 F.3d 986, 990

28  (9th Cir. 2011). "The court draws all reasonable inferences in favor of the plaintiff." *Id.* "Although

1   'conclusory allegations of law and unwarranted inferences are insufficient' to avoid a Rule

2   12(b)(6) dismissal … a complaint need not contain detailed factual allegations; rather, it must plead

3   'enough facts to state a claim to relief that is plausible on its face.'" *Cousins v. Lockyer*, 568 F.3d

4   1063, 1067-68 (9th Cir. 2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)

5   (internal quotes omitted). "A claim has facial plausibility when the plaintiff pleads factual content

6   that allows the court to draw the reasonable inference that the defendant is liable for the misconduct

7   alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Therefore, "[a] complaint should not be

8   dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no

9   set of facts in support of his claim which would entitle him to relief." *Geraci v. Homestreet Bank*,

10  347 F.3d 749, 751 (9th Cir. 2003) (quoting *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957)).

11  **C.      Plaintiffs' Second Amendment Claim Easily Satisfies These Lenient Standards**

12              The proper standards for determining Defendants' motion are essential to bear in mind

13  because the FAC repeatedly alleges essential facts which, taken as true, establish Plaintiffs' claim

14  under the Second Amendment as more than legally sufficient. Specifically, they assert "[i]n

15  California, individuals are required to purchase and transfer firearms and ammunition through state

16  and federally licensed dealers in face-to-face transactions or face serious criminal penalties." FAC

17  ¶ 4. "Shuttering access to arms, the ammunition required to use those arms, and the ranges and

18  education facilities that individuals need to learn how to safely and competently use arms,

19  necessarily closes off the [Second Amendment] Constitutional right to learn about, practice with,

20  and keep and bear those arms." *Id.* Therefore, "[f]irearm and ammunition product manufacturers,

21  retailers, importers, distributors, and shooting ranges are essential businesses that provide essential

22  access to constitutionally protected fundamental, individual rights." *Id.* at ¶ 2. As a result, "[b]y

23  forcing duly licensed, essential businesses to close or eliminate key services for the general public,"

24  Defendants' Prior Orders were "foreclosing the only lawful means to buy, sell, and transfer

25  firearms and ammunition available to typical, law-abiding individuals in California." *Id.* at ¶ 5.

26  Ultimately, the FAC expressly alleges that Defendants' orders "prevent[ed] the Plaintiffs,

27  Plaintiffs' members, and similarly situated members of the public from exercising their rights,

28  including the purchase, sale, transfer of, and training with constitutionally protected arms,

12

ammunition, magazines, and appurtenances, as well as their right and ability to travel to, access, and use them to acquire constitutionally protected goods and services," thereby "causing injury and damage that is actionable under 42 U.S.C. § 1983." *Id.* at ¶ 145. The FAC also specifically addresses the instance of a change in circumstance brought about by Defendants' having "eliminate[d], amend[ed], or cease[ed] enforcing," the orders, averring that any and all past enforcement of the Prior Orders "has already resulted in a constitutionally significant injury of the same nature while in effect, which is itself actionable under 42 U.S.C. § 1983." *Id.* at ¶ 146.

While Defendants may contest the "essential" nature of such businesses through their orders shutting them down as "non-essential," *see* MTD at 3, any "factual disputes are construed in the plaintiff's favor," *Freestream Aircraft (Bermuda) Ltd. v. Aero Law Grp.*, 905 F.3d 597, 602 (9th Cir. 2018), and Defendants do *not* dispute the fundamental fact that their orders mandated these closures, thereby cutting off citizens' only means of lawfully conducting sales and transfers of firearms and ammunition within the county for more than three months between March 16 and June 18. This fact alone strongly supports Plaintiffs' claim under the Second Amendment.

### 1.    The Controlling Legal Framework is the *Heller-McDonald* Paradigm.

In its MPI Order, this Court rightly rejected Defendants' claim that Plaintiffs' Second Amendment claim is subject to mere "rational basis review." MPI Order at 11, n. 6 ("The Court will not apply rational basis review.") *Heller* forbids it: "If all that was required to overcome the right to keep and bear arms was a rational basis, the Second Amendment would be redundant with the separate constitutional prohibitions on irrational laws, and would have no effect." *District of Columbia v. Heller*, 554 U.S. 570, 627, n. 27 (2008). "'[L]aws burdening Second Amendment rights must withstand more searching scrutiny than rational basis review.'" *Mai v. United States*, 952 F.3d 1106, 1115 (9th Cir. 2020) (quoting *United States v. Torres*, 911 F.3d 1253, 1262 (9th Cir. 2019)). And this Court also unequivocally rejected Defendants' claim that the Prior Orders imposed no constitutionally significant burden, specifically holding they effectively banned the core right to acquire firearms in the exercise of the fundamental right of self-defense. MTD 21 (holding that the Prior Orders burdened the right to acquire firearms because they "applie[d] to all residents of Alameda County, 'law-abiding' or not, and prevent[ed] them from purchasing firearms

for as long as it [was] in place"); *id.* at 24 ("Without question, the Order burdens the core Second Amendment right 'to possess a handgun in the home for the purpose of self-defense.' *McDonald [v. City of Chicago]*, 561 U.S. [742,] 791 [(2010)]"); *id.* at 17 ("the Court will treat the Order as barring most individuals in Alameda County from purchasing firearms"). While Plaintiffs maintain such a prohibition is categorically unconstitutional without resort to interest balancing, should there be any such balancing, "some sort of *heightened* scrutiny must apply." *United States v. Chovan*, 735 F.3d 1127, 1136-37 (9th Cir. 2013). The Ninth Circuit requires "either intermediate or strict scrutiny to laws that burden Second Amendment rights depending on 'how close the law comes to the core of the Second Amendment right' and 'the severity of the law's burden on the right.'" MPI Order at 10 (quoting *Wilson v. Lynch*, 835 F.3d 1083, 1092 (9th Cir. 2016)).

### i.   The *Jacobson* Framework Devolves into Mere Rational Basis Review.

This Court ultimately went on to apply *Jacobson v. Commonwealth of Massachusetts*, 197 U.S. 11 (1905) in evaluating the constitutional implications of the burden on the rights at stake. MPI Order at 14-20. The right at stake there was an inchoate, non-enumerated liberty interest – "the inherent right of every freeman to care for his own body and health in such way as to him seems best." *Id.* at 25. Aside from the lack of parity when we are dealing with enumerated and distinctly different rights under the Second Amendment, the trouble with applying the *Jacobson* framework here is that its test essentially reduces, at best, to nothing more than mere "rational basis" review. Under its test, any government action "*purporting* to have been enacted to protect the public health, the public morals, *or* the public safety" must be upheld unless it "has no real or substantial relation to those objects, *or* is, *beyond all question*, a plain, palpable invasion of rights secured by the fundamental law." *Id.* at 31 (italics added). That is, the government need only *claim* the action is necessary without any evidence or proof – "purport" means the "specious appearance of being, intending, or claiming,"  https://www.merriam-webster.com/dictionary/purport  – in furtherance of any interest ostensibly related to the public "health," "safety," *or* "morals," and that action is insulated from any judicial upset so long as it *either* has a "real or substantial relation" to the claimed object *or* it is *beyond all question* "a plain, palpable invasion" of fundamental rights.

The deferential standard of review articulated in *Jacobson* creates a test few, if any,

government actions *purportedly* taken for the public's benefit could ever fail. This test appears even easier to pass than the highly deferential rational basis standard, which requires that the action be upheld "'if there is any reasonably conceivable state of facts that could provide a rational basis' for it," *United States v. Mayea-Pulido* 946 F.3d 1055, 1059 (9th Cir. 2020) (quoting *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313 (1993)), and "rational speculation unsupported by evidence or empirical data" is good enough, *id.* at 315 – just as it seems to be under *Jacobson*. But, "Supreme Court jurisprudence has progressed markedly from the deferential tone of *Jacobson* and its progressive-era embrace of the social compact." Note, *Toward a Twenty-First Century Jacobson v. Massachusetts*, 121 Harv. L. Rev. 1820 (2008); Goston, *Jacobson v. Massachusetts at 100 Years: Police Power and Civil Liberties in Tension*, 95 Am. J. Pub. Health 576, 580 (2005).

Recognizing this, some courts have rightly rejected applications of *Jacobson* to COVID-19 related restrictions that would gut the protections for enumerated rights developed over many years of modern constitutional jurisprudence. For example, in *Adams & Boyle, P.C. v. Slatery*, 956 F.3d 913 (6th Cir. 2020), the Sixth Circuit upheld a preliminary injunction against a governor's COVID-19 order temporarily banning certain types of abortions as "elective" surgeries, cautioning that "[a]ffording flexibility [] is not the same as abdicating responsibility, especially when well-established constitutional rights are at stake…" *Id.* at 917. The court properly refused to "countenance …the notion that COVID-19 has somehow demoted *Roe* and *Casey* to second-class rights, enforceable against only the most extreme and outlandish violations," as the government's interpretation of *Jacobson* would have had it be. Similarly, in *Robinson v. Attorney General*, 957 F.3d 1171 (11th Cir. 2020), the Eleventh Circuit rejected Alabama's attempt to wield the *Jacobson* case as somehow dispositive in support of its own COVID-19 driven restriction on abortions, explaining "just as constitutional rights have limits, so too does a state's power to issue executive orders limiting such rights in times of emergency." *Id.* at 1179. The court went on to rest its analysis of the COVID-19 restrictions primarily on the *Roe-Casey* "undue burden" test. *Id.* at 1179-1182.

### ii.    *Abbott* and *Rutledge* Are Wrong on the Law, and Distinguishable.

The *Robinson* court sharply distinguished two of the primary cases this Court cited as support for applying *Jacobson* here  – *In re Abbott*, 954 F.3d 772 (5th Cir. 2020), and *In re*

1    *Rutledge*, 956 F.3d 1018 (8th Cir. 2020)[5] – where other abortion regulations were upheld.

2    *Robinson*, 957 F.3d at 1182-83. *See* MPI Order at 12 (citing these cases as illustrations that

3    *Jacobson* "remains alive and well – including during the present pandemic"). Indeed, "important"

4    to the *Abbott* decision was that the restriction did "not apply to any procedure that, if performed in

5    accordance with the commonly accepted standard of clinical practice, would not deplete the

6    hospital capacity or the personal protective equipment needed to cope with the COVID-19

7    disaster." *Abbott* at 780. It was equally important to the *Rutledge* decision that the "directive d[id]

8    not operate as an outright ban on all or virtually all pre-viability abortions," since it "contain[ed]

9    emergency exceptions, including where 'there is a threat to the patient's life if the procedure is not

10   performed.'" *Rutledge* at 1029-1030. Here, *no* exceptions existed to the absolute bar that, as this

11   Court has put it, "prevent[ed] [residents] from purchasing firearms *for as long as [the orders were]*

12   *in place*," MPI Order at 24, including none for "emergencies," although a central purpose of the

13   Second Amendment right is to the ability to lawfully keep and bear arms in *defense of one's life*.

14       Moreover, the *Abbott* and *Rutledge* courts relied on the *Jacobson* framework as the driving

15   force for their constitutional analyses upholding the government actions. *See Abbott*, 954 F.3d at

16   783 (finding the district court committed "extraordinary error" "by failing to apply (or even

17   acknowledge) the framework governing emergency exercises of state authority during a public

18   health crisis, established over 100 years ago in *Jacobson v. Commonwealth of Massachusetts*");

19   *Rutledge*, 956 F.3d at 1028 ("*Jacobson* provides that a court may review a constitutional challenge

20   to a government's response to a public health crisis *only* if the state's response lacks a 'real or

21   substantial relation' to the public health crisis or it is, 'beyond all question, a plain, palpable

22   invasion' of the right to abortion.") (italics added). This mode of analysis effectively "demoted"

23   the fundamental interests at stake to "second-class rights, enforceable against only the most

24

25   _____

26   [5] The *Adams & Boyle* court also acknowledged these cases in reaching its decision, and specifically
     distinguished *Abbott*. *Adams*, 956 F.3d at 927 (noting that the restriction at issue contained "an
27   important caveat permitting doctors to perform procedures that, in their clinical judgment, "would
     not deplete the hospital capacity or the [PPE] needed to cope with the COVID-19 disaster").
28

1  extreme and outlandish violations" given the rational-basis-like standard of *Jacobson*. *Adams*, 956

2  F.3d at 917; *compare First Baptist Church v. Kelly*, ___ F.3d.Supp ___, 2020 WL 1910021 (D.

3  Kan. Apr. 18, 2020) (where the district court ruled that *Jacobson* "d[id] not provide the best

4  framework in which to evaluate the governor's executive orders" restricting First Amendment free

5  exercise rights in response to COVID-19 and applied the traditional jurisprudence instead).

6           **iii.**    ***South Bay* Does Not Dictate the Rule or the Result Here Either.**

7        This Court has also cited the case of *South Bay United Pentecostal v. Newsom*, 140 S.Ct.

8  1613 (2020), concerning the denial of injunctive relief against California COVID-19 restrictions

9  on religious gatherings. MPI Order at 12. True, Chief Justice Roberts's lone concurring opinion

10  cited *Jacobson* as relevant to the general framework. *South Bay* at 1614. However, one cannot

11  ignore the dissent of Justice Kavanaugh, joined by three other justices, who took California to task

12  even over this limited capacity restriction on religious gatherings, holding the state to *strict scrutiny*

13  and finding the restriction unconstitutional as being unsupported by any compelling governmental

14  justification. *Id.* at 1613-14 (Kavanaugh, J., dissenting). That is, four of the five justices of the

15  Supreme Court were prepared to strike down this restriction *partially* impinging upon First

16  Amendment rights, which was much more limited in its scope and effect than the orders at issue

17  here given their effect of having *completely* denied all residents' access to the exercise of

18  fundamental rights protected under the Second Amendment.

19        *South Bay* is also sharply distinguishable, legally and factually. *McDowell and Craig v.*

20  *City of Santa Fe Springs*, 54 Cal.2d 33, 38 (1960) ("It is elementary that the language used in any

21  opinion is to be understood in the light of the facts and the issue then before the court. Further,

22  cases are not authority for propositions not considered."). Legally, the case was decided outside

23  the Second Amendment context, where the high court has expressly held that *Jacobson*-like

24  rational basis review is an unacceptable form of constitutional scrutiny. *Heller*, 554 U.S. at 627, n.

25  27. Factually, the case involved merely a *capacity limit* on the number of attendees for religious

26  services otherwise generally *permitted*. *South Bay*, 140 S.Ct. at 1613. Had the Prior Orders just

27  reduced the capacity or number of daily transactions within retailers of firearms and ammunition,

28  we might have a comparison. But they *completely denied* access to, and any lawful transactions

1   involving, firearms and ammunition throughout the county. Further, while a capacity limitation on

2   an otherwise permissible activity may be entitled to deference because one could conceivably

3   conclude that health officials did not exceed the bounds of their state statutory powers, *id.* at 1613,

4   a complete preclusion of constitutionally protected activity is a very different story.[6] Having

5   imposed this complete preclusion without any showing of, or apparently any effort to investigate,

6   less restrictive alternatives, Defendants' actions cannot be fairly attributed the sort of presumed

7   "competence" and "expertise" in "assess[ing] public health" for which any *Jacobson*-like

8   deference may be appropriate. *Id.* at 1613 (granting such deference to the capacity limitation).

9        In fact, beyond its fundamentally unsuitable legal framework, *Jacobson* itself is

10   distinguishable too. The health directives at issue there called for a mandatory vaccination against

11   the Smallpox disease, and free of charge. *Jacobson*, 197 U.S. at 12-13. Thus, the only imposition

12   put on the citizens was a one-time, discrete invasion of "the right to care for [their] own body and

13   health in such way as to [them] seems best," for the fleeting moment that they were administered

14   the inoculation, which ultimately *benefitted* them by providing immunity against the disease. Here,

15   Plaintiffs and all those similarly situated were *completely deprived* of their right to lawfully acquire

16   firearms and ammunition, cutting off their ability to exercise their fundamental right to keep and

17   bear arms expressly enumerated under the Second Amendment, for *more than three months*.

18        For all these reasons, *Jacobson* is simply not an appropriate framework for analyzing the

19   legality of these government-imposed restraints on the fundamental constitutional right

20   enumerated under the Second Amendment, pandemic or not. Rather, upholding the important

21   principles developed over the many decades since *Jacobson* to protect the enumerated

22   constitutional rights requires applying the jurisprudence applicable to them. Here, that means the

23   *Heller-McDonald* paradigm must drive the constitutional analysis.

24

25   _____

26

27   [6] While Defendants have been granted state statutory power to "take any preventive measure that may be necessary to protect and preserve the public health," MPI Order at 13, the propriety of their
28   actions ultimately must be adjudged and resolved under the United States Constitution.

18

**2.      Application of the Controlling Legal Framework**

The Supreme Court has made clear the Framers and ratifiers of the Fourteenth Amendment counted the right to keep and bear arms as among those fundamental rights *necessary* (i.e., essential) to our system of ordered liberty, *McDonald*, 561 U.S. at 778, 791, and as a privilege and immunity of citizenship, *id*. at 805 (Thomas, J., concurring). The Prior Orders struck at the heart of every right enshrined in the Second Amendment – the right to "keep," "bear," "use," "possess," and "carry" for self-defense in the home, in case of confrontation, and for other lawful purposes, as well as the corresponding right to obtain the ammunition required to actually use them for these protected purposes. *See Heller*, 554 U.S. at 592, 635; *McDonald*, 561 U.S. at 767; *Jackson v. City and County of San Francisco*, 746 F.3d 953, 968 (9th Cir. 2014); *Ezell v. City of Chicago*, 651 F.3d 684, 704 (7th Cir. 2011). Further, by forcing residents to "shelter in place" and precluding all travel except to engage in "*essential* activities" and patronize "*essential* businesses" – which clearly did *not* include any travel for purposes of acquiring firearms or ammunition – the Prior Orders untenably imposed the additional burdens of restraining residents' right to travel as necessary to exercise the panoply of rights enshrined in the Second Amendment.

**i.      The Prior Orders Are Subject to Strict Scrutiny, if Any at All.**

Infringements like this "fail constitutional muster" "[u]nder any of the standards of scrutiny the Court has applied to enumerated constitutional rights." *Heller*, 554 U.S. at 571. And, even assuming traditional scrutiny, a "law that implicates the core of the Second Amendment right and severely burdens that right"—like the orders here—"warrants strict scrutiny." *Bauer v. Becerra*, 858 F.3d 1216, 1222 (9th Cir. 2017) (quoting *United States v. Chovan*, 735 F.3d at 1138)). "To overcome such a high standard of review, the government is required to prove that the restriction 'furthers a compelling interest and is narrowly tailored to achieve that interest.'" *Wolfson v. Concannon*, 811 F.3d 1176, 1181 (9th Cir. 2016) (quoting *Citizens United v. Federal Election Commission*, 558 U.S. 310, 340 (2010)). The Court has questioned Plaintiffs' reliance on *Bateman v. Perdue*, 881 F.Supp.2d 709 (E.D.N.C. 2012) – involving government restrictions against the possession, sale, and transport of firearms during declared states of emergency – as further support for application of strict scrutiny in this context, over concerns that the *Bateman* court did not cite

19

1    *Jacobson*, "did not explain how it arrived at its conclusion," and that "its language would seem to

2    suggest that strict scrutiny applies to any firearms regulation." MPI Order at 24. But *Jacobson* is

3    not the appropriate yardstick for measuring the constitutionality of such restrictions. Further, the

4    district court in *Bateman* drew careful lines, consistent with the teachings of *Heller*, delineating

5    when strict scrutiny is appropriate as opposed to a lesser form of scrutiny: "'A severe burden on

6    the core Second Amendment right of armed self-defense should require strong justification. But

7    less severe burdens on the right, laws that merely regulate rather than restrict, and laws that do not

8    implicate the central self-defense concern of the Second Amendment, may be more easily

9    justified."' *Id.* at 715 (quoting *United States v. Chester*, 628 F.3d 673, 682 (4th Cir. 2010)).

10    While the burden in *Bateman* was certainly severe, as the government wielded the power

11    to "outright ban the possession, transportation, sale, purchase, storage or use of dangerous firearms

12    and ammunition during a declared state of emergency—even within one's home," *Bateman*, 881

13    F.Supp.2d at 715-16, the difference here is merely a matter of degree, not kind. Indeed, for all

14    those Alameda County residents who did not already have a firearm, and all in need of ammunition

15    to actually use their firearms, the effect of the Prior Orders was just as severe, since the ban

16    deprived them of any ability to even possess, transport, store, or use a firearm. The Court here

17    recognized this in observing that "[f]or someone who does not already have a functioning firearm

18    at home, the Order makes it virtually impossible to exercise the *Heller* right for as long as it is in

19    force." MPI Order at 23. Also, as in *Bateman*, the Prior Orders applied "equally to all individuals

20    and to *all classes of firearms*, not just handguns," *Bateman* at 715, which made their burdensome

21    effect even more substantial than the *handgun* ban struck down as unconstitutional in *Heller*.

22    **ii.**    **The Prior Orders Fail Intermediate Scrutiny As Well.**

23    The Court has discounted Plaintiffs' authority for the point that the government bears the

24    burden of proving less restrictive alternatives do not exist or would be inadequate even under

25    intermediate scrutiny, because they have relied on free speech cases instead of Second Amendment

26    cases. MPI Order at 27. But, as Defendants themselves have noted, the Ninth Circuit in *Jackson*, a

27    seminal Second Amendment case in this circuit, observed that "'First Amendment principles'

28    *guide* Second Amendment analyses." Def. Joint Opp. to Plaintiffs' to MPI, ECF No. 46 at 9, citing

1    *Jackson*, 746 F.3d at 960-61 (italics added). And Defendants themselves have relied heavily on

2    "both free expression and free exercise lines of cases" to argue their points on the merits of the

3    Second Amendment claim. ECF No. 46 at 13.

4        That rich body of well-developed law in the First Amendment context teaches that "[i]t is

5    not enough for the Government to show that [its chosen action] has some effect." *Ashcroft v.*

6    *ACLU*, 542 U.S. 656, 669 (2004). *Id.* Rather, the government must prove that any substantially

7    less restrictive alternatives would be less effective or ineffective. *Id.* And even if the government

8    demonstrates a sufficiently substantial interest behind the action, it must show, and the court must

9    find, "the means chosen are not substantially broader than necessary to achieve the government's

10   interest." *Ward v. Rock Against Racism*, 491 U.S. 781, 800 (1989); *Turner Broadcasting System,*

11   *Inc. v. F.C.C.*, 512 U.S. 622, 665 (1994). Further, in the *Second Amendment* context, a federal

12   district judge sitting in California applying Supreme Court and Ninth Circuit law recently

13   explained the government's burden here as follows: "'[T]he government's stated objective ...

14   [must] be significant, substantial, or important; and (2) there ... [must] be a 'reasonable fit' between

15   the challenged regulation and the asserted objective.'" *Rhode v. Becerra*, __ F.Supp.3d __, 2020

16   WL 2392655, *19 (S.D. Cal. 2020) (quoting *Silvester v. Harris*, 843 F.3d 816, 821-22 (9th Cir.

17   2016). "[E]ven under intermediate scrutiny, a court must determine whether the legislature has

18   'base[d] its conclusions upon substantial evidence.'" *Id.* (quoting *Turner* at 196). "The government

19   must carry the burden of establishing that its regulations are reasonably tailored." *Id.* This means

20   it "must establish a tight 'fit' between the registration requirements and an important or substantial

21   governmental interest, a fit 'that employs not necessarily the least restrictive means but ... a means

22   narrowly tailored to achieve the desired objective.'" *Id.* (quoting *Heller v. D.C.*, 670 F.3d 1244,

23   1258 (D.C. Cir. 2011). Were it otherwise, and the government restriction could stand on the simple

24   rationale that "*any* exception to the shelter-in-place order makes the order less effective at

25   achieving its goal," MPI Order at 28 (italics added), the result would be a slippery slope

26   jeopardizing all individual liberties without meaningful recourse. This case is not about

27   "exceptions" to otherwise valid government restrictions; it is about prohibitions to the exercise of

28   fundamental constitutional rights which never should have been erected in the first place.

1    Defendants here have made absolutely no effort to demonstrate or to even *claim* they ever

2    *considered* less restrictive alternatives, much less that any such alternatives would be ineffective

3    or inadequate to achieve the stated goals. It follows that they fail to claim, much less present, any

4    *evidence* showing this *ban* is "reasonably tailored," much less "*narrowly* tailored to achieve the

5    desired objective." The mere fact that other "other non-exempt" businesses were forced to close

6    as well under the Prior Orders, MPI Order at 19, cannot suffice. The closures at issue did not simply

7    cut off citizens' ability to engage in just any activity, like going to the movies or the arcade; they

8    deprived all county residents of *constitutional rights* enshrined in the Second Amendment. And,

9    that the orders may have *also* infringed *additional* constitutional rights certainly is no excuse or

10   justification for *this* violation; to contrary, that could only heighten the orders' untenable effect.

11   Moreover, the significant burden on the rights at stake weighs just as heavily in the calculus

12   under intermediate scrutiny. In this context, this Court has construed the burden of the Prior Orders

13   as of the "'less burdensome'" variety which "'regulated only the manner in which persons may

14   exercise their Second Amendment rights.'" MPI Order at 22 (quoting *Jackson*, 746 F.3d at 961).

15   The Court ultimately analogized the case to the general 10-day waiting period for firearm

16   purchases upheld in *Silvester*, 843 F.3d 816, since the waiting period effects a temporary delay and

17   not a permanent denial of acquisition rights, MPI Order at 22, 24. However, in making it "virtually

18   impossible to exercise the *Heller* right for as long as it is in force," as this Court observed, MTD

19   at 23, the actual effect of the preclusion was to cut off *the right itself*, not just the manner in which

20   the right could be exercised. And, as this Court has also observed, the delay here was "significantly

21   longer than the ten days upheld in *Silvester*." MPI Order at 22. The Court would go no further on

22   that point because "Plaintiffs cite no authority concerning nor provide any guidance as to how the

23   Court might determine how long a delay would constitute a severe burden on the acquisition right."

24   *Id.* at 22. However, the onus is on Defendants, not the aggrieved party, to justify the extent of the

25   deprivation as part and parcel of the government's burden to prove "'a 'fit' between the

26   legislature's ends and the means chosen to accomplish those ends' … whose scope is 'in proportion

27   to the interest served,' that employs not necessarily the least restrictive means but ... a means

28   narrowly tailored to achieve the desired objective.'" *Rhode*, 2020 WL 2392655, *19 (quoting

1  *Board of Trustees of State University of New York v. Fox*, 492 U.S. 469, 480 (1989)). Wherever

2  the proverbial line in the sand may be drawn here, a deprivation of the right that persists almost

3  *ten times longer* than the delay upheld in *Silvester* must fall on the unconstitutional side of the line.

4         Thus, Defendants cannot carry their burden even under intermediate scrutiny. Plaintiffs, on

5  the other hand, have decidedly demonstrated that their Second Amendment claim easily survives

6  the lenient standards of "facial plausibility" necessary to sustain the FAC under Rule 12(b)(6).

7  **D.     Plaintiffs' Due Process Claim Also Passes Muster Under Rule 12(b)(6) Standards.**

8         The violation of the Second Amendment already demonstrated is at the heart of the

9  substantive due process component of Count II.  *See* FAC ¶ 150 (alleging that Plaintiffs and the

10 class of individuals they represent "wish to purchase, take possession of, and practice proficiency

11 with arms, including firearms, ammunition, magazines, and appurtenances, but are precluded from

12 doing so without reasonable fear of criminal prosecution as a direct result of the unconstitutionally

13 vague, arbitrary and capricious, and overbroad laws, orders, policies, practices, customs, and

14 enforcement actions by Defendants in this case"). And that violation strongly supports the

15 substantive due process claim. *See Anderson v. Creighton*, 483 U.S. 635, 639 (1987) ("the right to

16 due process of law is quite clearly established by the Due Process Clause, and thus there is a sense

17 in which any action that violates that Clause (no matter how unclear it may be that the particular

18 action is a violation) violates a clearly established right"); *Stamas v. County of Medra*, 795

19 F.Supp.2d 1047, 1075 (E.D. Cal. 2011) ("the protection from governmental action provided by

20 substantive due process has most often been reserved for the vindication of fundamental rights").

21        The substantive due process protection bars "arbitrary, wrongful government actions

22 regardless of the fairness of the procedures used to implement them." *Zinermon v. Burch*, 494 U.S.

23 113, 125 (1990) (internal quotations omitted). Government actions are "arbitrary" for substantive

24 due process purposes when they are "conscience shocking, *in a constitutional sense*." *Sanchez v.*

25 *City of Fresno*, 914 F.Supp.2d 1079, 1099 (E.D. Cal. 2012) (quoting *Collins v. City of Harker*

26 *Heights*, 503 U.S. 115, 128 (1992)). Ultimately, the protection concerns "governmental conduct

27 that violates the 'decencies of civilized conduct[,]' [citations], interferes with rights 'implicit in the

28 concept of ordered liberty[,]' [citations], and is so 'brutal' and 'offensive' that it [does] not comport

1  with traditional ideas of fair play and decency[.]"' *Ms. L. v. U.S. Immigration and Customs*
2  *Enforcement*, 302 F.Supp.3d 1149, 1166 (S.D. Cal. 2018) (internal citations omitted).

3       Given the clear violation of the Second Amendment, which persisted more than three
4  months, and cut off residents' only means to lawfully acquire firearms and ammunition in the
5  exercise of their fundamental rights to keep, bear, use, possess, and carry firearms for self-defense
6  in the home, in case of confrontation, and for other lawful purposes, Plaintiffs have more than
7  sufficiently alleged that the Prior Orders contravened the most basic concepts of ordered liberty,
8  fair play, and decency so as to be "arbitrary" in a *constitutional* sense. Thus, Plaintiffs' substantive
9  due process claim survives the lenient pleading standards as well.

10      This constitutional arbitrariness also supports Plaintiffs' void-for-vagueness claim. "The
11  void-for-vagueness doctrine prohibits the government from imposing sanctions 'under a criminal
12  law so vague that it fails to give ordinary people fair notice of the conduct it punishes, *or* so
13  standardless that it invites arbitrary enforcement."' *Welch v. U.S.*, __ U.S. __, 136 S.Ct. 1257, 1262
14  (2016) (quoting *Johnson v. U.S.*, __ U.S. __, 135 S.Ct. 2551, 2556 (2015)) (italics added). "An
15  unconstitutionally vague law invites arbitrary enforcement in this sense if it 'leaves judges and
16  jurors free to decide, without any legally fixed standards, what is prohibited and what is not in each
17  particular case,' [citation], or permits them to prescribe the sentences or sentencing range
18  available." *Beckles v. U.S.*, 137 S.Ct. 886, 894-95 (2017). Again, the Prior Orders, and all future
19  orders Defendants will issue as public health directives, are not any sort of *legislative* act, but
20  instead consist of executive proclamations issued without any prior input from or notice to the
21  affected citizens. All the power rests essentially unchecked with the Public Health Officer, who
22  defines the nature and scope of all the restrictions, chooses all the relevant decision-making factors
23  as to what is and is not "essential," determines how each factor is applied, and decides when and
24  how the restrictions will be implemented. And all of it comes with the force of criminal law, as
25  any violation "constitutes an imminent threat and menace to public health, constitutes a public
26  nuisance, and is punishable by fine, imprisonment, or both." *See e.g.*, RJN, Ex. E, § 9. Surely, such
27  broad and essentially unbridled power being vested with a single public official, ultimately
28  accountable only to standards, definitions, and classifications as she herself declares them to be,

1    "permit[s] and encourage[s] arbitrary and erratic arrests and convictions with too much discretion

2    committed to law enforcement," and thus makes for a *plausible* claim of a due process violation,

3    as Plaintiff have alleged in support of their due process claim. FAC ¶ 153. That is enough to satisfy

4    the standards of Rule 12(b)(6) and allow the claim to proceed.

5    **E.      This Court Retains the Power to Grant Meaningful, Effective, and Necessary Relief.**

6           In addition to their claim for nominal damages that preserves this Court's jurisdiction to

7    grant relief for the constitutional injuries already inflicted, Plaintiffs' claim for declaratory remains

8    redressable notwithstanding that the Prior Orders at issue are no longer in effect. "'In the context

9    of declaratory relief, a plaintiff demonstrates redressability if the court's statement would require

10   the defendant to act in any way that would redress past injuries or prevent future harm.'" *Microsoft*

11   *Corporation v. United States Dept. of Justice*, 233 F.Supp.3d 887, 903 (W.D. Wash. 2017) (quoting

12   *Viet. Veterans of Am. v. C.I.A.*, 288 F.R.D. 192, 205 (N.D. Cal. 2012)). "A plaintiff is entitled to a

13   presumption of redressability where he 'seeks declaratory relief against the type of government

14   action that indisputably caused him injury.'" *Id.* (quoting *Mayfield v. United States*, 599 F.3d 964,

15   971 (9th Cir. 2010)). Here, given the clear existence of past injury and the "reasonable expectation"

16   – indeed true likelihood – that Defendants will reimpose similar orders as COVID-19 continues to

17   pose the same risks they insist necessitated such orders in the first instance, the declaratory relief

18   Plaintiffs seek would both redress past injury and prevent future harm. Thus, contrary to

19   Defendants' claim, Plaintiffs *do* retain "a legally cognizable interest in the outcome of the litigation

20   against the County Defendants," and there *are* "justiciable issues left to be decided." MTD at 8.

21

22                                   **V.      CONCLUSION**

23          For the foregoing reasons, Defendants' motion to dismiss must be denied.

24   Dated: July 15, 2020                    **THE DIGUISEPPE LAW FIRM, P.C.**

25                                            */s/ Raymond M. DiGuiseppe*
                                             Raymond M. DiGuiseppe
26                                           Attorney for Plaintiffs

27

28